| | | |
|---|---|---|
| Tommy's Castaic, LLC, | ) | |
| Tommy's California Ventura, LLC, | ) | |
| Larsons Marine | ) | |
| d/b/a Tommy's Stockton, | ) | |
| Larsons Marine | ) | |
| d/b/a Tommy's Sacramento, | ) | |
| High Country Watersports, LLC | ) | |
| d/b/a Tommy's Colorado, | ) | |
| MKB Florida Holdings, LLC | ) | |
| d/b/a Tommy's Florida, | ) | |
| Tommy's Phoenix, LLC, | ) | |
| Tommy's Las Vegas, LLC, | ) | |
| Tommy's Knoxville, LLC, | ) | |
| Walloon Lake Village Marina, LLC | ) | |
| d/b/a Tommy's Michigan, | ) | Case No.: |
| Tommy's Chattanooga, LLC, | ) | |
| Tommy's Fort Worth, LLC, | ) | |
| Tommy's Lewisville, LLC, | ) | |
| Tommy's Detroit, LLC, | ) | |
| Tommy's Grand Rapids, LLC, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| vs. | ) | |
| | ) | |
| Malibu Boats, Inc., and | ) | |
| Malibu Boats, LLC, | ) | |
| | ) | |
| *Defendants.* | ) | |

## <u>VERIFIED COMPLAINT</u>

Plaintiffs file this complaint against Defendants Malibu Boats, Inc. and Malibu Boats, LLC

("Malibu") and state as follows:

## SUMMARY OF ACTION

1.    This is an action to hold Malibu accountable for the intentional and fraudulent

scheme on the part of its CEO, Jack Springer, to artificially inflate the stock value and market

1

share of Malibu, a publicly traded company and which resulted in significant damage to Tommy's, one of Malibu's largest boat dealership networks. Malibu, a manufacturer of recreational powerboats, engaged in an elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen (15) Tommy's dealerships (collectively, "Tommy's") in order to artificially inflate Malibu's sales performance, artificially claim increased market share in the industry and artificially inflate its stock value during an obvious and known downturn in the recreational power boat industry. Beginning in late 2022, Malibu began suggesting (which subsequently turned into demand and inducement) that Tommy's increase its existing floor plan credit facility from $50 million to $160 million in order to make room for "25 weeks of inventory at the turn of the next model year" and to regain market share during 2023-2024 model years. With 2022 incentives earned and unpaid, Malibu dangled incentives for 2023 and 2024 and stood firm on its own alleged market analysis in causing Tommy's to increase its floor plan facility. Ultimately, Tommy's (in reliance on Malibu's representations and promises) first increased its floor plan from $50 million to $85 million and then to $110 million with a $20 million over limit in order to satisfy what was nothing more than Springer's/Malibu's goal of artificially inflating Malibu's numbers by dumping inventory on Tommy's. Immediately upon Tommy's increasing its floor plan capacity (at a time when Tommy's was only approximately $30 million into the $50 million facility), Malibu began pumping an unreasonable inventory into Tommy's, and it did so with a model mix of boats that heavily skewed toward the highest priced, highest margin, slow moving Malibu boats versus the more modestly priced, lower margin and faster moving Axis boats that Tommy's requested. After getting everything it demanded from Tommy's and reporting outstanding sales performance and increased market share during a drastic downturn in the industry, Malibu refused to pay millions of dollars

2

in incentives earned, forced Tommy's into default with its floor plan lender and ultimately claimed to have terminated all of Tommy's dealerships on March 22, 2024. Worst of all, Malibu waited until just prior to the peak sales season to terminate Tommy's dealerships with zero regard for Tommy's customers, hundreds of employees across the country and numerous vendors who rely upon Tommy's (i.e. not to mention with approx. $110 million worth of boats in inventory across the country which Tommy's needs manufacturer support in order to sell in a commercially reasonable retail manner). Malibu's actions were nothing short of punitive. As a result of Malibu's scheme, Tommy's has been damaged. This scheme was disclosed to Tommy's directly by three (3) significant Malibu stakeholders. "Jack refused to turn off the spigot" and intended to "pump" Tommy's full of inventory for the sales and market share.

2.     Two of Tommy's Texas dealerships have Dealership Agreements with terms ending June 30, 2025. Malibu pretextually claims to have terminated those Dealership Agreements while being in material breach itself.

3.     Tommy's has been a dealer for Malibu for 12 years and continues to operate as a dealer for Malibu to this day. The majority of Tommy's dealerships across the country (i.e. with the exception of two in Texas) enter into annual Dealership Agreements (i.e. the term of which is one year—from July 1 to the following June 30). Historically, the Dealership Agreements have always lapsed/expired by their terms, with Tommy's and Malibu executing new agreements in the fall after the boating season concludes. This course of performance and course of dealing continued with the parties' respective Dealership Agreements for the 2022-2023 year.

4.     Malibu claims to have terminated its relationships with Tommy's, at least in part, because of Tommy's default with its floor plan lender, M&T Bank, and its lack of floor plan capacity. To the contrary, Tommy's floor plan facility was adequate to run very profitable

3

dealerships had Malibu not utilized Tommy's floor plan to pump Tommy's full of the highest priced, highest margin and slow-moving Malibu boats for the sole purpose of artificially inflating Malibu's sales numbers and market share for 2023. Further, any purported issues Tommy's had with M&T Bank were caused by Malibu's own breach of the Dealership Agreements and bad faith/unfair dealing (i.e. in addition to the conduct above, Malibu reneged on its representation that it would provide M&T with a repurchase agreement which is customary in the industry, and has been the practice with all Tommy's prior lenders). Malibu is responsible for the issues Tommy's is now having with M&T and upon which Malibu attempts to rely in order to terminate the Dealership Agreements.

5.     Tommy's is entitled to significant money damages, including direct, indirect, consequential, and punitive damages because of Malibu's breaches of contract and wrongful conduct.

## PARTIES, JURISDICTION AND VENUE

6.     Plaintiff **Tommy's Castaic, LLC** is a Michigan limited liability company. Matthew Allen Borisch is the sole member of Tommy's Castaic, LLC.

7.     Plaintiff **Tommy's California Ventura, LLC** is a Michigan limited liability company. Matthew Allen Borisch is the sole member of Tommy's California Ventura, LLC.

8.     Plaintiff **High Country Watersports, LLC**, d/b/a Tommy's Colorado, is a Colorado limited liability company. Matthew Allen Borisch Trust is the sole member of High Country Watersports, LLC.

9.     Plaintiff **Larson Marine d/b/a Tommy's Stockton** is a Michigan limited liability company. Matthew Allen Borisch is the sole member of Larson Marine.

10.     Plaintiff **MKB Florida Holdings, LLC**, d/b/a Tommy's Florida, is a Michigan limited liability company. Matthew Allen Borisch Trust and Kara Ann Borisch Trust are members of MKB Florida Holdings, LLC.

11.     Plaintiff **Tommy's Phoenix, LLC** is a Michigan limited liability company. Matthew Allen Borisch is the sole member of Tommy's Phoenix, LLC.

12.     Plaintiff **Tommy's Las Vegas, LLC** is a Michigan limited liability company that maintains its principal place of business in Grand Rapids, MI. Matthew Allen Borisch is the sole member of Tommy's Las Vegas, LLC.

13.     Plaintiff **Tommy's Knoxville, LLC** is a Michigan limited liability company that maintains its principal place of business in Grand Rapids, MI. Matthew Allen Borisch is the sole member of Tommy's Knoxville, LLC.

14.     Plaintiff **Walloon Lake Village Marina, LLC**, d/b/a Tommy's Michigan, is a Michigan limited liability company. Matthew Allen Borisch Trust is the sole member of Walloon Lake Village Marina, LLC.

15.     Plaintiff **Larson Marine d/b/a Tommy's Sacramento**, is a Michigan limited liability company. Matthew Allen Borisch is the sole member of Larson Marine.

16.     Plaintiff **Tommy's Chattanooga, LLC** is a Michigan limited liability company. Matthew Allen Borisch is the sole member of Tommy's Chattanooga, LLC.

17.     Plaintiff **Tommy's Fort Worth, LLC** is a Michigan limited liability company. Matthew Allen Borisch is the sole member of Tommy's Fort Worth, LLC.

18.     Plaintiff **Tommy's Lewisville, LLC** is a Michigan limited liability company. Matthew Allen Borisch is the sole member of Tommy's Lewisville, LLC.

19.     Plaintiff **Tommy's Detroit, LLC** is a Michigan limited liability company. Tommy's Holding Company LLC is the sole member of Tommy's Detroit LLC. Matthew Allen Borisch is the sole member of Tommy's Holding Company LLC.

20.     Plaintiff **Tommy's Grand Rapids, LLC** is a Michigan limited liability company. Matthew A. Borisch Trust is the sole member of Tommy's Grand Rapids, MI.

21.     Matthew Allen Borisch is a Michigan resident.

22.     Matthew Allen Borisch is the trustee of the Matthew Allen Borisch Trust.

23.     Kara Ann Borisch is a Michigan resident.

24.     Kara Ann Borisch is the trustee of the Kara Ann Borisch Trust.

25.     Tommy's Holding Company LLC is a Michigan limited liability company that maintains its principal place of business in Grand Rapids, MI.

26.     Defendant **Malibu Boats, LLC** is a Delaware limited liability company with its principal place of business in Loudon, TN. Malibu Boats, LLC's members are as follows:

      a.     Malibu Boats, Inc., a Delaware C-Corp trading on the NASDAQ under the ticket MBUU, with its principal place of business located in Tennessee, owns 97.205%;

      b.     Horizon Holdings, LLC, a California limited liability company with its principal place of business located in California, which is owned by two members—Philip S. Estes and James M. Shoring, both of whom are residents of and are domiciled in California—owns 2.139%;

      c.     Dan Gasper, who is a resident of and is domiciled in California, owns 0.253%;

      d.     Mark Lanigan, who is a resident of and is domiciled in Utah, owns 0.117%;

6

e.     Malibu Holdings L.P., an Ohio limited partnership, is wholly owned by Horizon Holdings, LLC—which, with the residency pled in (b) above, makes it a resident of California—owns 0.091%;

f.     Michael Hooks, who is a resident of and is domiciled in California, owns 0.058%;

g.     Scott Davenport, who is a resident of and is domiciled in Texas, owns 0.047%;

h.     Brad Ditchfield, who is a resident of and is domiciled in Tennessee, owns 0.038%;

i.     Jack Springer, who is a resident of and is domiciled in Texas, and who is Malibu's current CEO, owns 0.023%;

j.     Wayne Wilson, who is a resident of and is domiciled in Tennessee, and who was Malibu's current CFO, owns 0.017%; and

k.     Ritchie Anderson, who is a resident of and is domiciled in Tennessee, owns 0.011%.

27.     Defendant **Malibu Boats, Inc.** is a Delaware corporation that was incorporated in Delaware and has its principal place of business in Tennessee.

28.     Complete diversity exists between Plaintiffs and Malibu because they are citizens of different states.

29.     This court has subject matter jurisdiction over this action under 28 U.S.C. §1332. There is complete diversity between the parties, and the amount in controversy exceeds $75,000, exclusive of interest, costs and attorneys' fees, and Plaintiffs seek equitable relief.

7

30.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Malibu is subject to this Court's personal jurisdiction by virtue of its regular and systemic conduct of business in this District. Also, the parties consented to litigate disputes related to the Dealership Agreements in this venue.

## COMMON ALLEGATIONS

31.     Tommy's is the largest national dealer for Malibu boats in the recreational power boat space.

32.     Tommy's has 15 dealerships across the country and accounts for 33% of Malibu power boat sales.

33.     Malibu entered into Dealership Agreements with each of Tommy's dealerships. Copies of the most recent Dealership Agreements between each of the Tommy's dealers and Malibu are in the custody, control and/or possession of Malibu.

34.     The term of these Dealership Agreements, with the exception of those in Texas, ran from July 1 to June 30.

35.     All of the Dealership Agreements specifically provide that Malibu will provide each dealer with a new agreement, or otherwise provide notice of non-renewal or termination of the previous agreement, reasonably in advance of the existing agreement's expiration.

### Malibu's Business Model

36.     Malibu touts itself as a leading designer, manufacturer, and marketer of a diverse range of recreational power boats, including performance boats, under the brands of Malibu and Axis.

8

37.     The Malibu brand purports to include the latest innovations in performance, comfort and convenience, and retails for between $80,000 and $300,000 per boat. The Axis brand purports to provide a more affordably priced, entry-level performance boat which retails between $80,000 and $175,000 per boat.

38.     Malibu boasts that it maintains the number one market share position in the United States in the performance sport boat category through its Malibu and Axis brands.

39.     The majority of Malibu's sales are made pursuant to floor plan financing programs in which Malibu participates on behalf of its dealers through a contingent repurchase agreement with the dealership's lender.

40.     Under such an arrangement, a dealer essentially establishes a line of credit with a lender for the purchase of dealer boat inventory from Malibu.

41.     When a dealer purchases and takes delivery of a boat pursuant to a floor plan financing arrangement, it draws against its line of credit and its lender pays the invoice cost of the boat directly to Malibu. This amounts to a sale for Malibu ("Sale").

42.     Tommy's began its relationship with Malibu 12 years ago.

43.     For the first 11 years, it was a true partnership with countless examples of Tommy's doing anything and everything asked of it to help Malibu protect and grow its market share through the good times, and the bad, in the industry, but the first 11 years was based on good faith and fair dealing between the parties.

44.     By 2023, Sales to Tommy's represented approximately 10.7% of Malibu's consolidated net sales for its fiscal year ending June 30, 2023.

9

45.     During the COVID-19 pandemic, domestic retail demand for recreational powerboats increased to the highest levels seen by the industry in decades, as customers turned to boating as a form of outdoor socially distanced recreation.

46.     Retail registration activity in the recreational powerboat market, however, began declining in the second half of the calendar year 2021 because of limited available inventory due to the strong sales activity during the pandemic and supply chain disruptions that began impacting production levels.

47.     During calendar year 2022, retail registration activity continued to decline at a lower year over year rate than the second half of counter year 2021, and by 2023 the industry demand was 50% of what it was in 2023.

48.     Malibu has a large fixed cost base that affects its profitability when manufacturing is limited.

49.     Malibu's profitability (i.e. its stock price) depends in large part on its ability to spread its fixed costs over a sufficiently large number of products manufactured and sold, and if Malibu makes a decision to reduce production, then its gross profit margins are negatively affected.

50.     Consequently, decreased demand, or need to reduce production, directly affects Malibu's ability to absorb fixed costs and materially impacts its financial condition (i.e. its stock price).

51.     Malibu acknowledges that the majority of its dealers have floor plan financing arrangements with lenders in order for the dealer to purchase Malibu boats.

52.     Those arrangements indirectly provide liquidity to Malibu by immediately financing dealer purchases of Malibu's products, thereby minimizing the use of Malibu's working capital in the form of accounts receivable.

10

53.     The majority of Malibu Sales are financed under similar arrangements pursuant to which Malibu receives payment for the Sale within a few days of shipping a boat to a dealer.

54.     Malibu represents that it provides its dealer's floor plan lender with a repurchase agreement to support the loan facility (and the dealer) whereby Malibu agrees to repurchase products repossessed by a dealer's floor plan lender if a dealer defaults on its debt obligations to the lender, and the boat is returned to Malibu, subject to certain limitations.

55.     A repurchase agreement for boats in connection with a floor plan financing arrangement is customary in the industry.

56.     And like the majority of Malibu's dealerships, Tommy's has such a floor plan financing arrangement that historically included a repurchase agreement for boats provided by Malibu to Tommy's.

57.     Tommy's has its floor plan financing with M&T Bank.

58.     Upon information and belief, Malibu and M&T representatives discussed a repurchase agreement at or about the time that Tommy's was moving its floor plan loan facility from 5/3 Bank to M&T Bank.

**Malibu's Scheme**

59.     In 2023, with national sales forecasted to be approximately 50% of 2022 sales, Springer and Malibu contrived a scheme to artificially boost Malibu's Sales and profitability by shifting the anticipated loss onto the backs of its dealers, including Tommy's dealerships.

60.     In late 2022, Malibu first began a campaign designed to coerce Tommy's to increase its available floor plan financing from $50 million to $160 million. Malibu did so by representing to Tommy's that it should have 25 weeks of inventory in stock at the turn of the model year based on Malibu's market analysis.

11

61.     At the time, Tommy's was only into its floor plan approximately $30 million, leaving $20 million of purchasing and financing capacity.

62.     As part of its Dealership Agreements with Malibu, Tommy's was entitled to earn incentives related to sales of Malibu products. The incentives include interest reimbursement, rebates and discounts.

63.     In the 2022 fiscal year, Tommy's had earned significant incentives for which Tommy's has demanded payment, but payment has been refused. Instead of meeting its obligation to pay these incentives to Tommy's, Malibu withheld these incentives and used promises of additional incentives to be earned as additional financial pressure on Tommy's to increase its floor plan financing capacity.

64.     Facing severe financial pressure, Tommy's ultimately succumbed to Malibu's campaign and increased its existing floor plan capacity from $50 million to $85 million with Fifth Third Bank and then to $110 million with a $20 million overlimit with M&T Bank.

65.     Malibu represented publicly and to Tommy's lender, M&T Bank, that Malibu would support the increased floor plan with a repurchase agreement which would have protected both M&T and Tommy's in the event Tommy's defaulted on its loan obligations: Malibu would repurchase Tommy's inventory, just as Malibu had done for the benefit of Tommy's and Fifth Third Bank (and all prior lenders) on Tommy's previous floor plan facilities.  A repurchase agreement (which results in virtually no adverse financial impact to Malibu) also protects Malibu's ability to control its boats in the market.

66.      However, despite a repurchase agreement to protect a floor plan lender being customary in the industry, Malibu ultimately reneged on its promise to execute a repurchase

12

agreement for the benefit of M&T Bank and Tommy's. To date, Malibu has yet to execute a repurchase agreement with M&T Bank and Tommy's.

67. Malibu has always provided Tommy's floor plan lender with a repurchase agreement over the past eleven years.

68. Having induced Tommy's to expand its floor plan capacity to $130 million, Malibu immediately began to pump its inventory onto Tommy's without consideration of Tommy's requests for a model mix Tommy's could actually sell (i.e., the requested model mix of 65/35 Malibu/Axis that was consistent with Malibu policy).

69. Moreover, the inventory that Malibu forced upon Tommy's was the highest priced, highest margin Malibu brand boats which benefits only Malibu, not Tommy's. It was the Axis brand boats that Tommy's needed and Malibu refused to deliver.

70. The Malibu brand boats have higher margins for Malibu. They also tie up substantially more of Tommy's floor plan and cost Tommy's substantially more in interest to carry due to the slow pace at which they are sold. In other words, Malibu's pumping Tommy's full of Malibu brand boats made it impossible for Tommy's to hit sales targets and buried Tommy's in interest which Malibu promised to pay as an incentive to take delivery of the next model year early. Malibu reneged on its promise to reimburse Tommy's for the carry interest.

71. In early February 2024, neither Tommy's, nor Malibu believed that the Dealership Agreements were expired or terminated. Rather, Malibu continued to treat Tommy's like a dealer under the same terms and conditions as set forth in the Dealership Agreements.

72. Historically, notwithstanding the expiration of the majority of Dealership Agreements on June 30, 2023, Malibu continued to treat Tommy's dealerships as active

dealerships. For example, the parties customarily renewed the Dealership Agreements several months after the original Dealership Agreements expired. During that interim period, the parties continued to conduct themselves as if it the Dealership Agreements were still in place (i.e. Tommy's would order and sell boats from Malibu, represent Malibu at boat shows, etc.)

73.     This 11-year course of dealing continued into early 2024. In February of 2024, Tommy's represented Malibu at the boat show in Miami, Florida at Malibu's request.

74.     While at the Miami boat show, Matthew Borisch, principal for all Tommy's dealerships, was pulled aside by three (3) Malibu stakeholders to discuss Tommy's Dealership Agreements with Malibu.

75.     The stakeholders disclosed to Mr. Borisch their understanding of what Malibu and its former CEO, Jack Springer, had done to Tommy's (i.e. "intentionally pumping Tommy's full of inventory" in order to artificially inflate Malibu sales and market share when "most manufacturers are 70% too heavy on inventory and he knows that.")

76.     They also reported that "Jack would not turn the spigot off" (i.e. meaning he would not cut back on manufacturing) despite what the market was showing.

77.     They reported that Wayne, the former CFO, left on "bad terms" and they were "nervous."

78.     They also asked Tommy's to "hold on" as "Jack is not going to last."

79.     The very next week, Malibu announced that Springer would be "stepping down" as CEO and Michael Hooks, current Board Chair, would be stepping in as the interim CEO.

80.     Notwithstanding its knowledge of Mr. Springer's conduct, Malibu represented to the public that "[w]hile retail activity at our dealers trended lower during fiscal year 2023, given

14

low inventory levels at the beginning of the fiscal year, we continued to experience strong wholesale demand throughout the first three quarters of fiscal year 2023."

81. The only "demand" that was present was Malibu's demand that Tommy's get to 25 weeks of inventory (despite the lack of customer demand) and that Tommy's accept the model mix of boats heavily skewed toward the Malibu brand (as opposed to the Axis brand that Tommy's had ordered and Malibu agreed to deliver).

**After intentionally over-producing boats and pumping excess inventory onto Tommy's, Malibu purports to terminate its business relationship with Tommy's.**

82. On Wednesday March 20, 2024, Mr. Borisch met with Malibu's Chairman/Interim CEO, Michael Hooks, and had a very productive, positive meeting about the future of the 12-year business relationship between Tommy's and Malibu. Mr. Borisch left the meeting believing the relationship would now be going back to how it had been for the prior 11 years.

83. Two days later, on Friday March 22, 2024, Tommy's received a letter from Malibu purporting to terminate Malibu's business relationship with all of Tommy's dealerships.

84. For reasons unknown, outgoing CEO, Mr. Springer, signed the notice of termination rather than Mr. Hooks.

85. In light of the positive meeting that took place with Mr. Hooks just two days prior, Mr. Borisch called Mr. Hooks to confirm that the letter signed by Mr. Springer was in fact the final word from Malibu and that Mr. Hooks endorsed Mr. Springer's decision.

86. Mr. Hooks confirmed that he, in fact, endorsed Mr. Springer's decision and that it was the final word from Malibu.

87.     Despite the negative forecast for boat sales in 2023 and a general sales decline in the industry, Malibu boasted positive sales performance and increased market share during that same time period.

88.     Malibu was able to do so because of its scheme to "keep the spigot on" and achieve Sales by dumping its excess inventory into Tommy's (without a repurchase agreement in place) after demanding that Tommy's increase its floor plan capacity. By forcing the excess supply onto Tommy's without worry of repurchase obligations, Malibu was able to represent to the public that it had achieved Sales and increased its market share above and beyond its competitors in the industry. Malibu was consequently able to manipulate investors into believing that Malibu outperformed the industry, and its stock was unaffected by an industry-wide decline.

89.     Upon information and belief, subsequent to terminating its business relationship with Tommy's, Malibu has also wasted no time in negotiating with competing dealers to take over Tommy's sales territories.

90.     At the time Malibu purported to terminate its business relationship with Tommy's, Malibu owed incentives to Tommy's related to the sale of Malibu products for model years 2022-2024. Those amounts have not been paid to date and thus, Malibu was in material breach of its contracts with Tommy's when it purported to terminate Tommy's.

91.     Malibu's abrupt purported termination of its business relationship with Tommy's causes severe disruption to the supply of products to Tommy's and destroys the parties' ability to cooperate in the outstanding sales of Malibu boats to Tommy's customers. This disruption is catastrophic to Tommy's, its relationship with its customers, and its goodwill and reputation in the powerboat industry.

16

92. April begins the busiest three-month season of the year in the boating industry, and the industry standard is for boat manufacturers to have agreements in place with dealerships to sell their products during this entire cycle to maximize sales. When Malibu purported to terminate its relationship with Tommy's just prior to the start of the peak boat sales season, they left Tommy's with no alternative boat suppliers and the inability to locate a replacement supplier until the peak sales season ends. In other words, Malibu's scheme worked like a charm. Malibu was able to dupe the market and destroy its largest potential competitor (from a dealership standpoint) in the process and with zero regard for the customers, employees and vendors who rely upon Tommy's dealerships.

## COUNT I – BREACH OF CONTRACT
### (Tommy's Lewisville and Tommy's Fort Worth against Malibu)

93. Plaintiffs incorporate by reference its allegations in the foregoing paragraphs as though fully restated herein.

94. Tommy's Lewisville has a written Dealership Agreement with Malibu that runs from July 1, 2022, through June 30, 2025.

95. Tommy's Fort Worth has a written Dealership Agreement with Malibu that runs from July 1, 2022, through June 30, 2025.

96. Tommy's has, in all material respects, complied with and substantially performed the terms and provisions of the Dealership Agreements.

97. Malibu has materially breached the Dealership Agreements by, among other things, pretextually terminating the Dealership Agreements, holding conversations with other boat dealerships to take Tommy's territories under the Dealership Agreements, fraudulently inducing

the conditions under which Malibu purports to terminate the Dealership Agreements, and failing to pay amounts owed for the incentives and rebates earned by Tommy's dealerships in 2022-2024.

98.     Malibu's fraudulent inducement of the conditions under which Malibu purports to terminate the Dealership Agreements constitutes a breach of the duty of good faith and fair dealing it owes Tommy's under the Dealership Agreements.

99.     As a direct and proximate result of Malibu's breaches of the Dealership Agreements, Tommy's has suffered, and continues to suffer, damages and injury to its businesses, including but not limited to, (1) increasing it floorplan financing agreement with M&T bank, (2) taking delivery of the high-end Malibu brand boats, (3) investing and representing Malibu at the February 2024 boat show, (4) losing its exclusive sales territory, (5) breaching sales agreements with its customers for sales of Malibu boats already entered, and (6) losing profits on the inventory of Malibu boats Tommy's expected to sell during the Dealership Agreement period, and (7) substantial incidental and consequential damages such as the loss of Tommy's business value and goodwill.  The amount of such damages shall be proven at trial.  In addition, Malibu has acted fraudulently and egregiously to such a degree that Tommy's is entitled to an award of punitive damages.

## COUNT II - BREACH OF CONTRACT
## (All Plaintiffs (except Tommy's Lewisville and Tommy's Forth Worth) against Malibu)

100.    Plaintiffs incorporate by reference its allegations in the foregoing paragraphs as though fully restated herein.

101.    Tommy's had written Dealership Agreements with Malibu that ran from July 1, 2022, through June 30, 2023.

18

102.    Though the Dealership Agreements term had run, Tommy's and Malibu continued to act as though the Dealership Agreements were still effective.

103.    For the preceding decade, Tommy's and Malibu continued to abide by the terms of their previously expired Dealership Agreements until the new Dealership Agreements were signed.

104.    As such, neither Tommy's nor Malibu believed that the Dealership Agreements were expired or terminated.

105.    Tommy's has, in all material respects, complied with and substantially performed the terms and provisions of the Dealership Agreements.

106.    Malibu has materially breached the Dealership Agreements by, among other things, failing to provide Tommy's with a new dealership agreement or notice of non-renewal or termination within a reasonable time before the expiration of the Dealership Agreements, pretextually terminating the Dealership Agreements, holding conversations with other boat dealerships to take Tommy's territories under the Dealership Agreements, fraudulently inducing the conditions under which Malibu purports to terminate the Dealership Agreements, and refusing to pay amounts owed for the incentives (i.e. interest reimbursement, discounts and rebates) earned by Tommy's dealerships for in 2022-2024.

107.    Malibu's fraudulent inducement of the conditions under which Malibu purports to terminate the Dealership Agreements constitutes a breach of the duty of good faith and fair dealing it owes Tommy's under the Dealership Agreements.

108.    As a direct and proximate result of Malibu's breaches of the Dealership Agreements, Tommy's has suffered, and continues to suffer, damages and injury to its businesses,

19

including but not limited to, (1) increasing it floorplan financing agreement with M&T bank, (2) taking delivery of the high-end Malibu brand boats, (3) investment made in numerous boat shows representing Malibu for the upcoming season, (4) losing its exclusive sales territory for Malibu boats, (5) breaching sales agreements with its customers for sales of Malibu boats already entered, (6) losing profits on the inventory of Malibu boats Tommy's expected to sell during the Dealership Agreement period, and (7) substantial incidental and consequential damages such as Tommy's loss of business value and goodwill. The amount of such damages shall be proven at trial.

109.     In addition, Malibu has acted fraudulently and egregiously to such a degree that Tommy's is entitled to an award of punitive damages.

## COUNT III – BREACH OF CONTRACT
### (Plaintiffs against Malibu)

110.     Tommy's incorporates by reference its allegations in the foregoing paragraphs as though fully restated herein.

111.     Tommy's had written Dealership Agreements with Malibu that ran from July 1, 2022, through June 30, 2023.

112.     The Dealership Agreements are binding contracts between Tommy's dealerships, respectively on the one hand, and Malibu, on the other hand.

113.     Malibu has materially breached its obligations under the parties' contracts by failing to pay amounts owed for the incentives earned by Tommy's in 2022-2024.

114.     As a direct and proximate result of Malibu's breaches of the Dealership Agreements, Tommy's has suffered, and continues to suffer money damages in the amount to be determined at trial.

20

115.     In addition, Malibu has acted fraudulently and egregiously to such a degree that Tommy's is entitled to an award of punitive damages.

**COUNT IV – QUANTUM MERUIT (IN THE ALTERNATIVE TO COUNT II)**
**(All Plaintiffs (except Tommy's Lewisville and Tommy's Forth Worth) against Malibu)**

116.     Tommy's incorporates by reference its allegations in the foregoing paragraphs as though fully restated herein.

117.     If the Court finds that there is not an existing contract between the parties, Tommy's rendered measurable services to Malibu by increasing its floor plan lending capabilities, taking on more inventory of high-end Malibu boats that cannot easily be sold for profit, and operating its business with Malibu as though Dealership Agreements were in place, as the parties had done for over a decade.

118.     Malibu knowingly induced Tommy's actions and received the benefit of Tommy's increased ability to receive shipment of Malibu's inventory, making Malibu's sales numbers look better than they truly were.

119.     Malibu knew, or should have known, that Tommy's reasonably expected to be compensated for these activities by executing new Dealership Agreements and repurchase agreements with Malibu, as Malibu had previously represented to Tommy's that it would do.

120.     Moreover, Tommy's earned incentives (i.e. interest reimbursement, discounts and rebates) under the 2022-2024 model year Malibu Dealership Performance Program which Malibu created and offered to its dealers, but yet refuses to pay Tommy's those incentives.

21

121.     Despite knowledge of all these expected benefits, Malibu never executed Dealership Agreements or repurchase agreements with Tommy's and has not paid Tommy's its incentives (i.e. interest reimbursement, discounts and rebates) for 2022-2024.

122.     To the extent the contracts at issue are found invalid or unenforceable, Tommy's is entitled to receive new Dealership Agreements, repurchase agreements, and the agreed-to dealer incentives for 2022-2024.

### COUNT V – UNJUST ENRICHMENT (IN THE ALTERNATIVE TO COUNT II) <br> (All Plaintiffs (except Tommy's Lewisville and Tommy's Forth Worth) against Malibu)

123.     Tommy's incorporates by reference its allegations in the foregoing paragraphs as though fully restated herein.

124.     If the Court finds that there is not an existing contract between the parties, Malibu received a material benefit from Tommy's for which Tommy's is entitled to recover.

125.     In reliance upon Malibu's promises of incentives to Tommy's, new Dealership Agreements with Tommy's dealerships, and repurchase agreements with Tommy's lender, Tommy's provided valuable services to Malibu's benefit by attending boat shows on its behalf, increasing its floor plan debt to receive more Malibu boats, and agreeing to take more high-end boats into its inventory to its own detriment.

126.     Malibu knew that Tommy's expected compensation for these acts, as many conversations between the parties show that Tommy's expected to receive its 2022-2024 incentives (i.e. interest reimbursement, discounts and rebates) and to receive new Dealership Agreements and repurchase agreements with its lender, as Malibu had promised.

127.    To the extent the contracts at issue are found invalid or unenforceable, Tommy's is entitled to receive new Dealership Agreements, a repurchase agreement between Malibu and Tommy's lender and the agreed-to dealer incentives (i.e. interest reimbursement, discounts and rebates) for 2022-2024.

### COUNT VI – PROMISSORY ESTOPPEL (IN THE ALTERNATIVE TO COUNT II) (All Plaintiffs (except Tommy's Lewisville and Tommy's Forth Worth) against Malibu)

128.    Tommy's incorporates by reference its allegations in the foregoing paragraphs as though fully restated herein.

129.    In connection with Tommy's increasing its floor plan capacity, Malibu promised that it would support Tommy's, and would enter into a repurchase agreement with Tommy's lender, and, in the event of Tommy's default with its lender, Malibu would buy back practically all of the inventory on Tommy's lot.

130.    Additionally, Malibu promised Tommy's that, if Tommy's continued to meet certain thresholds given by Malibu, like taking on inventory shipments of 65% Malibu boats and 35% Axis boats, despite the operational difficulties this would force on Tommy's, that Malibu would enter into new Dealership Agreements with Tommy's and Tommy's would earn additional substantial incentives (i.e. interest reimbursement, discounts and rebates).

131.    These promises were enforceable as Malibu made its promises unequivocal and set clear standards for what Tommy's must do in order to receive a repurchase agreement or new Dealership Agreements.

132.    Tommy's relied on these promises to its detriment when it increased its floor plan capacity with M&T and continued to use up more of that floor plan credit in reliance on Malibu's promises.

23

133. Tommy's also received shipment of more Malibu boats as inventory to its detriment, which further exhausted Tommy's floor plan capacity, in reliance on Malibu's promise that it would execute new Dealership Agreements with Tommy's.

134. Tommy's has been harmed by Malibu's misrepresentations, and in reliance upon Malibu's misrepresentations, Tommy's now has taken delivery of a large inventory of high-end Malibu boats that cannot easily be sold and which have eaten up virtually all of Tommy's increased floor plan capacity causing it to become further indebted to its lender and buried in interest carrying costs.

135. Tommy's has taken and agreed to fulfill custom customer orders and warranty claims nationwide that cannot be completed unless the relationship with Malibu is maintained through the 2024 season.

136. Tommy's is entitled to recover its damages incurred when it acted to its own detriment in reliance on Malibu's false promises of new Dealership Agreements, repurchase agreements with Tommy's lender, and dealer incentives (i.e. interest reimbursement, discounts and rebates) together with all incidental and consequential damages. The amount of such damages shall be proven at trial.

137. In addition, Malibu has acted fraudulently and egregiously to such a degree that Tommy's is entitled to an award of punitive damages.


## COUNT VII – INTENTIONAL MISREPRESENTATION/FRAUD

138. Tommy's incorporates by reference its allegations in the foregoing paragraphs as though fully restated herein.

24

139. Malibu represented that it would execute new Dealership Agreements and repurchase agreements with and/or for the benefit of Tommy's and its lender.

140. Malibu represented that it would take care of Tommy's, that Tommy's could get Axis brand boats on a 65/35 split, and that new Dealership Agreements would be forthcoming to formalize the continued relationships.

141. Malibu never intended to execute new Dealership Agreements with Tommy's for the 2024 season, nor did it intend to deliver the requested model mix offered to Tommy's.

142. Malibu knowingly made the false representations about the new Dealership Agreements to induce Tommy's to increase its floor plan capacity and to continue taking excess inventory to make Malibu's financial position look more favorable.

143. Because the 2023 season Dealership Agreements had expired, Tommy's relied on Malibu's representations that they would sign new Dealership Agreements and continued expanding its inventory as Malibu requested and increased its floor financing obligations with M&T Bank.

144. Because the two parties had often signed new Dealership Agreements past the expiration of the prior-year's Dealership Agreements, Tommy's reliance on Malibu's claims that it would execute new Dealership Agreements was reasonable.

145. As a direct and proximate result of Malibu's intentional misrepresentations to Tommy's about its intention to sign new Dealership Agreements, Tommy's has suffered, and continues to suffer, damages and injury to its businesses and its value, including but not limited to, (1) additional costs to service its debt under its floor plan lending agreement, (2) additional

25

high-end Malibu inventory that it cannot easily sell, (3) loss of the exclusive right to sell Malibu boats within certain territories, (4) and breaching Malibu boat order agreements with its customers. The amount of such damages shall be proven at trial.

146. In addition, Malibu has acted maliciously, intentionally, fraudulently or recklessly with regard to the misrepresentations made to Tommy's, and Tommy's is entitled to an award of punitive damages.

## COUNT VIII – NEGLIGENT MISREPRESENTATION

147. Tommy's incorporates by reference its allegations in the foregoing paragraphs as though fully restated herein.

148. In the ordinary course of business between the parties, as had been conducted for the previous 12 years, Malibu made statements to Tommy's that indicated that Malibu intended to take care of Tommy's for its cooperation (i.e. increasing its floor plan capacity and taking delivery of the boats that Malibu "needed" Tommy's to take).

149. These representations included, among other things, that Malibu would enter into new Dealership Agreements with Tommy's, would enter into floor plan repurchase agreements with Tommy's lender, M&T, and that Tommy's would earn substantial incentives.

150. Additionally, Malibu gave Tommy's information about its Dealer Performance Program and the incentives that would be available to Tommy's for the 2023-2024 season, but yet intentionally interfered with Tommy's ability to earn those incentives (i.e. interest reimbursement, discounts and rebates) along with failure to pay 2022 incentives (i.e. interest reimbursement, discounts and rebates) already earned.

26

151.    Despite Tommy's agreeing to receive a 65/35 split of Malibu and Axis boats, and increasing its floor plan capacity, Malibu never executed new Dealership Agreements with Tommy's or repurchase agreements with Tommy's lender, M&T; Malibu also failed to deliver a model mix per its own policy and pursuant to Tommy's orders and Malibu's commitment.

152.    Additionally, although Malibu represented to Tommy's that Tommy's exclusive right to sell Malibu boats in a specific territory would not be terminated, Malibu later terminated this agreement, putting customer orders at risk and destroying Tommy's business with the abrupt termination just prior to the boating season.

153.    As a direct and proximate result of Malibu's negligent misrepresentations to Tommy's about its intention to sign new Dealership Agreements, Tommy's has suffered, and continues to suffer, damages and injury to its businesses and its value, including but not limited to, (1) additional costs to service its debt under its floor plan lending agreement, (2) additional high-end Malibu inventory that it cannot easily sell, (3) loss of the exclusive right to sell Malibu boats within certain territories, (4) and breaching Malibu boat order agreements with its customers. The amount of such damages shall be proven at trial.

154.    In addition, Malibu has acted maliciously, fraudulently or recklessly with regard to the misrepresentations made to Tommy's, and Tommy's is entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court grant:

A.    An award of actual money damages, including direct, indirect, incidental, and consequential damages, to Tommy's based on the various theories of breach of

27

contract, quasi-contract, promissory estoppel, intentional misrepresentation, and negligent

misrepresentation as set forth above, as well as Malibu's other wrongful conduct;

B.     An award of punitive damages to Tommy's based on Malibu's misconduct, which is intentional, malicious, fraudulent and/or reckless, and based on Malibu's fraudulent and egregious conduct related to its breach of contract(s) set forth herein; and

C.     Award Plaintiffs all other relief deemed just and proper.

**THIS IS THE PLAINTIFFS' FIRST APPLICATION
FOR EXTRAORDINARY RELIEF IN THIS MATTER**

Respectfully submitted,

**BAKER DONELSON**

By:/s/ Scott D. Carey
    Scott D. Carey
    1600 West End Avenue, Suite 2000
    Nashville, Tennessee 37203
    Telephone: (615) 726-5600
    Facsimile: (615) 744-5613
    scarey@bakerdonelson.com

    Nicholas W. Diegel
    265 Brookview Centre Way, Suite 600
    Knoxville, TN 37919
    Telephone: (865) 549-7000
    Facsimile: (865) 525-8569
    ndiegel@bakerdonelson.com

    Floyd E. Gates, Jr. (*PHV forthcoming*)
    Christopher J. Zdarsky (*PHV forthcoming*)
    **BODMAN PLC**
    99 Monroe Ave. NW, Suite 300
    Grand Rapids, MI 49503
    (616) 205-4330

Dated: April 10, 2024

28

## VERIFICATION

I, Matthew A. Borisch, am authorized to verify the foregoing Verified Complaint on behalf of the Plaintiffs. I verify it based upon personal knowledge, Plaintiffs' books and records, or matters made known to me. For those matters stated upon information and belief, I believe them to be true after reasonable inquiry. I declare under penalties of perjury that the foregoing is true and correct.

By: _____
    Matthew A. Borisch

29