**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**NORTHERN DIVISION**

| | |
|---|---|
| Tommy's Castaic, LLC, et al., ) | |
| *Plaintiffs,* ) | |
| ) | |
| vs. ) | |
| ) | Case No.: 3:24-cv-00166-KAC-JEM |
| Malibu Boats, Inc., and ) | |
| Malibu Boats, LLC, ) | |
| ) | |
| *Defendants.* ) | |

**DECLARATION OF IAN R. SHAPIRO**
**IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

I, Ian R. Shapiro, state as follows:

1.      I am a partner at the law firm Cooley LLP, counsel for Malibu Boats, Inc. and Malibu Boats, LLC (jointly, "Malibu") in the above-captioned proceedings.

2.      I make this Declaration in support of Malibu's Motion to Dismiss the Complaint under Fed. R. Civ. P. 12(b)(6).

3.      Attached as **Exhibit 1** is a true and correct copy of a Malibu Model Year 2023 Dealer Agreement (Non-Texas), signed by Malibu and High Country Watersports, LLC; the same was admitted in evidence connection with the bankruptcy proceedings captioned *In re: Tommy's Fort Worth, LLC, et al.,* Case No. 24-90000-elm11, in the United States Bankruptcy Court for the Northern District of Texas.

4.      Attached as **Exhibit 2** is a true and correct copy of a Malibu Multi-Year Agreement (Texas), in effect in Model Year 2023, and signed by Malibu and Tommy's Lewisville, LLC; the same was submitted by the plaintiffs in the bankruptcy proceedings captioned *In re: Tommy's Fort Worth, LLC, et al.,* Case No. 24-90000-elm11, in the United States Bankruptcy Court for the Northern District of Texas.

5.	Attached as **Exhibit 3** is a true and correct copy of the Model Year 2023 Malibu Dealer Performance Program.

6.	Attached as **Exhibit 4** is a true and correct copy of the Model Year 2024 Malibu Dealer Performance Program.

7.	Attached as **Exhibit 5** is a true and correct copy of the Transcript of June 7, 2024 Proceedings before the Honorable Edward L. Morris in bankruptcy proceedings captioned *In re: Tommy's Fort Worth, LLC, et al.,* Case No. 24-90000-elm11, in the United States Bankruptcy Court for the Northern District of Texas.

8.	Attached as **Exhibit 6** is a true and correct copy of the Order Denying Debtors' Emergency Motion to Enforce Automatic Stay, in the bankruptcy proceedings captioned *In re: Tommy's Fort Worth, LLC, et al.,* Case No. 24-90000-elm11, in the United States Bankruptcy Court for the Northern District of Texas, entered June 10, 2024, at Dkt. 148.

9.	Exhibits 3 and 4, the Malibu Dealer Performance Programs, are submitted with limited, minimal redactions, and an accompanying Motion to Seal.  The information redacted consists of Malibu's confidential and proprietary financial information relating to wholesale price and cost terms and related pricing formulae incorporated in the Dealership Agreements between Malibu and its independent dealers. Malibu does not ask the Court to rely on the redacted information in support of its Motion to Dismiss, and the information is irrelevant to the issues raised by Malibu's Motion to Dismiss. Malibu makes reasonable efforts to protect the confidentiality of this information as evidenced by the confidentiality provisions set forth in Section 7 of Exhibits 1 and 2, which specifically identify "pricing programs or information" and "sales programs," as confidential information.

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Dated: June 24, 2024
Executed in New York, NY

/s/ Ian R. Shapiro
Ian Shapiro
Cooley LLP
55 Hudson Yards
New York, NY 10001
Telephone: (212) 479-6000
Facsimile: (212) 479-6275
ishapiro@cooley.com

*Attorney for Defendants Malibu Boats, Inc. and Malibu Boats, LLC*

# Exhibit 1

**Exhibit 1**

**Dealership Agreement for High Country Watersports MY23,**
*Malibu 2023 Model Year Dealer Agreement*

APP0001

# MALIBU
## 2023 MODEL YEAR DEALER AGREEMENT

This Dealer Agreement ("Agreement") is between Malibu Boats, LLC, a Delaware limited liability company having its principal place of business at 5075 Kimberly Way, Loudon TN 37774, USA ("Malibu") and High Country Watersports 12900 W 43rd Drive, Golden, CO  80403, USA

In consideration of the terms set forth in this Agreement, Malibu and Dealer hereby contract and agree as follows:

| Dealer Address: | 12900 W 43rd Drive, Golden, CO  80403, USA |
|---|---|
| Effective Date: | July 1, 2022 |
| Expiration Date | June 30, 2023 |

1. <u>Appointment of Dealer.</u>

   a. Malibu hereby appoints Dealer as an authorized retail dealer during the term of this Agreement for the retail sale and service of Malibu Products to end use retail consumers at Dealer's approved store location(s) within the Dealer Area ("Dealer Area"), as set forth in Exhibit 1.  Dealer will not sell or service the Products from other locations in or out of the Dealer Area without Malibu's express, prior approval. Dealer shall not sell the Products through sub-dealers or brokers.  This Agreement extends only to the Products as expressly set forth in Exhibit 1, and Malibu may add other products or engage in other business activities (including adding new products or brands during the term of this Agreement) which are outside the scope of this Agreement unless/until otherwise expressly added to or incorporated into the scope of this Agreement.

   b. Malibu will not appoint another dealer for the Products in the Dealer Area during the term of this Agreement, except that Malibu may appoint another dealer in the Dealer Area if Dealer materially breaches any of the terms of this Agreement (in which case the Dealer Area shall remain non-exclusive for the remaining term of this Agreement).  Malibu may also appoint another dealer in the Dealer Area to represent any products or services which are outside of the scope of Dealer's appointment.  Malibu does not restrict the sale of Products into areas as to which no dealer has been assigned, and the referral of potential customers to Dealer in any such unassigned area shall not be construed to modify the Dealer Area to include any unassigned area. The Dealer Area may be modified in any subsequent agreement.

   c. Dealer's appointment shall be subject to the terms of this Agreement, including any schedules attached to this Agreement, and shall also be subject to any Malibu policies, procedures or programs

Dealer Acceptance - Initial: _JK_____

Document Ref: DFZ7Q-QXWJH-P4S9U-GVGUW

and/or any Dealer Manual (which may be different for domestic and international dealers), any of which may be published from time to time (and which may be amended and shall be effective as amended during the term of this Agreement), all of which are incorporated by reference as a part of this Agreement.  Malibu shall make all policies, procedures, or programs and any Dealer Manual available to Dealer via Malibu's dealer website portal or through other communications, and it is Dealer's responsibility to access, review and comply with these policies, procedures, programs and/or any Dealer Manual because they are fully enforceable as a part of this Agreement.

2. <u>Term</u>.  This Agreement must be signed by both parties to be effective, and starts on the Effective Date and will expire and terminate as set forth in Exhibit 1, unless earlier terminated under this Agreement.  Malibu will provide Dealer with a new agreement, or notice of non-renewal or termination, reasonably in advance of the expiration of this Agreement.  In the event any new agreement is signed, this Agreement shall be deemed superseded, null and void, as of the effective date of any new agreement.  Any new agreement may contain terms, conditions and requirements which are different than those contained in this Agreement. Nothing in this Agreement (including provisions or projections dealing with future performance goals or requirements for periods beyond the term of this Agreement) shall be construed to create a promise, representation or agreement of a continuing relationship beyond the term of this Agreement, and this Agreement shall be deemed terminated, null and void, if no new agreement is signed except as to any provisions which expressly continue beyond the term of this Agreement. Any payment or performance following the expiration or termination of this Agreement will not be construed as a renewal or extension of the Term or this Agreement, but as independent and separate transactions terminable at will by Malibu.

3. <u>Dealer Responsibilities.</u>  In addition to the other terms of this Agreement, Dealer shall:

   a. Maintain a fully operational retail sales and service facility at the Dealer Location.

   b. Identify itself as a dealer of the Products, and use its best efforts as an authorized Malibu dealer to promote and sell the Products in the Dealer Area.

   c. Meet or exceed the performance standards as set forth in Exhibit 2, including any initial product order, order commitments, market share requirements, customer satisfaction benchmarks, training, and inventory or other financing commitments, as specified in Exhibit 2.

   d. Maintain an adequate service department, including trained service department staff for whom Malibu shall provide service training from time to time (Malibu shall provide the training at no charge to Dealer, but Dealer shall pay all out-of-pocket expenses incurred by its personnel in attending this training), and also including personnel with OEM certification to provide engine and other component service, which is adequately equipped and stocked to provide prompt and convenient service (including any aftermarket installations or modifications which may be independently offered or performed by Dealer for Dealer's customers, and as to which Malibu makes no recommendation, representation, approval or warranty) to purchasers and owners of the Products (whether or not originally sold by Dealer).  Service work may be subcontracted only with Malibu's prior authorization.

   e. Make a copy of Malibu's limited warranty available for review by prospective customers of the Products, and provide all buyers with a copy of Malibu's limited warranty and all other Malibu and component documents and manuals in connection with any sale of the Products (as well as copies of all component warranties).  Dealer shall not make any representations relating to Malibu's limited warranty.

Dealer Acceptance - Initial: __*JK*____

f.  Provide prompt and thorough pre-delivery commissioning, delivery and warranty registration (including registration with the manufacturer of all component warranties, such as engines) of the Products, in accordance with Malibu's (or any applicable component manufacturer's) policies and procedures.

g.  Provide warranty service on the Products (whether or not originally sold by Dealer) in accordance with Malibu's applicable warranty policies and procedures (which may be changed from time to time), as to which Malibu agrees to pay Dealer at Dealer's standard (or agreed upon) rate, subject to reasonable audits of Dealer's warranty service performances from time to time.

h.  Dealer shall not offer new products for sale of any other brands and products which compete with the Products, as set forth in Exhibit 3.

i.  Purchase and maintain adequate liability and casualty insurance on Dealer's operations and business activities, with limits of not less than two million dollars ($2,000,000), with proof of such insurance to be made available upon request.

j.  Notify Malibu immediately of any accidents involving Malibu's products of which Dealer becomes aware.

k.  Notify Malibu immediately in the event any Products are presented more than two (2) times for unresolved warranty claims, including warranty claims on engines and components not warranted by Malibu.

l.  Comply with, and not take any action in contravention or inconsistent with, all applicable laws and regulations in the operation of Dealer's business and the marketing and sale of the Products, including in the case of International Dealers compliance with all laws, regulations, controls and tariffs applicable to the import and export of the Products, including the United States Foreign Corrupt Practices Act.

m.  Indemnify and hold Malibu, together with its parent, affiliates, employees, offices and agents, harmless from any and all claims and damages arising as a result of any alleged fault, negligence, breach, violation of law or wrongdoing on the part of Dealer. In the event any such claim arises, Dealer shall promptly notify Malibu in writing of the claim. Malibu shall have the sole and exclusive right to control and conduct all litigation or other proceedings, and to enter into any settlement negotiations and settlements, as determined in its sole discretion, including the selection and retention of counsel of its choice. Under no event shall Dealer give any admission, or enter into any settlement or compromise of any claim, suit, or action, without the prior written consent of Malibu, which shall be given or withheld in Malibu's sole discretion.

4.  <u>Financial Status and Credit.</u>

a.  Dealer shall maintain a credit standing and financial condition satisfactory to Malibu, and shall upon request provide Malibu with complete and accurate financial statements for Dealer and its principal(s). Dealer consents to full and open disclosure of financial information concerning Dealer between Malibu and any financial institution or floor plan lender which finances Dealer's purchase and inventory of Products, and Dealer hereby authorizes any such financial institution or floor plan lender to provide Malibu with all financial information relevant to Dealer including financial statements or reports, payment or performance history, credit references, financial analyses, inventory reports or audits, and other information concerning Dealer's performance of its obligations. Upon request,

Dealer Acceptance - Initial: _JK_____

Dealer shall provide written confirmation authorizing these disclosures.  Dealer shall, at all times, comply with all financing and lending requirements and obligations, including the making of all payments, curtailments, and so forth.

b.  Dealer shall pay for all Products in accordance with Malibu's terms of payment, including payment terms applicable to specific orders.  All Products shall be paid for in full at the time of shipment, unless otherwise expressly agreed by Malibu.

c.  Malibu may, but shall not be required to, establish, modify, or discontinue credit terms or limits for Dealer.  Dealer hereby grants Malibu a purchase money security interest in all Products until they are paid for, and Dealer authorizes Malibu to file a financing statement or any other document(s) that may be necessary to perfect or provide other record notice of that security interest.

d.  In the event any Products are not paid for when due, Malibu reserves all rights relating to that non-payment, and shall have the right to charge interest on all such overdue amounts at the maximum rate allowed by law, and to offset or withhold any amounts due by it to Dealer against any of Dealer's obligations to Malibu.

e.  Malibu may accelerate and declare all outstanding amounts owed by Dealer as immediately due and owing upon any event of Dealer non-payment that continues for more than fifteen (15) days after the payment due date, or upon the expiration or termination of this Agreement.

5.  Orders, Prices, Terms, Shipment.

a.  Dealer shall submit all orders in the manner, and following the procedures, prescribed by Malibu.  No order shall be considered accepted until acknowledged and approved by Malibu, and Malibu reserves the right to reject any order (in whole or in part) in its sole discretion.  Malibu may require deposits or progress payments (which will be forfeited and non-refundable as liquidated damages upon Dealer's cancellation or failure to accept or pay for that order) on orders, or may impose other terms and requirements as a condition of any order.  Likewise, Malibu may require Dealer to pay a cancellation or restocking fee, as determined by Malibu, on any order which is cancelled or as to which Dealer fails or refuses to take delivery, or as to any Products which Malibu is required to purchase under the terms of any inventory floor plan or other financing arrangements.

b.  Prices will be determined based on Malibu's applicable wholesale price list or program in effect on the date of Dealer's order, except for any Malibu buying or promotion programs that may be in effect from time to time.  Malibu may change its wholesale price list, or any buying or promotional programs, in its sole discretion, as to any orders which have not then been submitted and accepted, without prior notice to Dealer.  Dealer shall not be eligible to participate in any buying or promotional programs, or to receive rebates, payments or incentives, during any period in which Dealer is in default of any provision of this Agreement.  All prices shall be net of shipping, delivery and handling charges, insurance, sales, use or VAT taxes, or other taxes, customs, duties, governmental or other charges, all of which shall be paid by Dealer.

c.  To the extent that Dealer's printed purchase orders or other purchasing documents contain terms and conditions which are inconsistent with this Agreement (or any other purchase documents or acknowledgements used by Malibu), Dealer agrees that Malibu's terms and conditions, as in effect from time to time, shall prevail and that Dealer's terms and conditions shall have no application to the

Dealer Acceptance - Initial: _JK_____

transaction (and shall not supplement or supersede Malibu's terms and conditions), and shall be null and void.

d.  Any production or shipping dates shall be preliminary only, and shall reflect Malibu's best estimate of the date any order shall be manufactured or shipped. Malibu reserves the right to allocate the manufacture or shipping dates of all Products in its sole discretion. Malibu shall make commercially reasonable efforts to notify Dealer of any anticipated material delays in the manufacture or shipping of any order, and Dealer shall have five (5) business days from the date of any such notification to cancel any such order. Malibu shall have no liability or responsibility to Dealer on account of any delays in the manufacture or shipping of any order, whether resulting from Malibu's allocation of the manufacture or shipment of its products or any other reason or cause.

e.  All sales shall be FOB Malibu's manufacturing facility (as applicable to each order) (the "Point of Shipment"), and Dealer shall solely and exclusively have all risk of loss when the Products leave Malibu's Point of Shipment, regardless of whether Malibu has utilized, suggested, or approved any common carrier, third party or any method of shipment, and regardless of whether shipping or freight costs are included in the invoice for the Products. Dealer shall be solely and exclusively responsible for ensuring that Dealer, any common carrier or third-party who takes possession of and/or ships the Products is properly and sufficiently licensed, qualified, competent and adequately insured, and Malibu shall have no responsibility or liability in connection therewith. Dealer shall acquire or purchase any shipping insurance it may desire. Dealer shall indemnity, defend and hold Malibu harmless from any and all demands, claims, suits, liabilities, damages and losses of any kind or nature whatsoever (whether incurred by Dealer or any third-party), which arise out of or relate to the conduct or actions of Dealer, any common carrier, or any third-party who takes possession of and/or ships the Products.

f.  Upon receipt of any Products, Dealer will promptly inspect the Products and inform Malibu of any non-conformities or defects. Any non-conformities or defects as to which notice is not given within five (5) days of Dealer's receipt of the Products shall be deemed waived. All non-conformities or defects shall be repaired or addressed through Malibu's warranty procedures, except as otherwise expressly agreed by Malibu, and Malibu gives no other warranties to Dealer with respect to any such non-conformities or defects.

g.  No return of the Products is permitted, absent Malibu's express agreement and written authorization, which shall be given or withheld in Malibu's sole discretion

6.  <u>Marketing and Promotional Activities.</u>

a.  Dealer shall sell or distribute the Products only to end retail customers from Dealer's approved store location(s), or during other pre-approved boat shows or promotional events. Although Dealer may sell to customers (who, on their own, seek to purchase Products from Dealer) residing in other countries, Dealer shall not sell or ship Products for initial delivery to or for the customer outside of the country in which the Dealer Area is located. Dealer may sell Products to other Malibu dealers (in Dealer's same country, and not internationally) on a wholesale-to-wholesale basis, providing that Malibu is promptly informed of all such transactions.

b.  Dealer shall identify itself as a Malibu dealer at its approved store location(s), and shall maintain a dealer-specific website prominently promoting and advertising Malibu's products. Dealer's website

Dealer Acceptance - Initial:  _JK_____

shall include an embedded link to the Malibu's website, in accordance with Malibu's policies.

c. Dealer's website shall specifically promote the sales and service of the Products in the Dealer Area, and Dealer shall not advertise, promote or market the sales or service of the Products outside of the Dealer Area, except that Dealer may advertise or market new Products through internet listings on Dealer's own website or other general marine or multiple listing websites (providing that such listings identify Dealer's location(s), and that such general listings are restricted to Products which are in the Dealer's inventory) which are focused on the sale of Products to customers within Dealer's Area to the fullest extent reasonably possible.  Malibu does not restrict the advertising of used products.

d. Nothing in this Agreement shall be construed as prohibiting Dealer from selling the Products to customers residing outside the Dealer Area, who visit the dealership and seek to purchase Products from Dealer. However, with respect to the sale of any Products outside of the Dealer Area (as determined by Malibu: (i) Dealer shall forfeit any and all incentives originally assigned to or paid to Dealer on that unit, including normal dealer program dollars associated with annual commitment programs, factory to dealer retail or wholesale incentives or retail spiff incentives; (ii) Dealer will be billed for the total amount of incentives forfeited in connection with the next available boat ordered (or billed independently of any order, as determined in Malibu's sole discretion); and (iii) the forfeited incentives may be paid in whole or in part by Malibu to the dealer in whose territory the boat in question is registered and who is responsible for providing warranty service to the end retail user, to assist in providing appropriate customer support for the end retail user.) Any such out of Dealer Area sales shall also be subject to any additional Malibu policies and procedures that may be established by Malibu from time to time.

e. Dealer shall not advertise the price for any new Products (whether or not acquired directly from Malibu or from a third-party) for the current and immediately prior model years, except as otherwise expressly authorized by Malibu (such as with respect to a specific promotional program).  This restriction shall not, however, restrict or prohibit Dealer from communicating a proposed price for a Product to individual, prospective customers.

f. Upon request, Dealer shall provide Malibu with copies of all Dealer advertising, promotional and marketing communications, postings and publications.

g. Dealer acknowledges that this Agreement does not restrict, hinder or impair Dealer's decision as to the retail price at which any Product may be sold, and that the final sales price of any Product remains within the Dealer's sole discretion and control.

h. The parties agree that these restrictions and policies are reasonable and for their mutual benefit, that any violation of these restrictions and policies are substantially likely to mislead the public concerning the Products, their availability and other material information, and that any violation of these restrictions and policies will be a violation of Malibu's rights and interests in its trademarks.  These restrictions shall apply during the term of this Agreement, and for a period of twenty-four (24) months thereafter.

7. <u>Confidential Information.</u> Dealer and its employees, contractors and agents agree to maintain in strict confidence, and not disclose and to use only in the performance of this Agreement, any confidential or proprietary information ("Confidential Information") concerning the business affairs or operations of Malibu or its affiliates, or the Products. Confidential Information includes anything that Malibu considers to be

Dealer Acceptance - Initial: __JK____

confidential and proprietary including, without limitation, all trade secrets, customer lists, price lists or pricing programs or information, marketing or business plans, sales programs, or other information concerning the manufacture or distribution or promotion or marketing of the Products. Dealer shall be responsible for all breaches by its employees, contractors or agents. Dealer will return or destroy all Confidential Information (including electronically store information or any documents relating thereto in any form or media) to Malibu upon the termination or expiration of this Agreement. These obligations relating to the Confidential Information shall remain in effect indefinitely, including after the termination or expiration of this Agreement.

8. <u>Trademarks, Copyrighted and Other Materials.</u>   Malibu and/or its affiliated companies are the exclusive owners of certain trademarks, service marks, logos and copyrighted materials (including hull, product and component designs, together with any industrial designs, patent or copyright details, patents, technical information or other confidential information relating to the Products or otherwise, which is now or hereafter owned or used by Malibu), which Malibu uses or may use in connection with the Products or otherwise in connection with its business ("Special Property"). Dealer will not have, nor shall it acquire, any rights in the Special Property (including any trademarks, service marks, logos and copyrighted materials added by Malibu in the future). Dealer will not use or register any of the Special Property for any purpose (including as a part of Dealer's corporate/entity or business name), except as expressly authorized in writing by Malibu. Dealer is authorized to use the Special Property for the limited purpose of identifying the Products offered for sale by Dealer, and to advertise the sale of those Products, providing that Dealer shall not use the Special Property in any form or style not provided or approved by Malibu. This authorization will not be interpreted as a license for the Special Property, and Dealer will acquire no proprietary or other rights with respect to the Special Property, and this (or any other) authorization for limited use will terminate simultaneously and automatically with the termination or expiration of this Agreement. Dealer will not use, register or claim any right or interest in the Special Property, nor shall Dealer create any other trademarks, copyrighted or legally protected materials relating to the Products or the Malibu. All such property shall be the sole and separate property of Malibu or its affiliates, as to which Dealer shall have no right or interest whatsoever. Dealer shall promptly notify Malibu of any suspected or actual infringement, unauthorized use of, or challenge to the Special Property or Malibu's (or its affiliate's) rights therein, and Dealer agrees that neither it nor anyone acting in concert with it shall contest Malibu's (or its affiliate's) sole ownership and rights in and to the Special Property. In the event of any improper or unauthorized use of, or challenge to, the Special Property, Dealer will cooperate with and assist Malibu in all actions to defend against all claims which are adverse to Malibu's interests therein, as requested or directed by Malibu. These obligations relating to the Special Property shall remain in effect indefinitely, including after the termination or expiration of this Agreement.

9. <u>Assignment and Transfer of Agreement.</u>   Dealer understands and acknowledges that the rights and duties set forth in the Agreement are personal to Dealer (or its current principal(s) if dealer is a corporation, company or other business entity) and that Malibu has entered into the Agreement in reliance on the business skill and experience, financial capacity, and personal character of Dealer (and its current principal(s), if applicable). Neither Dealer, nor any principal(s), without Malibu's prior written approval, shall, by operation of law (including upon the death or disability of Dealer or its principal(s)) or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association, LLC, or corporation, any interest in the Dealership or this Agreement. Malibu

Dealer Acceptance - Initial: __JK____

agrees that it will give good faith consideration to any succession plan or any proposed assignment of this Agreement to a new Dealer (or principal), except that the approval or disapproval of any such succession plan or assignment shall be in Malibu's sole discretion.  Any attempted or purported succession or assignment not having the prior written approval of Malibu shall be null and void, and shall constitute a default hereunder.

10. <u>Default Events.</u> In addition to any failure of Dealer to perform the requirements, terms and conditions set forth elsewhere within this Agreement, the following shall also be deemed violations and events of default under this Agreement, all of which (whether specifically listed in this paragraph or otherwise set forth in this Agreement) shall be deemed "good cause" for the non-renewal or termination of this Agreement, or allowing Malibu to take any other actions allowed under this Agreement:

   a. Any failure of Dealer to pay when due any amounts owed to Malibu or its affiliates.

   b. Any failure by Dealer to fulfill the Performance Requirements set forth in Exhibit 2.

   c. Any failure to Dealer to have sufficient and adequate floor plan financing and other financial arrangements or resources to perform Dealer's obligations under this Agreement.

   d. Any actions or undertakings by Dealer to conduct its business operations outside of the Dealer Area, or any discontinuance by Dealer of its business operations (including the closure of any approved location) inside the Dealer Area.

   e. Any improper marketing or promotional activities by Dealer, or any unauthorized disclosure of Malibu's dealer or wholesale buying/pricing information.

   f. Any action or omission by Dealer in violation of Malibu's policies, procedures, or programs or any Dealer Manual, or any unauthorized disclosure of Malibu's marketing programs or business strategies.

   g. Any sale (or entering into any agreement to sell) any competing Brands or product lines in violation of this Agreement.

   h. Any improper use by Dealer of Malibu's Confidential Information or Special Property.

   i. Any act of fraud, deception or illegal conduct by Dealer or its principal(s), or any failure to maintain and operate Dealer's business in accordance with applicable legal requirements, including any licenses or permits.

   j. Dealer's (or Dealer's principal(s)') insolvency, bankruptcy, assignment of its assets for the benefit of creditors, or the initiation of any similar proceedings by, or against, Dealer or its principal(s).

   k. Any attempted or completed assignment, sale or transfer of Dealer or its business or business assets, or a material change (as determined by Malibu in its sole discretion) in Dealer's ownership or principal(s), except in accordance with the procedures set forth in this Agreement.

   l. Any failure of Dealer to fulfill its other obligations under this Agreement.

11. <u>Remedies and Procedures for Default.</u> Upon the occurrence of any event of default, Malibu may by written notice to Dealer undertake or implement any or all of the following remedies, together with all other remedies as may be available to Malibu:

   a. Provide Dealer with notice of, and an opportunity to cure, any such violation(s) and/or event(s) of default (within thirty (30) days following the notice) if Malibu determines in its sole discretion that any such violation(s) and/or event(s) of default can reasonably be cured, or if otherwise required by law.

   b. Suspend its performance hereunder, including any warranty authorizations or any sale of Products,

Dealer Acceptance - Initial: _JK_____

parts and accessories to Dealer, until such time as Dealer provides Malibu with reasonable assurance of Dealer's ability to perform its obligations hereunder.

c. Declare that the Dealer Area shall no longer be exclusive as to Dealer, including the appointment of one or more co-dealers to sell the Products in the Dealer Area during the remaining term of this Agreement and thereafter.

d. Declare Dealer ineligible to participate in any incentive programs, special buying programs, rebates, bonuses or other financial incentives.

e. Cause any deposits (including deposits on Product orders), program incentives, rebates, bonuses and other financial incentives to be forfeited, cancelled, or not renewed.

f. Cancel any Dealer orders then pending.

g. Terminate this Agreement as a result of any violation(s) or event(s) of default.

The exercise or implementation of any remedy by Malibu shall not be exclusive, nor shall Malibu's use or reliance on a remedy constitute a waiver of Malibu's right to impose additional remedies for the same breach, either at the same time or subsequently. Dealer's performance of its obligations hereunder shall be deemed a condition precedent to Malibu's obligations under this Agreement.

12. <u>Other Termination Events.</u>  This Agreement may also be terminated upon the occurrence of any of the following:

a. If Malibu violates, fails to perform, or is otherwise in default of its obligations under the terms of this Agreement, and the violation, failure or performance or other default continues for thirty (30) days following Dealer's written notice thereof to Malibu.

b. If Dealer gives sixty (60) days written notice to Malibu of Dealer's intent to resign as a Dealer, except that Malibu may elect to make Dealer's resignation effective immediately (or in less than sixty (60) days) upon its receipt of any such notice.

c. If the parties enter into a mutually acceptable termination agreement.

d. If the parties fail to enter into a new, superseding dealer agreement upon the expiration of this Agreement.

13. <u>Effect of Termination or Expiration of Agreement; Special Provisions</u>

a. Any expiration or termination of this Agreement will not relieve any party from any obligation or liability to the other party that has accrued pursuant to this Agreement prior to the time of termination or expiration.

b. Malibu is not obligated to purchase any of Dealer's inventory of the Products, signage or equipment under any circumstances (including the termination or expiration of this Agreement), except that Malibu may at its option and in its sole discretion repurchase from Dealer (free of all liens and claims) all or any portion of the Products in Dealer's inventory at the lesser of (i) the net wholesale purchase price paid to Malibu for such Products less any discounts, promotional payments, rebates or other allowances previously paid or credited by Malibu, or (ii) the depreciated value of such Malibu Products as reasonably determined by Malibu, with any repurchase being further subject to credit or offset by Malibu for all amounts then owed and unpaid by Dealer.  Any repurchases by Malibu will be

Dealer Acceptance - Initial:  _JK_____

FOB the Dealer Location; and Dealer will promptly make such Malibu Products available for inspection and pick-up by Malibu or its agent or carrier as instructed by Malibu.

c.  In the event of the termination or expiration of this Agreement, Malibu is relieved from any obligation to make any further Product (including parts and accessories) shipments under the Agreement, and may cancel all of Dealer's unshipped orders for Products (including parts and accessories), irrespective of previous acceptance by those orders, except as otherwise expressly agreed in writing between the parties.  The acceptance of orders from the Dealer, the continuous sale of boats to the Dealer, or any other act or transaction of business, after the termination or expiration of this Agreement shall not be construed as a continuation of this Agreement, the commencement of a new agreement, or a waiver of any termination of this Agreement.

d.  Upon the termination or expiration of this Agreement, all obligations owed by Dealer to Malibu shall become immediately due and payable, whether otherwise then due or not (without presentment, demand, protest or notice of any kind, all of which are waived by Dealer), and Malibu may offset or deduct from any or all sums owed to Dealer any or all sums owed by Dealer, returning to Dealer the excess, if any.

e.  Upon the effective date of any termination or expiration of this Agreement, Dealer shall immediately cease to hold itself out as a Malibu dealer or a dealer of the Products, and shall discontinue the use of all trademarks, trade names, signs, logotypes or any other Special Property of Malibu, and any license or agreement for the use thereof shall be deemed terminated.

f.  During the term of this Agreement, and for a period of twenty-four (24) months following the termination or expiration of this Agreement, Dealer shall not disparage Malibu, any of Malibu's officers or employees, or any Malibu Product, or otherwise take any action which could reasonably be expected to adversely affect the reputation of Malibu, any of Malibu's officers or employees, or any Malibu Product.

14.  <u>Reservations.</u>  Malibu shall have the right in its sole discretion to allocate Products among dealers and customers as it determines appropriate, change the configuration or construction of, or specifications for, any of the Products, to discontinue the manufacture or distribution of any of the Products, all without incurring any obligation or liability to Dealer.

15.  <u>Status of Parties.</u>  Dealer is an independent business contracting and conducting business on its own behalf, and not as the agent, partner, franchisee, or joint venturer of Malibu or its affiliates, for any purpose whatsoever.  Except for Dealer's agreement and obligation to comply with this Agreement, the management of Dealer's business and the formulation of plans, policies and procedures for the operation of Dealer's business are the sole prerogative and responsibility of Dealer.

16.  <u>Time of the Essence; Force Majeure.</u> Time is of the essence as to all aspects of this Agreement and its performance, provided however that no party will be deemed in breach of this Agreement for any reasonable delay or failure in performance of any non-monetary obligation due to any force majeure cause outside of its control, for so long as such condition of force majeure materially exists.

17.  <u>Governing Law, English Language.</u>  This Agreement shall be governed by the substantive laws of the state of Tennessee, without regard to choice of laws principles.  In the event Dealer is outside of the United States, the parties agree that the United Nations Convention on Contracts for the International Sale of Goods shall have no applicability.  In the event any state law (or national law in the event Dealer is outside

Dealer Acceptance - Initial:  _JK_____

of the United States), requires or imposes additional or different terms than those set forth in this Agreement, those additional or different terms shall be deemed to supplement or supersede the terms of this Agreement, but only to the minimum extent required by law.  All other provisions of this Agreement shall remain in effect, and shall be fully enforceable.

It is the express wish and intent of the parties that this Agreement and all related documents, including notices and other communications, shall be drawn up in the English language only. *Il est la volonté expresse des parties que cette convention et tous les documents s'y rattachant, y compris les avis et les autres communications, soient rédigés et signés en anglais seulement.*

18.  <u>Dispute Resolution Procedures.</u>

   a.  <u>Dealers in the United States and Canada.</u>  The sole and exclusive jurisdiction and venue for any legal action between the parties arising under or relating to this Agreement or any of the Products shall be the Loudon County, Tennessee Circuit Court or the United States District Court having authority in that jurisdiction, and the parties each hereby irrevocably consent and submit to the exclusive jurisdiction of these courts and waive any objection to jurisdiction or venue in those courts. Malibu's defense or participation in any legal proceedings in response to any claim which may be brought by Dealer, or Malibu's initiation of a claim for injunctive relief against Dealer, in any other jurisdiction or venue shall not constitute a waiver of this provision. The parties hereby irrevocably waive any right to a trial by jury and agree that any litigated dispute shall be resolved in a nonjury trial.  Each party shall be responsible for its own attorney's fees and other costs and expenses associated with the litigation. In the event of any unauthorized or improper use of Malibu's Confidential Information or Special Property, or other circumstances giving rise to a claim by Malibu for injunctive relief arising under or relating to this Agreement, the parties agree that Malibu shall be entitled to a Temporary Restraining Order and Preliminary Injunction without the requirement of posting a bond as a condition therefor, and the filing of any action for injunctive relief shall be in addition to any legal action for damages or other relief pursuant to or relating to this Agreement.

   b.  <u>Dealers in Other Countries.</u> Except for controversies or claims primarily relating to the validity or infringement of any of the Special Property of Malibu (as to which Malibu may bring an action in any court having jurisdiction over the matter), any controversy or claim arising under or relating to this Agreement or relating to the Products, shall be settled by binding arbitration to be conducted in Loudon County Tennessee, United States of America, using the arbitration services of a recognized commercial arbitration service (such as the American Arbitration Association) nominated or otherwise acceptable to Malibu. Any such arbitration shall be conducted by a sole neutral arbitrator, pursuant to the applicable commercial arbitration rules of the designated arbitration service. Each party will pay an equal share of all fees and costs of the arbitrator.  Any judgment on the award rendered by the arbitrator may be entered and enforced in any court having competent jurisdiction wherever located.

19.  <u>Entire Agreement and Severability.</u>

   a.  This Agreement, including all exhibits and all policies, procedures, or programs and any Dealer

Dealer Acceptance - Initial: _JK_____

Manual relating to this Agreement, contains the entire understanding and contract between the parties and expressly supersedes all prior and different agreements, representations and understandings. In signing this Agreement, Dealer agrees and represents that Malibu has performed all obligations under any prior contracts or agreements between the parties, that Dealer has no defenses, claims or set-offs relating to this Agreement or any prior contracts or agreements between the parties, and Dealer's execution of this Agreement shall constitute a waiver and release of any and all claims that Malibu has breached or violated Malibu's obligations under any prior contracts or agreements between the parties.

b.   The headings in this Agreement are solely for the convenience of the parties, and shall not be considered as substantive terms of this Agreement.

c.   Except for sales and incentive programs and policies that Malibu may publish from time to time relating to this Agreement, this Agreement may not be changed, amended or supplemented except by a subsequent written agreement signed by both parties (including a principal officer of Malibu).

d.   If any provision of this Agreement is held illegal or unenforceable in a judicial or arbitration proceeding, such provision shall be severed and shall be operative, and the remainder of this Agreement shall remain operative and binding on the Parties to the fullest extent allowed by law.

e.   This Agreement is binding upon the parties hereto, together with their respective successors and assigns.  In the event any provision of this Agreement is found to be unenforceable in whole or in part, the remaining provisions of this Agreement shall be enforced in accordance with the intent of this Agreement.

f.   This Agreement shall not be effective until signed by both parties (and shall not be effective until signed by both parties, including two authorized signatures on behalf of Malibu, notwithstanding the conduct of any business between the parties), and may be signed in counter-parts, and electronic or facsimile signatures shall be deemed binding and enforceable. In signing this Agreement on behalf of Dealer, the undersigned representative represents and warrants that she/he has the full and unrestricted authority to sign this Agreement as a binding contract of Dealer, and as an expressly and properly approved action on behalf of Dealer (including any corporate resolutions or other approval actions).

20.  Notices. Any notice required or permitted by this Agreement shall be in writing and will be sufficient if delivered in person, by email if receipt is acknowledged by the other party, or by sending such notice by recognized overnight courier service (such as FedEx or UPS) properly addressed to the other party's address set forth in this Agreement or as otherwise revised by written notice to the other party.  All such notices will be deemed given one (1) day after the date of sending.

21.  Waiver. The failure of a party to insist upon performance strictly in accordance with the terms of this Agreement will not be deemed a waiver of the right to insist upon such performance at any time during the continuation of any default or with respect to the same or any other default on any future occasion.

22.  Review Before Signing.  Dealer and its authorized representative agree and represent that it/they has/have carefully reviewed this Agreement before signing it, and that the terms and conditions of this Agreement are reasonable, satisfactory and acceptable to Dealer.

Dealer Acceptance - Initial:  _JK_____

Document Ref: DFZ7Q-QXWJH-P4S9U-GVGUW

[signatures on next page]

Dealer Acceptance - Initial: _JK_____

Document Ref: DFZ7Q-QXWJH-P4S9U-GVGUW

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the dates indicated below.

**Accepted on behalf of Malibu:**

*Eric Bondy*
_____        Date: _08 / 26 / 2022_____
Eric Bondy, Vice President of Sales

*Wayne Wilson*
_____        Date: _09 / 06 / 2022_____
Wayne Wilson, CFO

**Accepted on behalf of Dealer:**

_____        Date: _08 / 25 / 2022_____
Dealer's Authorized Representative

Printed Name: _Jim Kutches_

Title: _Acquisition & Compliance Director_____

---

Dealer Acceptance - Initial: _JK_____

# EXHIBIT 1

Legal Name of Dealer: High Country Watersports ("<u>Dealer</u>" or "<u>you</u>")

Type of Entity and State or Province DBA:Tommy's Slalom Shop a Boat Dealership in CO

Dealer Location: 12900 W 43rd Drive, Golden, CO  80403, USA("<u>Dealer Location</u>")

Dealer Administrative Office if different: <u>Same as Above</u>

Term: This Agreement starts on the Effective Date and will expire without further notice on June 30, 2023 unless earlier terminated under this Agreement ("Term"). At the time of the expiration or earlier termination of this Agreement, your appointment as a Malibu dealer will automatically terminate.

The following is a list of counties that are assigned to Dealer:

**Colorado:: Adams, Alamosa, Arapahoe, Archuleta, Baca, Bent, Boulder, Broomfield, Chaffee, Cheyenne, Clear Creek, Conejos, Costilla, Crowley, Custer, Denver, Dolores, Douglas, Eagle, El Paso, Elbert, Fremont, Gilpin, Grand, Hinsdale, Huerfano, Jackson, Jefferson, Kiowa, Kit Carson, La Plata, Lake, Larimer, Las Animas, Lincoln, Logan, Mineral, Montezuma, Morgan, Otero, Park, Phillips, Pitkin, Prowers, Pueblo, Rio Grande, Routt, Saguache, San Juan, San Miguel, Sedgwick, Summit, Teller, Washington, Weld, Yuma**

Dealer Acceptance - Initial: _JK_____

**BOATS**

## 2023 MALIBU PRODUCT LINES

<u>Performance Series</u>:
Response TXi
Response TXi CB
Response TXi MO
Response TXi MOCB

<u>Wakesetter Series</u>:
Wakesetter 20 VTX
Wakesetter 22 LSV
Wakesetter 23 LSV
Wakesetter 25 LSV
Wakesetter 26 LSV
Wakesetter 21 LX
Wakesetter 23 MXZ
Wakesetter 24 MXZ

<u>M Series</u>:
M220
M240

Dealer Acceptance - Initial: _JK_____

**MALIBU BOAT MAINTENANCE AND DEALER PREPARATION PROCEDURES**

Without limiting its other obligations under the Dealer Agreement:

Maintenance and Storage:

Dealer will exercise all commercially reasonable efforts to properly maintain and store all Malibu boat products in its inventory in accordance with general industry standards and best practices in connection with the storage and maintenance of motor boat inventories of the type and class of the Malibu boat products, including but not limited to:

(1) Protecting Malibu boat products from temperature fluctuations such as freezing climates.

(2) Providing other appropriate cover for Malibu boat products stored outside in order to ensure that interiors remain dry and exteriors are shaded from the sun.

(3) Removing shrink-wrap from Malibu boat products upon delivery to prevent condensation and mildew on interiors and discoloration of gelcoat on exteriors.

Dealer Preparation and Record Keeping:

In connection with the sale or other distribution of any Malibu boat product to a retail customer, Dealer will:

(1) Perform any and all necessary rigging installation and inspection services prior to delivery to the retail customer.

(2) Furnish the retail customer with information provided by Malibu as to the safe and proper use and maintenance of Malibu Products. This will include but is not limited to Malibu's operational manual, engine manual and vinyl care manual.

(3) Furnish the retail customer with all notices, correction letters, safety messages, and any other written material provided by Malibu in connection with Malibu boat products. Upon delivery to the retail customer, Dealer will complete the Warranty Registration card provided and forward to Malibu or complete the online warranty registration within ten (10) days. If using the warranty card, the card must be signed by the retail customer in the presence of the Dealer or Dealer's representative, and a copy sent to Malibu.

(4) Maintain complete sales and service records regarding all Malibu boat product customers. Dealer agrees to report to Malibu on a regular basis the names and addresses of the Malibu boat products customers, to the extent not prohibited by applicable law.

Dealer Acceptance - Initial: _JK_____

30905743.4

**EXHIBIT 2**
**PERFORMANCE STANDARDS**

The following performance standards are in addition to those in Sections 7 (e), (f) and (g) of the Agreement (together, the "Performance Standards"). They will be measured and reviewed every fiscal year (beginning July 1 of each year), unless another measuring period is noted below.

1.  Dealer will maintain a proper level of floorplan to support Malibu & Axis commitment and purchases estimated at $12582277
2.  Dealer will be required to hit a Malibu target Market Share of 18% by 12/31/2022 & 18%  by 6/30/2023 as agreed to on your MY23 Malibu Commitment Sheet. This will be measured based off SSI data.
3.  Your CSAT index for any rolling six month period shall meet a minimum score of 91% and a minimum survey return rate of 40% for New Owner Survey and a minimum score of 85% and a minimum survey return rate of 25% for Year 1 Owner Survey.   Per DPP your scores will be measured each July, October, January and April with these results setting the RSI level for the current quarter.
4.  You must complete warranty registration for 100% of the Malibu boat products you sell. Each boat sold must be registered within 10 days after customer takes delivery of the boat.
5.  Quarterly update identifying the dealership sponsored promotional personnel and a calendar of promotional events. Number to be agreed upon with Malibu Sales Rep and to be based on market size and market factors.
6.  Dealers are required to update inventory in Dealer CRM on a weekly basis. Weekly inventory must be updated in the Dealer CRM prior to midnight eastern time each Friday.
7.  Attendance at all Sales, Service, Regional and North American Dealer Meetings is required by appropriate dealership personnel.  Attendance of and participation in Malibu & Axis sponsored Sales Training will be supported by Coop.
8.  Malibu Boats shall have the sole right to determine qualification and compliance with the terms and conditions of Dealer Performance Program.  Malibu reserves the right to modify, suspend, terminate or replace the DPP program or any sales program at any time.
9.  Dealer will be required to stock a representation of the following new models: 22 LSV & 26 LSV
10. Dealer is required to have a clearly identified link on their dealership website that links visitors to the Malibu Build A Boat.
11. You agree that you shall represent Malibu Products at the following boat shows: Denver, Ft Collins, Colorado Springs
12. Dealer is required to be a current member of WSIA (Water Sports Industry Association) and to actively promote "WAKE RESPONSIBLY".
13. X

Dealer Acceptance - Initial: _JK_____

**Accepted on behalf of Dealer:**

_____    **Date:** 08 / 25 / 2022
Dealer's Authorized Representative             _____

Printed Name: <u>Jim Kutches</u>

Title: <u>Acquisition & Compliance Director</u>

Dealer Acceptance - Initial: _JK_____

**EXHIBIT 3**

<u>**Exclusive Towed Water Sports Boat Brand**</u>**. You agree that, without the prior written authorization of Malibu (which may be conditioned, delayed or withheld in Malibu's sole and absolute discretion), you will not sell, advertise for sale, or otherwise arrange, negotiate, assist or facilitate the sale of any new boats which are manufactured or distributed by or bearing the trademarks or logo in any substantial matter of any inboard sport-boat brand (each a "Direct Competitor"), which means a brand of trailerable fiberglass boats with inboard or inboard/outboard gasoline powered engine configurations, between 18 and 26 feet LOA, and configured to be used as the towing vessel for towed water sports activities, including, but not limited to, Nautique, Mastercraft, Supra, Moomba, MB, Centurion, Supreme, Epic, Tige, ATX, and Heyday. You further agree that, unless and until Malibu terminates this Agreement or notifies you that Malibu will not renew this Agreement at expiration, without the prior written authorization of Malibu (which may be conditioned, delayed or withheld in Malibu's sole and absolute discretion), you will not engage in negotiations or enter into any contract or agreement of any nature whatsoever with a Direct Competitor.** You acknowledge and understand that violation of this section 5 is grounds for Malibu's immediate termination of this Agreement, subject to applicable law.

Exclusivity - Malibu & Axis Brands are to be the exclusive inboard watersports brands at 12900 W 43rd Drive, Golden, CO  80403, USA

**Accepted on behalf of Dealer:**

_____     **Date:** ___08 / 25 / 2022___
Dealer's Authorized Representative

Printed Name: <u>Jim Kutches</u>

Title: ___Acquisition & Compliance Director___

Dealer Acceptance - Initial: __JK____

30905743.4
Document Ref: DFZ7Q-QXWJH-P4S9U-GVGUW

AXIS

2023 MODEL YEAR DEALER AGREEMENT

This Dealer Agreement ("Agreement") is between Malibu Boats, LLC, a Delaware limited liability company having its principal place of business at 5075 Kimberly Way, Loudon TN 37774, USA ("Malibu") and High Country Watersports 12900 W 43rd Drive, Golden, CO  80403, USA ("Dealer")

In consideration of the terms set forth in this Agreement, Malibu and Dealer hereby contract and agree as follows:

| | |
|---|---|
| Dealer Address: | 12900 W 43rd Drive, Golden, CO  80403, USA |
| Effective Date: | July 1, 2022 |
| Expiration Date | June 30, 2023 |

1. <u>Appointment of Dealer.</u>
   a. Malibu hereby appoints Dealer as an authorized retail dealer during the term of this Agreement for the retail sale and service of Axis Products to end use retail consumers at Dealer's approved store location(s) within the Dealer Area ("Dealer Area"), as set forth in Exhibit 1.  Dealer will not sell or service the Products from other locations in or out of the Dealer Area without Malibu's express, prior approval. Dealer shall not sell the Products through sub-dealers or brokers.  This Agreement extends only to the Products as expressly set forth in Exhibit 1, and Malibu may add other products or engage in other business activities (including adding new products or brands during the term of this Agreement) which are outside the scope of this Agreement unless/until otherwise expressly added to or incorporated into the scope of this Agreement.
   b. Malibu will not appoint another dealer for the Products in the Dealer Area during the term of this Agreement, except that Malibu may appoint another dealer in the Dealer Area if Dealer materially breaches any of the terms of this Agreement (in which case the Dealer Area shall remain non-exclusive for the remaining term of this Agreement).  Malibu may also appoint another dealer in the Dealer Area to represent any products or services which are outside of the scope of Dealer's appointment.  Malibu does not restrict the sale of Products into areas as to which no dealer has been assigned, and the referral of potential customers to Dealer in any such unassigned area shall not be construed to modify the Dealer Area to include any unassigned area. The Dealer Area may be modified in any subsequent agreement.
   c. Dealer's appointment shall be subject to the terms of this Agreement, including any schedules attached to this Agreement, and shall also be subject to any Malibu policies, procedures or programs

Dealer Acceptance - Initial: _JK____

and/or any Dealer Manual, any of which may be published from time to time (and which may be amended and shall be effective as amended during the term of this Agreement), all of which are incorporated by reference as a part of this Agreement. Malibu shall make all policies, procedures, or programs and any Dealer Manual available to Dealer via Malibu's dealer website portal or through other communications, and it is Dealer's responsibility to access, review and comply with these policies, procedures, programs and/or any Dealer Manual because they are fully enforceable as a part of this Agreement.

2.  <u>Term</u>.  This Agreement must be signed by both parties to be effective, and starts on the Effective Date and will expire and terminate as set forth in Exhibit 1, unless earlier terminated under this Agreement. Malibu will provide Dealer with a new agreement, or notice of non-renewal or termination, reasonably in advance of the expiration of this Agreement.  In the event any new agreement is signed, this Agreement shall be deemed superseded, null and void, as of the effective date of any new agreement.  Any new agreement may contain terms, conditions and requirements which are different than those contained in this Agreement. Nothing in this Agreement (including provisions or projections dealing with future performance goals or requirements for periods beyond the term of this Agreement) shall be construed to create a promise, representation or agreement of a continuing relationship beyond the term of this Agreement, and this Agreement shall be deemed terminated, null and void, if no new agreement is signed except as to any provisions which expressly continue beyond the term of this Agreement. Any payment or performance following the expiration or termination of this Agreement will not be construed as a renewal or extension of the Term or this Agreement, but as independent and separate transactions terminable at will by Malibu.

3.  <u>Dealer Responsibilities.</u>  In addition to the other terms of this Agreement, Dealer shall:

    a.  Maintain a fully operational retail sales and service facility at the Dealer Location.

    b.  Identify itself as a dealer of the Products, and use its best efforts as an authorized Malibu dealer to promote and sell the Products in the Dealer Area.

    c.  Meet or exceed the performance standards as set forth in Exhibit 2, including any initial product order, order commitments, market share requirements, customer satisfaction benchmarks, training, and inventory or other financing commitments, as specified in Exhibit 2.

    d.  Maintain an adequate service department, including trained service department staff for whom Malibu shall provide service training from time to time (Malibu shall provide the training at no charge to Dealer, but Dealer shall pay all out-of-pocket expenses incurred by its personnel in attending this training), and also including personnel with OEM certification to provide engine and other component service, which is adequately equipped and stocked to provide prompt and convenient service (including any aftermarket installations or modifications which may be independently offered or performed by Dealer for Dealer's customers, and as to which Malibu makes no recommendation, representation, approval or warranty) to purchasers and owners of the Products (whether or not originally sold by Dealer).  Service work may be subcontracted only with Malibu's prior authorization.

    e.  Make a copy of Malibu's limited warranty available for review by prospective customers of the Products, and provide all buyers with a copy of Malibu's limited warranty and all other Malibu and component documents and manuals in connection with any sale of the Products (as well as copies of all component warranties).  Dealer shall not make any representations relating to Malibu's limited warranty.

Dealer Acceptance - Initial:  _JK_____

f.   Provide prompt and thorough pre-delivery commissioning, delivery and warranty registration (including registration with the manufacturer of all component warranties, such as engines) of the Products, in accordance with Malibu's (or any applicable component manufacturer's) policies and procedures.

g.   Provide warranty service on the Products (whether or not originally sold by Dealer) in accordance with Malibu's applicable warranty policies and procedures (which may be changed from time to time), as to which Malibu agrees to pay Dealer at Dealer's standard (or agreed upon) rate, subject to reasonable audits of Dealer's warranty service performances from time to time.

h.   Dealer shall not offer new products for sale of any other brands and products which compete with the Products, as set forth in Exhibit 3.

i.   Purchase and maintain adequate liability and casualty insurance on Dealer's operations and business activities, with limits of not less than two million dollars ($2,000,000), with proof of such insurance to be made available upon request.

j.   Notify Malibu immediately of any accidents involving Malibu's products of which Dealer becomes aware.

k.   Notify Malibu immediately in the event any Products are presented more than two (2) times for unresolved warranty claims, including warranty claims on engines and components not warranted by Malibu.

l.   Comply with, and not take any action in contravention or inconsistent with, all applicable laws and regulations in the operation of Dealer's business and the marketing and sale of the Products, including in the case of International Dealers compliance with all laws, regulations, controls and tariffs applicable to the import and export of the Products, including the United States Foreign Corrupt Practices Act.

m.   Indemnify and hold Malibu, together with its parent, affiliates, employees, offices and agents, harmless from any and all claims and damages arising as a result of any alleged fault, negligence, breach, violation of law or wrongdoing on the part of Dealer.  In the event any such claim arises, Dealer shall promptly notify Malibu in writing of the claim.  Malibu shall have the sole and exclusive right to control and conduct all litigation or other proceedings, and to enter into any settlement negotiations and settlements, as determined in its sole discretion, including the selection and retention of counsel of its choice.  Under no event shall Dealer give any admission, or enter into any settlement or compromise of any claim, suit, or action, without the prior written consent of Malibu, which shall be given or withheld in Malibu's sole discretion.

4.   Financial Status and Credit.

a.   Dealer shall maintain a credit standing and financial condition satisfactory to Malibu, and shall upon request provide Malibu with complete and accurate financial statements for Dealer and its principal(s).  Dealer consents to full and open disclosure of financial information concerning Dealer between Malibu and any financial institution or floor plan lender which finances Dealer's purchase and inventory of Products, and Dealer hereby authorizes any such financial institution or floor plan lender to provide Malibu with all financial information relevant to Dealer including financial statements or reports, payment or performance history, credit references, financial analyses, inventory reports or audits, and other information concerning Dealer's performance of its obligations.  Upon request,

Dealer Acceptance - Initial: __JK____

Dealer shall provide written confirmation authorizing these disclosures.  Dealer shall, at all times, comply with all financing and lending requirements and obligations, including the making of all payments, curtailments, and so forth.

b.  Dealer shall pay for all Products in accordance with Malibu's terms of payment, including payment terms applicable to specific orders.  All Products shall be paid for in full at the time of shipment, unless otherwise expressly agreed by Malibu.

c.  Malibu may, but shall not be required to, establish, modify, or discontinue credit terms or limits for Dealer.  Dealer hereby grants Malibu a purchase money security interest in all Products until they are paid for, and Dealer authorizes Malibu to file a financing statement or any other document(s) that may be necessary to perfect or provide other record notice of that security interest.

d.  In the event any Products are not paid for when due, Malibu reserves all rights relating to that non-payment, and shall have the right to charge interest on all such overdue amounts at the maximum rate allowed by law, and to offset or withhold any amounts due by it to Dealer against any of Dealer's obligations to Malibu.

e.  Malibu may accelerate and declare all outstanding amounts owed by Dealer as immediately due and owing upon any event of Dealer non-payment that continues for more than fifteen (15) days after the payment due date, or upon the expiration or termination of this Agreement.

5.  <u>Orders, Prices, Terms, Shipment.</u>

a.  Dealer shall submit all orders in the manner, and following the procedures, prescribed by Malibu.  No order shall be considered accepted until acknowledged and approved by Malibu, and Malibu reserves the right to reject any order (in whole or in part) in its sole discretion.  Malibu may require deposits or progress payments (which will be forfeited and non-refundable as liquidated damages upon Dealer's cancellation or failure to accept or pay for that order) on orders, or may impose other terms and requirements as a condition of any order.  Likewise, Malibu may require Dealer to pay a cancellation or restocking fee, as determined by Malibu, on any order which is cancelled or as to which Dealer fails or refuses to take delivery, or as to any Products which Malibu is required to purchase under the terms of any inventory floor plan or other financing arrangements.

b.  Prices will be determined based on Malibu's applicable wholesale price list or program in effect on the date of Dealer's order, except for any Malibu buying or promotion programs that may be in effect from time to time.  Malibu may change its wholesale price list, or any buying or promotional programs, in its sole discretion, as to any orders which have not then been submitted and accepted, without prior notice to Dealer.  Dealer shall not be eligible to participate in any buying or promotional programs, or to receive rebates, payments or incentives, during any period in which Dealer is in default of any provision of this Agreement.  All prices shall be net of shipping, delivery and handling charges, insurance, sales, use or VAT taxes, or other taxes, customs, duties, governmental or other charges, all of which shall be paid by Dealer.

c.  To the extent that Dealer's printed purchase orders or other purchasing documents contain terms and conditions which are inconsistent with this Agreement (or any other purchase documents or acknowledgements used by Malibu), Dealer agrees that Malibu's terms and conditions, as in effect from time to time, shall prevail and that Dealer's terms and conditions shall have no application to the

Dealer Acceptance - Initial: _JK_____

transaction (and shall not supplement or supersede Malibu's terms and conditions), and shall be null and void.

d.   Any production or shipping dates shall be preliminary only, and shall reflect Malibu's best estimate of the date any order shall be manufactured or shipped.  Malibu reserves the right to allocate the manufacture or shipping dates of all Products in its sole discretion.  Malibu shall make commercially reasonable efforts to notify Dealer of any anticipated material delays in the manufacture or shipping of any order, and Dealer shall have five (5) business days from the date of any such notification to cancel any such order.  Malibu shall have no liability or responsibility to Dealer on account of any delays in the manufacture or shipping of any order, whether resulting from Malibu's allocation of the manufacture or shipment of its products or any other reason or cause.

e.   All sales shall be FOB Malibu's manufacturing facility (as applicable to each order) (the "Point of Shipment"), and Dealer shall solely and exclusively have all risk of loss when the Products leave Malibu's Point of Shipment, regardless of whether Malibu has utilized, suggested, or approved any common carrier, third party or any method of shipment, and regardless of whether shipping or freight costs are included in the invoice for the Products.  Dealer shall be solely and exclusively responsible for ensuring that Dealer, any common carrier or third-party who takes possession of and/or ships the Products is properly and sufficiently licensed, qualified, competent and adequately insured, and Malibu shall have no responsibility or liability in connection therewith.  Dealer shall acquire or purchase any shipping insurance it may desire.  Dealer shall indemnity, defend and hold Malibu harmless from any and all demands, claims, suits, liabilities, damages and losses of any kind or nature whatsoever (whether incurred by Dealer or any third-party), which arise out of or relate to the conduct or actions of Dealer, any common carrier, or any third-party who takes possession of and/or ships the Products.

f.   Upon receipt of any Products, Dealer will promptly inspect the Products and inform Malibu of any non-conformities or defects.  Any non-conformities or defects as to which notice is not given within five (5) days of Dealer's receipt of the Products shall be deemed waived.  All non-conformities or defects shall be repaired or addressed through Malibu's warranty procedures, except as otherwise expressly agreed by Malibu, and Malibu gives no other warranties to Dealer with respect to any such non-conformities or defects.

g.   No return of the Products is permitted, absent Malibu's express agreement and written authorization, which shall be given or withheld in Malibu's sole discretion

6.   Marketing and Promotional Activities.

a.   Dealer shall sell or distribute the Products only to end retail customers from Dealer's approved store location(s), or during other pre-approved boat shows or promotional events.  Although Dealer may sell to customers (who, on their own, seek to purchase Products from Dealer) residing in other countries, Dealer shall not sell or ship Products for initial delivery to or for the customer outside of the country in which the Dealer Area is located.  Dealer may sell Products to other Axis dealers (in Dealer's same country, and not internationally) on a wholesale-to-wholesale basis, providing that Malibu is promptly informed of all such transactions.

b.   Dealer shall identify itself as a Axis dealer at its approved store location(s), and shall maintain a dealer-specific website prominently promoting and advertising Axis's products.  Dealer's website

Dealer Acceptance - Initial: _JK_____

shall include an embedded link to the Axis Wake Research website, in accordance with Malibu's policies.

c.  Dealer's website shall specifically promote the sales and service of the Products in the Dealer Area, and Dealer shall not advertise, promote or market the sales or service of the Products outside of the Dealer Area, except that Dealer may advertise or market new Products through internet listings on Dealer's own website or other general marine or multiple listing websites (providing that such listings identify Dealer's location(s), and that such general listings are restricted to Products which are in the Dealer's inventory) which are focused on the sale of Products to customers within Dealer's Area to the fullest extent reasonably possible.  Malibu does not restrict the advertising of used products.

d.  Nothing in this Agreement shall be construed as prohibiting Dealer from selling the Products to customers residing outside the Dealer Area, who visit the dealership and seek to purchase Products from Dealer. However, with respect to the sale of any Products outside of the Dealer Area (as determined by Axis: (i) Dealer shall forfeit any and all incentives originally assigned to or paid to Dealer on that unit, including normal dealer program dollars associated with annual commitment programs, factory to dealer retail or wholesale incentives or retail spiff incentives; (ii) Dealer will be billed for the total amount of incentives forfeited in connection with the next available boat ordered (or billed independently of any order, as determined in Axis' sole discretion); and (iii) the forfeited incentives may be paid in whole or in part by Axis  to the dealer in whose territory the boat in question is registered and who is responsible for providing warranty service to the end retail user, to assist in providing appropriate customer support for the end retail user. Any such out of Dealer Area sales shall also be subject to any additional Axis policies and procedures that may established by Axis from time to time.

e.  Dealer shall not advertise the price for any new Products (whether or not acquired directly from Malibu or from a third-party) for the current and immediately prior model years, except as otherwise expressly authorized by Malibu (such as with respect to a specific promotional program).  This restriction shall not, however, restrict or prohibit Dealer from communicating a proposed price for a Product to individual, prospective customers.

f.  Upon request, Dealer shall provide Malibu with copies of all Dealer advertising, promotional and marketing communications, postings and publications.

g.  Dealer acknowledges that this Agreement does not restrict, hinder or impair Dealer's decision as to the retail price at which any Product may be sold, and that the final sales price of any Product remains within the Dealer's sole discretion and control.

h.  The parties agree that these restrictions and policies are reasonable and for their mutual benefit, that any violation of these restrictions and policies are substantially likely to mislead the public concerning the Products, their availability and other material information, and that any violation of these restrictions and policies will be a violation of Malibu's rights and interests in its trademarks.  These restrictions shall apply during the term of this Agreement, and for a period of twenty-four (24) months thereafter.

7.  <u>Confidential Information.</u> Dealer and its employees, contractors and agents agree to maintain in strict confidence, and not disclose and to use only in the performance of this Agreement, any confidential or proprietary information ("Confidential Information") concerning the business affairs or operations of Malibu or

Dealer Acceptance - Initial: __JK____

its affiliates, or the Products. Confidential Information includes anything that Malibu considers to be confidential and proprietary including, without limitation, all trade secrets, customer lists, price lists or pricing programs or information, marketing or business plans, sales programs, or other information concerning the manufacture or distribution or promotion or marketing of the Products.  Dealer shall be responsible for all breaches by its employees, contractors or agents.  Dealer will return or destroy all Confidential Information (including electronically store information or any documents relating thereto in any form or media) to Malibu upon the termination or expiration of this Agreement.  These obligations relating to the Confidential Information shall remain in effect indefinitely, including after the termination or expiration of this Agreement.

8.  <u>Trademarks, Copyrighted and Other Materials.</u>  Malibu and/or its affiliated companies are the exclusive owners of certain trademarks, service marks, logos and copyrighted materials (including hull, product and component designs, together with any industrial designs, patent or copyright details, patents, technical information or other confidential information relating to the Products or otherwise, which is now or hereafter owned or used by Malibu), which Malibu uses or may use in connection with the Products or otherwise in connection with its business ("Special Property").  Dealer will not have, nor shall it acquire, any rights in the Special Property (including any trademarks, service marks, logos and copyrighted materials added by Malibu in the future).  Dealer will not use or register any of the Special Property for any purpose (including as a part of Dealer's corporate/entity or business name), except as expressly authorized in writing by Malibu.  Dealer is authorized to use the Special Property for the limited purpose of identifying the Products offered for sale by Dealer, and to advertise the sale of those Products, providing that Dealer shall not use the Special Property in any form or style not provided or approved by Malibu.  This authorization will not be interpreted as a license for the Special Property, and Dealer will acquire no proprietary or other rights with respect to the Special Property, and this (or any other) authorization for limited use will terminate simultaneously and automatically with the termination or expiration of this Agreement.  Dealer will not use, register or claim any right or interest in the Special Property, nor shall Dealer create any other trademarks, copyrighted or legally protected materials relating to the Products or the Axis Wake Research Brand.  All such property shall be the sole and separate property of Malibu or its affiliates, as to which Dealer shall have no right or interest whatsoever.  Dealer shall promptly notify Malibu of any suspected or actual infringement, unauthorized use of, or challenge to the Special Property or Malibu's (or its affiliate's) rights therein, and Dealer agrees that neither it nor anyone acting in concert with it shall contest Malibu's (or its affiliate's) sole ownership and rights in and to the Special Property.  In the event of any improper or unauthorized use of, or challenge to, the Special Property, Dealer will cooperate with and assist Malibu in all actions to defend against all claims which are adverse to Malibu's interests therein, as requested or directed by Malibu. These obligations relating to the Special Property shall remain in effect indefinitely, including after the termination or expiration of this Agreement.

9.  <u>Assignment and Transfer of Agreement.</u>  Dealer understands and acknowledges that the rights and duties set forth in the Agreement are personal to Dealer (or its current principal(s) if dealer is a corporation, company or other business entity) and that Malibu has entered into the Agreement in reliance on the business skill and experience, financial capacity, and personal character of Dealer (and its current principal(s), if applicable).  Neither Dealer, nor any principal(s), without Malibu's prior written approval, shall, by operation of law (including upon the death or disability of Dealer or its principal(s)) or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons,

Dealer Acceptance - Initial: _JK_____

partnership, association, LLC, or corporation, any interest in the Dealership or this Agreement. Malibu agrees that it will give good faith consideration to any succession plan or any proposed assignment of this Agreement to a new Dealer (or principal), except that the approval or disapproval of any such succession plan or assignment shall be in Malibu's sole discretion.  Any attempted or purported succession or assignment not having the prior written approval of Malibu shall be null and void, and shall constitute a default hereunder.

10. <u>Default Events.</u> In addition to any failure of Dealer to perform the requirements, terms and conditions set forth elsewhere within this Agreement, the following shall also be deemed violations and events of default under this Agreement, all of which (whether specifically listed in this paragraph or otherwise set forth in this Agreement) shall be deemed "good cause" for the non-renewal or termination of this Agreement, or allowing Malibu to take any other actions allowed under this Agreement:

    a.   Any failure of Dealer to pay when due any amounts owed to Malibu or its affiliates.

    b.   Any failure by Dealer to fulfill the Performance Requirements set forth in Exhibit 2.

    c.   Any failure to Dealer to have sufficient and adequate floor plan financing and other financial arrangements or resources to perform Dealer's obligations under this Agreement.

    d.   Any actions or undertakings by Dealer to conduct its business operations outside of the Dealer Area, or any discontinuance by Dealer of its business operations (including the closure of any approved location) inside the Dealer Area.

    e.   Any improper marketing or promotional activities by Dealer, or any unauthorized disclosure of Axis's dealer or wholesale buying/pricing information.

    f.   Any action or omission by Dealer in violation of Malibu's policies, procedures, or programs or any Dealer Manual, or any unauthorized disclosure of Malibu's marketing programs or business strategies.

    g.   Any sale (or entering into any agreement to sell) any competing Brands or product lines in violation of this Agreement.

    h.   Any improper use by Dealer of Malibu's Confidential Information or Special Property.

    i.   Any act of fraud, deception or illegal conduct by Dealer or its principal(s), or any failure to maintain and operate Dealer's business in accordance with applicable legal requirements, including any licenses or permits.

    j.   Dealer's (or Dealer's principal(s)') insolvency, bankruptcy, assignment of its assets for the benefit of creditors, or the initiation of any similar proceedings by, or against, Dealer or its principal(s).

    k.   Any attempted or completed assignment, sale or transfer of Dealer or its business or business assets, or a material change (as determined by Malibu in its sole discretion) in Dealer's ownership or principal(s), except in accordance with the procedures set forth in this Agreement.

    l.   Any failure of Dealer to fulfill its other obligations under this Agreement.

11. <u>Remedies and Procedures for Default.</u> Upon the occurrence of any event of default, Malibu may by written notice to Dealer undertake or implement any or all of the following remedies, together with all other remedies as may be available to Malibu:

    a.   Provide Dealer with notice of, and an opportunity to cure, any such violation(s) and/or event(s) of default (within thirty (30) days following the notice) if Malibu determines in its sole discretion that any such violation(s) and/or event(s) of default can reasonably be cured, or if otherwise required by law.

Dealer Acceptance - Initial: __*JK*____

b.  Suspend its performance hereunder, including any warranty authorizations or any sale of Products, parts and accessories to Dealer, until such time as Dealer provides Malibu with reasonable assurance of Dealer's ability to perform its obligations hereunder.

c.  Declare that the Dealer Area shall no longer be exclusive as to Dealer, including the appointment of one or more co-dealers to sell the Products in the Dealer Area during the remaining term of this Agreement and thereafter.

d.  Declare Dealer ineligible to participate in any incentive programs, special buying programs, rebates, bonuses or other financial incentives.

e.  Cause any deposits (including deposits on Product orders), program incentives, rebates, bonuses and other financial incentives to be forfeited, cancelled, or not renewed.

f.  Cancel any Dealer orders then pending.

g.  Terminate this Agreement as a result of any violation(s) or event(s) of default.

The exercise or implementation of any remedy by Malibu shall not be exclusive, nor shall Malibu's use or reliance on a remedy constitute a waiver of Malibu's right to impose additional remedies for the same breach, either at the same time or subsequently. Dealer's performance of its obligations hereunder shall be deemed a condition precedent to Malibu's obligations under this Agreement.

12. <u>Other Termination Events.</u>   This Agreement may also be terminated upon the occurrence of any of the following:

a.  If Malibu violates, fails to perform, or is otherwise in default of its obligations under the terms of this Agreement, and the violation, failure or performance or other default continues for thirty (30) days following Dealer's written notice thereof to Malibu.

b.  If Dealer gives sixty (60) days written notice to Malibu of Dealer's intent to resign as a Dealer, except that Malibu may elect to make Dealer's resignation effective immediately (or in less than sixty (60) days) upon its receipt of any such notice.

c.  If the parties enter into a mutually acceptable termination agreement.

d.  If the parties fail to enter into a new, superseding dealer agreement upon the expiration of this Agreement.

13. <u>Effect of Termination or Expiration of Agreement; Special Provisions</u>

a.  Any expiration or termination of this Agreement will not relieve any party from any obligation or liability to the other party that has accrued pursuant to this Agreement prior to the time of termination or expiration.

b.  Malibu is not obligated to purchase any of Dealer's inventory of the Products, signage or equipment under any circumstances (including the termination or expiration of this Agreement), except that Malibu may at its option and in its sole discretion repurchase from Dealer (free of all liens and claims) all or any portion of the Products in Dealer's inventory at the lesser of (i) the net wholesale purchase price paid to Malibu for such Products less any discounts, promotional payments, rebates or other allowances previously paid or credited by Malibu, or (ii) the depreciated value of such Malibu Products as reasonably determined by Malibu, with any repurchase being further subject to credit or

Dealer Acceptance - Initial: __JK_____

Document Ref: DFZ7Q-QXWJH-P4S9U-GVGUW

offset by Malibu for all amounts then owed and unpaid by Dealer. Any repurchases by Malibu will be FOB the Dealer Location; and Dealer will promptly make such Malibu Products available for inspection and pick-up by Malibu or its agent or carrier as instructed by Malibu.

c.  In the event of the termination or expiration of this Agreement, Malibu is relieved from any obligation to make any further Product (including parts and accessories) shipments under the Agreement, and may cancel all of Dealer's unshipped orders for Products (including parts and accessories), irrespective of previous acceptance by those orders, except as otherwise expressly agreed in writing between the parties. The acceptance of orders from the Dealer, the continuous sale of boats to the Dealer, or any other act or transaction of business, after the termination or expiration of this Agreement shall not be construed as a continuation of this Agreement, the commencement of a new agreement, or a waiver of any termination of this Agreement.

d.  Upon the termination or expiration of this Agreement, all obligations owed by Dealer to Malibu shall become immediately due and payable, whether otherwise then due or not (without presentment, demand, protest or notice of any kind, all of which are waived by Dealer), and Malibu may offset or deduct from any or all sums owed to Dealer any or all sums owed by Dealer, returning to Dealer the excess, if any.

e.  Upon the effective date of any termination or expiration of this Agreement, Dealer shall immediately cease to hold itself out as a Axis dealer or a dealer of the Products, and shall discontinue the use of all trademarks, trade names, signs, logotypes or any other Special Property of Malibu, and any license or agreement for the use thereof shall be deemed terminated.

f.  During the term of this Agreement, and for a period of twenty-four (24) months following the termination or expiration of this Agreement, Dealer shall not disparage Malibu, any of Malibu's officers or employees, or any Axis Product, or otherwise take any action which could reasonably be expected to adversely affect the reputation of Malibu, any of Malibu's officers or employees, or any Axis Product.

14. <u>Reservations.</u>  Malibu shall have the right in its sole discretion to allocate Products among dealers and customers as it determines appropriate, change the configuration or construction of, or specifications for, any of the Products, to discontinue the manufacture or distribution of any of the Products, all without incurring any obligation or liability to Dealer.

15. <u>Status of Parties.</u>  Dealer is an independent business contracting and conducting business on its own behalf, and not as the agent, partner, franchisee, or joint venturer of Malibu or its affiliates, for any purpose whatsoever. Except for Dealer's agreement and obligation to comply with this Agreement, the management of Dealer's business and the formulation of plans, policies and procedures for the operation of Dealer's business are the sole prerogative and responsibility of Dealer.

16. <u>Time of the Essence; Force Majeure.</u> Time is of the essence as to all aspects of this Agreement and its performance, provided however that no party will be deemed in breach of this Agreement for any reasonable delay or failure in performance of any non-monetary obligation due to any force majeure cause outside of its control, for so long as such condition of force majeure materially exists.

17. <u>Governing Law, English Language.</u>  This Agreement shall be governed by the substantive laws of the state of Tennessee, without regard to choice of laws principles. In the event Dealer is outside of the United States, the parties agree that the United Nations Convention on Contracts for the International Sale of

Dealer Acceptance - Initial: _JK_____

Goods shall have no applicability.  In the event any state law (or national law in the event Dealer is outside of the United States), requires or imposes additional or different terms than those set forth in this Agreement, those additional or different terms shall be deemed to supplement or supersede the terms of this Agreement, but only to the minimum extent required by law.  All other provisions of this Agreement shall remain in effect, and shall be fully enforceable.

It is the express wish and intent of the parties that this Agreement and all related documents, including notices and other communications, shall be drawn up in the English language only. *Il est la volonté expresse des parties que cette convention et tous les documents s'y rattachant, y compris les avis et les autres communications, soient rédigés et signés en anglais seulement.*

18. Dispute Resolution Procedures.

   a. Dealers in the United States and Canada.  The sole and exclusive jurisdiction and venue for any legal action between the parties arising under or relating to this Agreement or any of the Products shall be the Loudon County, Tennessee Circuit Court or the United States District Court having authority in that jurisdiction, and the parties each hereby irrevocably consent and submit to the exclusive jurisdiction of these courts and waive any objection to jurisdiction or venue in those courts. Malibu's defense or participation in any legal proceedings in response to any claim which may be brought by Dealer, or Malibu's initiation of a claim for injunctive relief against Dealer, in any other jurisdiction or venue shall not constitute a waiver of this provision. The parties hereby irrevocably waive any right to a trial by jury and agree that any litigated dispute shall be resolved in a nonjury trial.  Each party shall be responsible for its own attorney's fees and other costs and expenses associated with the litigation. In the event of any unauthorized or improper use of Malibu's Confidential Information or Special Property, or other circumstances giving rise to a claim by Malibu for injunctive relief arising under or relating to this Agreement, the parties agree that Malibu shall be entitled to a Temporary Restraining Order and Preliminary Injunction without the requirement of posting a bond as a condition therefor, and the filing of any action for injunctive relief shall be in addition to any legal action for damages or other relief pursuant to or relating to this Agreement.

   b. Dealers in Other Countries. Except for controversies or claims primarily relating to the validity or infringement of any of the Special Property of Malibu (as to which Malibu may bring an action in any court having jurisdiction over the matter), any controversy or claim arising under or relating to this Agreement or relating to the Products, shall be settled by binding arbitration to be conducted in Loudon County Tennessee, United States of America, using the arbitration services of a recognized commercial arbitration service (such as the American Arbitration Association) nominated or otherwise acceptable to Malibu. Any such arbitration shall be conducted by a sole neutral arbitrator, pursuant to the applicable commercial arbitration rules of the designated arbitration service. Each party will pay an equal share of all fees and costs of the arbitrator.  Any judgment on the award rendered by the arbitrator may be entered and enforced in any court having competent jurisdiction wherever located.

19. Entire Agreement and Severability.

Dealer Acceptance - Initial: _JK_____

30905743.4

Document Ref: DFZ7Q-QXWJH-P4S9U-GVGUW

a. This Agreement, including all exhibits and all policies, procedures, or programs and any Dealer Manual relating to this Agreement, contains the entire understanding and contract between the parties and expressly supersedes all prior and different agreements, representations and understandings. In signing this Agreement, Dealer agrees and represents that Malibu has performed all obligations under any prior contracts or agreements between the parties, that Dealer has no defenses, claims or set-offs relating to this Agreement or any prior contracts or agreements between the parties, and Dealer's execution of this Agreement shall constitute a waiver and release of any and all claims that Malibu has breached or violated Malibu's obligations under any prior contracts or agreements between the parties.

b. The headings in this Agreement are solely for the convenience of the parties, and shall not be considered as substantive terms of this Agreement.

c. Except for sales and incentive programs and policies that Malibu may publish from time to time relating to this Agreement, this Agreement may not be changed, amended or supplemented except by a subsequent written agreement signed by both parties (including a principal officer of Malibu).

d. If any provision of this Agreement is held illegal or unenforceable in a judicial or arbitration proceeding, such provision shall be severed and shall be operative, and the remainder of this Agreement shall remain operative and binding on the Parties to the fullest extent allowed by law.

e. This Agreement is binding upon the parties hereto, together with their respective successors and assigns.  In the event any provision of this Agreement is found to be unenforceable in whole or in part, the remaining provisions of this Agreement shall be enforced in accordance with the intent of this Agreement.

f. This Agreement shall not be effective until signed by both parties (and shall not be effective until signed by both parties, including two authorized signatures on behalf of Malibu, notwithstanding the conduct of any business between the parties), and may be signed in counter-parts, and electronic or facsimile signatures shall be deemed binding and enforceable. In signing this Agreement on behalf of Dealer, the undersigned representative represents and warrants that she/he has the full and unrestricted authority to sign this Agreement as a binding contract of Dealer, and as an expressly and properly approved action on behalf of Dealer (including any corporate resolutions or other approval actions).

20. Notices. Any notice required or permitted by this Agreement shall be in writing and will be sufficient if delivered in person, by email if receipt is acknowledged by the other party, or by sending such notice by recognized overnight courier service (such as FedEx or UPS) properly addressed to the other party's address set forth in this Agreement or as otherwise revised by written notice to the other party.  All such notices will be deemed given one (1) day after the date of sending.

21. Waiver. The failure of a party to insist upon performance strictly in accordance with the terms of this Agreement will not be deemed a waiver of the right to insist upon such performance at any time during the continuation of any default or with respect to the same or any other default on any future occasion.

22. Review Before Signing.  Dealer and its authorized representative agree and represent that it/they has/have carefully reviewed this Agreement before signing it, and that the terms and conditions of this Agreement are reasonable, satisfactory and acceptable to Dealer.

Dealer Acceptance - Initial: __JK____

[signatures on next page]

Dealer Acceptance - Initial: _JK_____

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the dates indicated below.

**Accepted on behalf of Malibu:**

*Eric Bondy*
_____   Date: _08 / 26 / 2022_____
Eric Bondy, Vice President of Sales

*Wayne Wilson*
_____   Date: _09 / 06 / 2022_____
Wayne Wilson, CFO

**Accepted on behalf of Dealer:**

_____   Date: _08 / 25 / 2022_____
Dealer's Authorized Representative

Printed Name: <u>Jim Kutches</u>

Title: <u>Acquisition & Compliance Director</u>

Dealer Acceptance - Initial: _JK_____

# EXHIBIT 1

Legal Name of Dealer: High Country Watersports ("Dealer" or "you")

Type of Entity and State or Province DBA:Tommy's Slalom Shop a Boat Dealership in CO

Dealer Location: 12900 W 43rd Drive, Golden, CO  80403, USA ("Dealer Location")

Dealer Administrative Office if different: Same as Above

Term: This Agreement starts on the Effective Date and will expire without further notice on June 30, 2023 unless earlier terminated under this Agreement ("Term"). At the time of the expiration or earlier termination of this Agreement, your appointment as a Malibu dealer will automatically terminate.

The following is a list of counties that are assigned to Dealer:

**Colorado:: Adams, Alamosa, Arapahoe, Archuleta, Baca, Bent, Boulder, Broomfield, Chaffee, Cheyenne, Clear Creek, Conejos, Costilla, Crowley, Custer, Denver, Dolores, Douglas, Eagle, El Paso, Elbert, Fremont, Gilpin, Grand, Hinsdale, Huerfano, Jackson, Jefferson, Kiowa, Kit Carson, La Plata, Lake, Larimer, Las Animas, Lincoln, Logan, Mineral, Montezuma, Morgan, Otero, Park, Phillips, Pitkin, Prowers, Pueblo, Rio Grande, Routt, Saguache, San Juan, San Miguel, Sedgwick, Summit, Teller, Washington, Weld, Yuma**

Dealer Acceptance - Initial: _JK_____

Document Ref: DFZ7Q-QXWJH-P4S9U-GVGUW

## 2023 Axis PRODUCT LINES

Axis A20

Axis A225

Axis A24

Axis T220

Axis T235

Axis T250

Dealer Acceptance - Initial: _JK____

## AXIS BOAT MAINTENANCE AND DEALER PREPARATION PROCEDURES

Without limiting its other obligations under the Dealer Agreement:

Maintenance and Storage:

Dealer will exercise all commercially reasonable efforts to properly maintain and store all Axis boat products in its inventory in accordance with general industry standards and best practices in connection with the storage and maintenance of motor boat inventories of the type and class of the Axis boat products, including but not limited to:

(1)      Protecting Axis boat products from temperature fluctuations such as freezing climates.

(2)      Providing other appropriate cover for Axis boat products stored outside in order to ensure that interiors remain dry and exteriors are shaded from the sun.

(3)      Removing shrink-wrap from Axis boat products upon delivery to prevent condensation and mildew on interiors and discoloration of gelcoat on exteriors.

Dealer Preparation and Record Keeping:

In connection with the sale or other distribution of any Axis boat product to a retail customer, Dealer will:

(1)      Perform any and all necessary rigging installation and inspection services prior to delivery to the retail customer.

(2)      Furnish the retail customer with information provided by Malibu as to the safe and proper use and maintenance of Axis Products.  This will include but is not limited to Axis's operational manual, engine manual and vinyl care manual.

(3)      Furnish the retail customer with all notices, correction letters, safety messages, and any other written material provided by Malibu in connection with Axis boat products.  Upon delivery to the retail customer, Dealer will complete the Warranty Registration card provided and forward to Malibu or complete the online warranty registration within ten (10) days.  If using the warranty card, the card must be signed by the retail customer in the presence of the Dealer or Dealer's representative, and a copy sent to Malibu.

(4)      Maintain complete sales and service records regarding all Axis boat product customers.  Dealer agrees to report to Malibu on a regular basis the names and addresses of the Axis boat products customers, to the extent not prohibited by applicable law.

Dealer Acceptance - Initial: __JK____

30905743.4

Document Ref: DFZ7Q-QXWJH-P4S9U-GVGUW

**EXHIBIT 2**
**PERFORMANCE STANDARDS**

The following performance standards are in addition to those in Sections 7 (e), (f) and (g) of the Agreement (together, the "Performance Standards"). They will be measured and reviewed every fiscal year (beginning July 1 of each year), unless another measuring period is noted below.

1.  Dealer will maintain a proper level of floorplan to support Malibu & Axis commitment and purchases estimated at $12582277

2.  Dealer will be required to hit an Axis target Market Share of 18% by 12/31/2022 & 18%  by 6/30/2023 as agreed to on your MY23 Axis Commitment Sheet. This will be measured based off SSI data.

3.  Your CSAT index for any rolling six month period shall meet a minimum score of 91% and a minimum survey return rate of 40% for New Owner Survey and a minimum score of 85% and a minimum survey return rate of 25% for Year 1 Owner Survey.   Per DPP your scores will be measured each July, October, January and April with these results setting the RSI level for the current quarter.

4.  You must complete warranty registration for 100% of the Malibu boat products you sell. Each boat sold must be registered within 10 days after customer takes delivery of the boat.

5.  Quarterly update identifying the dealership sponsored promotional personnel and a calendar of promotional events. Number to be agreed upon with Malibu Sales Rep and to be based on market size and market factors.

6.  Dealers are required to update inventory in Dealer CRM on a weekly basis. Weekly inventory must be updated in the Dealer CRM prior to midnight eastern time each Friday.

7.  Attendance at all Sales, Service, Regional and North American Dealer Meetings is required by appropriate dealership personnel.  Attendance of and participation in Malibu & Axis sponsored Sales Training will be supported by Coop.

8.  Malibu Boats shall have the sole right to determine qualification and compliance with the terms and conditions of Dealer Performance Program.  Malibu reserves the right to modify, suspend, terminate or replace the DPP program or any sales program at any time.

9.  Dealer will be required to stock a representation of the following new models: A225 & T235

10. Dealer is required to have a clearly identified link on their dealership website that links visitors to the Axis Build A Boat.

11. You agree that you shall represent Malibu Products at the following boat shows: Denver, Ft Collins, Colorado Springs

12. Dealer is required to be a current member of WSIA (Water Sports Industry Association) and to actively promote "WAKE RESPONSIBLY".

13. X

Dealer Acceptance - Initial:  _JK_____

**Accepted on behalf of Dealer:**

_____    **Date:** 08 / 25 / 2022
Dealer's Authorized Representative                                      _____

Printed Name: <u>Jim Kutches</u>

Title: <u>Acquisition & Compliance Director</u>

Dealer Acceptance - Initial: _JK_____

**EXHIBIT 3**

**Exclusive Towed Water Sports Boat Brand**. You agree that, without the prior written authorization of Malibu (which may be conditioned, delayed or withheld in Malibu's sole and absolute discretion), you will not sell, advertise for sale, or otherwise arrange, negotiate, assist or facilitate the sale of any new boats which are manufactured or distributed by or bearing the trademarks or logo in any substantial matter of any inboard sport-boat brand (each a "**Direct Competitor**"), which means a brand of trailerable fiberglass boats with inboard or inboard/outboard gasoline powered engine configurations, between 18 and 26 feet LOA, and configured to be used as the towing vessel for towed water sports activities, including, but not limited to, Nautique, Mastercraft, Supra, Moomba, MB, Centurion, Supreme, Epic, Tige, ATX, and Heyday.  You further agree that, unless and until Malibu terminates this Agreement or notifies you that Malibu will not renew this Agreement at expiration, without the prior written authorization of Malibu (which may be conditioned, delayed or withheld in Malibu's sole and absolute discretion), you will not engage in negotiations or enter into any contract or agreement of any nature whatsoever with a Direct Competitor.  You acknowledge and understand that violation of this section 5 is grounds for Malibu's immediate termination of this Agreement, subject to applicable law.

Exclusivity - Malibu & Axis Brands are to be the exclusive inboard watersports brands at 12900 W 43rd Drive, Golden, CO  80403, USA

---

**Accepted on behalf of Dealer:**

_____        **Date:** ___08 / 25 / 2022___

Dealer's Authorized Representative

Printed Name: Jim Kutches

Title: Acquisition & Compliance Director

---

Dealer Acceptance - Initial: __JK____

Document Ref: DFZ7Q-QXWJH-P4S9U-GVGUW

# Signature Certificate

Reference number: DFZ7Q-QXWJH-P4S9U-GVGUW

| Signer | Timestamp | Signature |
|---|---|---|

**Jim Kutches**
Email: jkutches@gettommys.com

| | | |
|---|---|---|
| Sent: | 18 Aug 2022 17:52:29 UTC | |
| Viewed: | 25 Aug 2022 19:05:28 UTC | |
| Signed: | 25 Aug 2022 19:07:11 UTC | |

**Recipient Verification:**
✔ Email verified                        25 Aug 2022 19:05:28 UTC

IP address: 50.238.244.54
Location: New Haven, United States

**Eric Bondy**
Email: ericb@malibuboats.com

| | | |
|---|---|---|
| Sent: | 18 Aug 2022 17:52:29 UTC | |
| Viewed: | 26 Aug 2022 18:13:11 UTC | |
| Signed: | 26 Aug 2022 18:13:43 UTC | |

**Recipient Verification:**
✔ Email verified                        26 Aug 2022 18:13:11 UTC

IP address: 96.33.98.50
Location: Loudon, United States

**Wayne Wilson**
Email: waynew@malibuboats.com

| | | |
|---|---|---|
| Sent: | 18 Aug 2022 17:52:29 UTC | |
| Viewed: | 06 Sep 2022 15:22:00 UTC | |
| Signed: | 06 Sep 2022 15:25:23 UTC | |

**Recipient Verification:**
✔ Email verified                        06 Sep 2022 15:22:00 UTC

IP address: 96.33.98.50
Location: Loudon, United States

Document completed by all parties on:
06 Sep 2022 15:25:23 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 30,000+ companies worldwide.



# Exhibit 2

**Exhibit 2**

**Dealership Agreement for Tommy's Lewisville MY23,**
*Malibu 2023 Model Year Multi-Year Agreement*

APP0043

MALIBU

2023 MODEL YEAR MULTI-YEAR DEALER AGREEMENT

This Dealer Agreement ("Agreement") is between Malibu Boats, LLC, a Delaware limited liability company having its principal place of business at 5075 Kimberly Way, Loudon TN 37774, USA ("Malibu") and Tommy's Lewisville 375 Oakridge Blvd, Lewisville, TX 75057, USA

In consideration of the terms set forth in this Agreement, Malibu and Dealer hereby contract and agree as follows:

| Dealer Address: | 375 Oakridge Blvd, Lewisville, TX 75057, USA |
| --- | --- |
| Effective Date: | July 1, 2022 |
| Expiration Date | June 30, 2025 |

1. Appointment of Dealer.
    a. Malibu hereby appoints Dealer as an authorized retail dealer during the term of this Agreement for the retail sale and service of Malibu Products to end use retail consumers at Dealer's approved store location(s) within the Dealer Area ("Dealer Area"), as set forth in Exhibit 1.  Dealer will not sell or service the Products from other locations in or out of the Dealer Area without Malibu's express, prior approval. Dealer shall not sell the Products through sub-dealers or brokers.  This Agreement extends only to the Products as expressly set forth in Exhibit 1, and Malibu may add other products or engage in other business activities (including adding new products or brands during the term of this Agreement) which are outside the scope of this Agreement unless/until otherwise expressly added to or incorporated into the scope of this Agreement.
    b. Malibu will not appoint another dealer for the Products in the Dealer Area during the term of this Agreement, except that Malibu may appoint another dealer in the Dealer Area if Dealer materially breaches any of the terms of this Agreement (in which case the Dealer Area shall remain non-exclusive for the remaining term of this Agreement).  Malibu may also appoint another dealer in the Dealer Area to represent any products or services which are outside of the scope of Dealer's appointment.  Malibu does not restrict the sale of Products into areas as to which no dealer has been assigned, and the referral of potential customers to Dealer in any such unassigned area shall not be construed to modify the Dealer Area to include any unassigned area. The Dealer Area may be modified in any subsequent agreement.
    c. Dealer's appointment shall be subject to the terms of this Agreement, including any schedules attached to this Agreement, and shall also be subject to any Malibu policies, procedures or programs

Dealer Acceptance - Initial: _TK_____

and/or any Dealer Manual, any of which may be published from time to time (and which may be amended and shall be effective as amended during the term of this Agreement), all of which are incorporated by reference as a part of this Agreement.  Malibu shall make all policies, procedures, or programs and any Dealer Manual available to Dealer via Malibu's dealer website portal or through other communications, and it is Dealer's responsibility to access, review and comply with these policies, procedures, programs and/or any Dealer Manual because they are fully enforceable as a part of this Agreement.

2.  <u>Term</u>.  This Agreement must be signed by both parties to be effective, and starts on the Effective Date and will expire and terminate as set forth in Exhibit 1, unless earlier terminated under this Agreement.  Malibu will provide Dealer with a new agreement, or notice of non-renewal or termination, reasonably in advance of the expiration of this Agreement.  In the event any new agreement is signed, this Agreement shall be deemed superseded, null and void, as of the effective date of any new agreement.  Any new agreement may contain terms, conditions and requirements which are different than those contained in this Agreement.  Nothing in this Agreement (including provisions or projections dealing with future performance goals or requirements for periods beyond the term of this Agreement) shall be construed to create a promise, representation or agreement of a continuing relationship beyond the term of this Agreement, and this Agreement shall be deemed terminated, null and void, if no new agreement is signed except as to any provisions which expressly continue beyond the term of this Agreement. Any payment or performance following the expiration or termination of this Agreement will not be construed as a renewal or extension of the Term or this Agreement, but as independent and separate transactions terminable at will by Malibu.

3.  <u>Dealer Responsibilities.</u>  In addition to the other terms of this Agreement, Dealer shall:

   a.  Maintain a fully operational retail sales and service facility at the Dealer Location.

   b.  Identify itself as a dealer of the Products, and use its best efforts as an authorized Malibu dealer to promote and sell the Products in the Dealer Area.

   c.  Meet or exceed the performance standards as set forth in Exhibit 2, including any initial product order, order commitments, market share requirements, customer satisfaction benchmarks, training, and inventory or other financing commitments, as specified in Exhibit 2. At least thirty days (30) before the commencement of each model year during the term of this Agreement, Dealer shall enter into a new, updated Exhibit 2 (Performance Standards), which is acceptable to Malibu, setting forth the Performance Standards applicable to Dealer during the remaining term of this Agreement.  This Agreement shall end and be immediately terminated upon Dealer's failure to comply with the annual requirement.

   d.  Maintain an adequate service department, including trained service department staff for whom Malibu shall provide service training from time to time (Malibu shall provide the training at no charge to Dealer, but Dealer shall pay all out-of-pocket expenses incurred by its personnel in attending this training), and also including personnel with OEM certification to provide engine and other component service, which is adequately equipped and stocked to provide prompt and convenient service (including any aftermarket installations or modifications which may be independently offered or performed by Dealer for Dealer's customers, and as to which Malibu makes no recommendation, representation, approval or warranty) to purchasers and owners of the Products (whether or not originally sold by Dealer).  Service work may be subcontracted only with Malibu's prior authorization.

Dealer Acceptance - Initial: _JK_____

e.  Make a copy of Malibu's limited warranty available for review by prospective customers of the Products, and provide all buyers with a copy of Malibu's limited warranty and all other Malibu and component documents and manuals in connection with any sale of the Products (as well as copies of all component warranties).  Dealer shall not make any representations relating to Malibu's limited warranty.

f.  Provide prompt and thorough pre-delivery commissioning, delivery and warranty registration (including registration with the manufacturer of all component warranties, such as engines) of the Products, in accordance with Malibu's (or any applicable component manufacturer's) policies and procedures.

g.  Provide warranty service on the Products (whether or not originally sold by Dealer) in accordance with Malibu's applicable warranty policies and procedures (which may be changed from time to time), as to which Malibu agrees to pay Dealer at Dealer's standard (or agreed upon) rate, subject to reasonable audits of Dealer's warranty service performances from time to time.

h.  Dealer shall not offer new products for sale of any other brands and products which compete with the Products, as set forth in Exhibit 3.

i.  Purchase and maintain adequate liability and casualty insurance on Dealer's operations and business activities, with limits of not less than two million dollars ($2,000,000), with proof of such insurance to be made available upon request.

j.  Notify Malibu immediately of any accidents involving Malibu's products of which Dealer becomes aware.

k.  Notify Malibu immediately in the event any Products are presented more than two (2) times for unresolved warranty claims, including warranty claims on engines and components not warranted by Malibu.

l.  Comply with, and not take any action in contravention or inconsistent with, all applicable laws and regulations in the operation of Dealer's business and the marketing and sale of the Products, including in the case of International Dealers compliance with all laws, regulations, controls and tariffs applicable to the import and export of the Products, including the United States Foreign Corrupt Practices Act.

m.  Indemnify and hold Malibu, together with its parent, affiliates, employees, offices and agents, harmless from any and all claims and damages arising as a result of any alleged fault, negligence, breach, violation of law or wrongdoing on the part of Dealer.  In the event any such claim arises, Dealer shall promptly notify Malibu in writing of the claim.  Malibu shall have the sole and exclusive right to control and conduct all litigation or other proceedings, and to enter into any settlement negotiations and settlements, as determined in its sole discretion, including the selection and retention of counsel of its choice.  Under no event shall Dealer give any admission, or enter into any settlement or compromise of any claim, suit, or action, without the prior written consent of Malibu, which shall be given or withheld in Malibu's sole discretion.

4.  <u>Financial Status and Credit.</u>

a.  Dealer shall maintain a credit standing and financial condition satisfactory to Malibu, and shall upon request provide Malibu with complete and accurate financial statements for Dealer and its principal(s).  Dealer consents to full and open disclosure of financial information concerning Dealer

between Malibu and any financial institution or floor plan lender which finances Dealer's purchase and inventory of Products, and Dealer hereby authorizes any such financial institution or floor plan lender to provide Malibu with all financial information relevant to Dealer including financial statements or reports, payment or performance history, credit references, financial analyses, inventory reports or audits, and other information concerning Dealer's performance of its obligations. Upon request, Dealer shall provide written confirmation authorizing these disclosures. Dealer shall, at all times, comply with all financing and lending requirements and obligations, including the making of all payments, curtailments, and so forth.

b.  Dealer shall pay for all Products in accordance with Malibu's terms of payment, including payment terms applicable to specific orders. All Products shall be paid for in full at the time of shipment, unless otherwise expressly agreed by Malibu.

c.  Malibu may, but shall not be required to, establish, modify, or discontinue credit terms or limits for Dealer. Dealer hereby grants Malibu a purchase money security interest in all Products until they are paid for, and Dealer authorizes Malibu to file a financing statement or any other document(s) that may be necessary to perfect or provide other record notice of that security interest.

d.  In the event any Products are not paid for when due, Malibu reserves all rights relating to that non-payment, and shall have the right to charge interest on all such overdue amounts at the maximum rate allowed by law, and to offset or withhold any amounts due by it to Dealer against any of Dealer's obligations to Malibu.

e.  Malibu may accelerate and declare all outstanding amounts owed by Dealer as immediately due and owing upon any event of Dealer non-payment that continues for more than fifteen (15) days after the payment due date, or upon the expiration or termination of this Agreement.

5.  Orders, Prices, Terms, Shipment.

a.  Dealer shall submit all orders in the manner, and following the procedures, prescribed by Malibu. No order shall be considered accepted until acknowledged and approved by Malibu, and Malibu reserves the right to reject any order (in whole or in part) in its sole discretion. Malibu may require deposits or progress payments (which will be forfeited and non-refundable as liquidated damages upon Dealer's cancellation or failure to accept or pay for that order) on orders, or may impose other terms and requirements as a condition of any order. Likewise, Malibu may require Dealer to pay a cancellation or restocking fee, as determined by Malibu, on any order which is cancelled or as to which Dealer fails or refuses to take delivery, or as to any Products which Malibu is required to purchase under the terms of any inventory floor plan or other financing arrangements.

b.  Prices will be determined based on Malibu's applicable wholesale price list or program in effect on the date of Dealer's order, except for any Malibu buying or promotion programs that may be in effect from time to time. Malibu may change its wholesale price list, or any buying or promotional programs, in its sole discretion, as to any orders which have not then been submitted and accepted, without prior notice to Dealer. Dealer shall not be eligible to participate in any buying or promotional programs, or to receive rebates, payments or incentives, during any period in which Dealer is in default of any provision of this Agreement. All prices shall be net of shipping, delivery and handling charges, insurance, sales, use or VAT taxes, or other taxes, customs, duties, governmental or other charges, all of which shall be paid by Dealer.

Dealer Acceptance - Initial: _JK_____

c.  To the extent that Dealer's printed purchase orders or other purchasing documents contain terms and conditions which are inconsistent with this Agreement (or any other purchase documents or acknowledgements used by Malibu), Dealer agrees that Malibu's terms and conditions, as in effect from time to time, shall prevail and that Dealer's terms and conditions shall have no application to the transaction (and shall not supplement or supersede Malibu's terms and conditions), and shall be null and void.

d.  Any production or shipping dates shall be preliminary only, and shall reflect Malibu's best estimate of the date any order shall be manufactured or shipped.  Malibu reserves the right to allocate the manufacture or shipping dates of all Products in its sole discretion.  Malibu shall make commercially reasonable efforts to notify Dealer of any anticipated material delays in the manufacture or shipping of any order, and Dealer shall have five (5) business days from the date of any such notification to cancel any such order.  Malibu shall have no liability or responsibility to Dealer on account of any delays in the manufacture or shipping of any order, whether resulting from Malibu's allocation of the manufacture or shipment of its products or any other reason or cause.

e.  All sales shall be FOB Malibu's manufacturing facility (as applicable to each order) (the "Point of Shipment"), and Dealer shall solely and exclusively have all risk of loss when the Products leave Malibu's Point of Shipment, regardless of whether Malibu has utilized, suggested, or approved any common carrier, third party or any method of shipment, and regardless of whether shipping or freight costs are included in the invoice for the Products.  Dealer shall be solely and exclusively responsible for ensuring that Dealer, any common carrier or third-party who takes possession of and/or ships the Products is properly and sufficiently licensed, qualified, competent and adequately insured, and Malibu shall have no responsibility or liability in connection therewith.  Dealer shall acquire or purchase any shipping insurance it may desire.  Dealer shall indemnity, defend and hold Malibu harmless from any and all demands, claims, suits, liabilities, damages and losses of any kind or nature whatsoever (whether incurred by Dealer or any third-party), which arise out of or relate to the conduct or actions of Dealer, any common carrier, or any third-party who takes possession of and/or ships the Products.

f.  Upon receipt of any Products, Dealer will promptly inspect the Products and inform Malibu of any non-conformities or defects.  Any non-conformities or defects as to which notice is not given within five (5) days of Dealer's receipt of the Products shall be deemed waived.  All non-conformities or defects shall be repaired or addressed through Malibu's warranty procedures, except as otherwise expressly agreed by Malibu, and Malibu gives no other warranties to Dealer with respect to any such non-conformities or defects.

g.  No return of the Products is permitted, absent Malibu's express agreement and written authorization, which shall be given or withheld in Malibu's sole discretion

6.  <u>Marketing and Promotional Activities.</u>

a.  Dealer shall sell or distribute the Products only to end retail customers from Dealer's approved store location(s), or during other pre-approved boat shows or promotional events.  Although Dealer may sell to customers (who, on their own, seek to purchase Products from Dealer) residing in other countries, Dealer shall not sell or ship Products for initial delivery to or for the customer outside of the country in which the Dealer Area is located.  Dealer may sell Products to other Malibu dealers (in

Dealer Acceptance - Initial: _JK_____

Dealer's same country, and not internationally) on a wholesale-to-wholesale basis, providing that Malibu is promptly informed of all such transactions.

b.  Dealer shall identify itself as a Malibu dealer at its approved store location(s), and shall maintain a dealer-specific website prominently promoting and advertising Malibu's products.  Dealer's website shall include an embedded link to the Malibu's website, in accordance with Malibu's policies.

c.  Dealer's website shall specifically promote the sales and service of the Products in the Dealer Area, and Dealer shall not advertise, promote or market the sales or service of the Products outside of the Dealer Area, except that Dealer may advertise or market new Products through internet listings on Dealer's own website or other general marine or multiple listing websites (providing that such listings identify Dealer's location(s), and that such general listings are restricted to Products which are in the Dealer's inventory) which are focused on the sale of Products to customers within Dealer's Area to the fullest extent reasonably possible.  Malibu does not restrict the advertising of used products.

d.  Nothing in this Agreement shall be construed as prohibiting Dealer from selling the Products to customers residing outside the Dealer Area, who visit the dealership and seek to purchase Products from Dealer. However, with respect to the sale of any Products outside of the Dealer Area (as determined by Malibu: (i) Dealer shall forfeit any and all incentives originally assigned to or paid to Dealer on that unit, including normal dealer program dollars associated with annual commitment programs, factory to dealer retail or wholesale incentives or retail spiff incentives; (ii) Dealer will be billed for the total amount of incentives forfeited in connection with the next available boat ordered (or billed independently of any order, as determined in Malibu's sole discretion); and (iii) the forfeited incentives may be paid in whole or in part by Malibu to the dealer in whose territory the boat in question is registered and who is responsible for providing warranty service to the end retail user, to assist in providing appropriate customer support for the end retail user. Any such out of Dealer Area sales shall also be subject to any additional Malibu policies and procedures that may be established by Malibu from time to time.

e.  Dealer shall not advertise the price for any new Products (whether or not acquired directly from Malibu or from a third-party) for the current and immediately prior model years, except as otherwise expressly authorized by Malibu (such as with respect to a specific promotional program).  This restriction shall not, however, restrict or prohibit Dealer from communicating a proposed price for a Product to individual, prospective customers.

f.  Upon request, Dealer shall provide Malibu with copies of all Dealer advertising, promotional and marketing communications, postings and publications.

g.  Dealer acknowledges that this Agreement does not restrict, hinder or impair Dealer's decision as to the retail price at which any Product may be sold, and that the final sales price of any Product remains within the Dealer's sole discretion and control.

h.  The parties agree that these restrictions and policies are reasonable and for their mutual benefit, that any violation of these restrictions and policies are substantially likely to mislead the public concerning the Products, their availability and other material information, and that any violation of these restrictions and policies will be a violation of Malibu's rights and interests in its trademarks.  These restrictions shall apply during the term of this Agreement, and for a period of twenty-four (24) months thereafter.

Dealer Acceptance - Initial: _JK_____

7. <u>Confidential Information.</u> Dealer and its employees, contractors and agents agree to maintain in strict confidence, and not disclose and to use only in the performance of this Agreement, any confidential or proprietary information ("Confidential Information") concerning the business affairs or operations of Malibu or its affiliates, or the Products. Confidential Information includes anything that Malibu considers to be confidential and proprietary including, without limitation, all trade secrets, customer lists, price lists or pricing programs or information, marketing or business plans, sales programs, or other information concerning the manufacture or distribution or promotion or marketing of the Products. Dealer shall be responsible for all breaches by its employees, contractors or agents. Dealer will return or destroy all Confidential Information (including electronically store information or any documents relating thereto in any form or media) to Malibu upon the termination or expiration of this Agreement. These obligations relating to the Confidential Information shall remain in effect indefinitely, including after the termination or expiration of this Agreement.

8. <u>Trademarks, Copyrighted and Other Materials.</u> Malibu and/or its affiliated companies are the exclusive owners of certain trademarks, service marks, logos and copyrighted materials (including hull, product and component designs, together with any industrial designs, patent or copyright details, patents, technical information or other confidential information relating to the Products or otherwise, which is now or hereafter owned or used by Malibu), which Malibu uses or may use in connection with the Products or otherwise in connection with its business ("Special Property"). Dealer will not have, nor shall it acquire, any rights in the Special Property (including any trademarks, service marks, logos and copyrighted materials added by Malibu in the future). Dealer will not use or register any of the Special Property for any purpose (including as a part of Dealer's corporate/entity or business name), except as expressly authorized in writing by Malibu. Dealer is authorized to use the Special Property for the limited purpose of identifying the Products offered for sale by Dealer, and to advertise the sale of those Products, providing that Dealer shall not use the Special Property in any form or style not provided or approved by Malibu. This authorization will not be interpreted as a license for the Special Property, and Dealer will acquire no proprietary or other rights with respect to the Special Property, and this (or any other) authorization for limited use will terminate simultaneously and automatically with the termination or expiration of this Agreement. Dealer will not use, register or claim any right or interest in the Special Property, nor shall Dealer create any other trademarks, copyrighted or legally protected materials relating to the Products or the Malibu. All such property shall be the sole and separate property of Malibu or its affiliates, as to which Dealer shall have no right or interest whatsoever. Dealer shall promptly notify Malibu of any suspected or actual infringement, unauthorized use of, or challenge to the Special Property or Malibu's (or its affiliate's) rights therein, and Dealer agrees that neither it nor anyone acting in concert with it shall contest Malibu's (or its affiliate's) sole ownership and rights in and to the Special Property. In the event of any improper or unauthorized use of, or challenge to, the Special Property, Dealer will cooperate with and assist Malibu in all actions to defend against all claims which are adverse to Malibu's interests therein, as requested or directed by Malibu. These obligations relating to the Special Property shall remain in effect indefinitely, including after the termination or expiration of this Agreement.

9. <u>Assignment and Transfer of Agreement.</u> Dealer understands and acknowledges that the rights and duties set forth in the Agreement are personal to Dealer (or its current principal(s) if dealer is a corporation, company or other business entity) and that Malibu has entered into the Agreement in reliance on the business skill and experience, financial capacity, and personal character of Dealer (and its current

Dealer Acceptance - Initial: _JK_____

principal(s), if applicable).  Neither Dealer, nor any principal(s), without Malibu's prior written approval, shall, by operation of law (including upon the death or disability of Dealer or its principal(s)) or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association, LLC, or corporation, any interest in the Dealership or this Agreement. Malibu agrees that it will give good faith consideration to any succession plan or any proposed assignment of this Agreement to a new Dealer (or principal), except that the approval or disapproval of any such succession plan or assignment shall be in Malibu's sole discretion.  Any attempted or purported succession or assignment not having the prior written approval of Malibu shall be null and void, and shall constitute a default hereunder.

10. <u>Default Events.</u> In addition to any failure of Dealer to perform the requirements, terms and conditions set forth elsewhere within this Agreement, the following shall also be deemed violations and events of default under this Agreement, all of which (whether specifically listed in this paragraph or otherwise set forth in this Agreement) shall be deemed "good cause" for the non-renewal or termination of this Agreement, or allowing Malibu to take any other actions allowed under this Agreement:

    a.   Any failure of Dealer to pay when due any amounts owed to Malibu or its affiliates.

    b.   Any failure by Dealer to fulfill the Performance Requirements set forth in Exhibit 2, or to enter into an updated Exhibit 2 (Performance Standards) which is acceptable to Malibu, Prior to the commencement of each model year during the term of this Agreement.

    c.   Any failure to Dealer to have sufficient and adequate floor plan financing and other financial arrangements or resources to perform Dealer's obligations under this Agreement.

    d.   Any actions or undertakings by Dealer to conduct its business operations outside of the Dealer Area, or any discontinuance by Dealer of its business operations (including the closure of any approved location) inside the Dealer Area.

    e.   Any improper marketing or promotional activities by Dealer, or any unauthorized disclosure of Malibu's dealer or wholesale buying/pricing information.

    f.   Any action or omission by Dealer in violation of Malibu's policies, procedures, or programs or any Dealer Manual, or any unauthorized disclosure of Malibu's marketing programs or business strategies.

    g.   Any sale (or entering into any agreement to sell) any competing Brands or product lines in violation of this Agreement.

    h.   Any improper use by Dealer of Malibu's Confidential Information or Special Property.

    i.   Any act of fraud, deception or illegal conduct by Dealer or its principal(s), or any failure to maintain and operate Dealer's business in accordance with applicable legal requirements, including any licenses or permits.

    j.   Dealer's (or Dealer's principal(s)') insolvency, bankruptcy, assignment of its assets for the benefit of creditors, or the initiation of any similar proceedings by, or against, Dealer or its principal(s).

    k.   Any attempted or completed assignment, sale or transfer of Dealer or its business or business assets, or a material change (as determined by Malibu in its sole discretion) in Dealer's ownership or principal(s), except in accordance with the procedures set forth in this Agreement.

    l.   Any failure of Dealer to fulfill its other obligations under this Agreement.

11. <u>Remedies and Procedures for Default.</u> Upon the occurrence of any event of default, Malibu may by written

Dealer Acceptance - Initial: _JK_____

notice to Dealer undertake or implement any or all of the following remedies, together with all other remedies as may be available to Malibu:

    a.   Provide Dealer with notice of, and an opportunity to cure, any such violation(s) and/or event(s) of default (within thirty (30) days following the notice) if Malibu determines in its sole discretion that any such violation(s) and/or event(s) of default can reasonably be cured, or if otherwise required by law.

    b.   Suspend its performance hereunder, including any warranty authorizations or any sale of Products, parts and accessories to Dealer, until such time as Dealer provides Malibu with reasonable assurance of Dealer's ability to perform its obligations hereunder.

    c.   Declare that the Dealer Area shall no longer be exclusive as to Dealer, including the appointment of one or more co-dealers to sell the Products in the Dealer Area during the remaining term of this Agreement and thereafter.

    d.   Declare Dealer ineligible to participate in any incentive programs, special buying programs, rebates, bonuses or other financial incentives.

    e.   Cause any deposits (including deposits on Product orders), program incentives, rebates, bonuses and other financial incentives to be forfeited, cancelled, or not renewed.

    f.   Cancel any Dealer orders then pending.

    g.   Terminate this Agreement as a result of any violation(s) or event(s) of default.

The exercise or implementation of any remedy by Malibu shall not be exclusive, nor shall Malibu's use or reliance on a remedy constitute a waiver of Malibu's right to impose additional remedies for the same breach, either at the same time or subsequently. Dealer's performance of its obligations hereunder shall be deemed a condition precedent to Malibu's obligations under this Agreement.

12.  <u>Other Termination Events.</u>  This Agreement may also be terminated upon the occurrence of any of the following:

    a.   If Malibu violates, fails to perform, or is otherwise in default of its obligations under the terms of this Agreement, and the violation, failure or performance or other default continues for thirty (30) days following Dealer's written notice thereof to Malibu.

    b.   If Dealer gives sixty (60) days written notice to Malibu of Dealer's intent to resign as a Dealer, except that Malibu may elect to make Dealer's resignation effective immediately (or in less than sixty (60) days) upon its receipt of any such notice.

    c.   If the parties enter into a mutually acceptable termination agreement.

    d.   If the parties fail to enter into a new, superseding dealer agreement upon the expiration of this Agreement.

13.  <u>Effect of Termination or Expiration of Agreement; Special Provisions</u>

    a.   Any expiration or termination of this Agreement will not relieve any party from any obligation or liability to the other party that has accrued pursuant to this Agreement prior to the time of termination or expiration.

    b.   Malibu is not obligated to purchase any of Dealer's inventory of the Products, signage or equipment under any circumstances (including the termination or expiration of this Agreement), except that

Dealer Acceptance - Initial: _JK_____

Malibu may at its option and in its sole discretion repurchase from Dealer (free of all liens and claims) all or any portion of the Products in Dealer's inventory at the lesser of (i) the net wholesale purchase price paid to Malibu for such Products less any discounts, promotional payments, rebates or other allowances previously paid or credited by Malibu, or (ii) the depreciated value of such Malibu Products as reasonably determined by Malibu, with any repurchase being further subject to credit or offset by Malibu for all amounts then owed and unpaid by Dealer.  Any repurchases by Malibu will be FOB the Dealer Location; and Dealer will promptly make such Malibu Products available for inspection and pick-up by Malibu or its agent or carrier as instructed by Malibu.

c.   In the event of the termination or expiration of this Agreement, Malibu is relieved from any obligation to make any further Product (including parts and accessories) shipments under the Agreement, and may cancel all of Dealer's unshipped orders for Products (including parts and accessories), irrespective of previous acceptance by those orders, except as otherwise expressly agreed in writing between the parties.  The acceptance of orders from the Dealer, the continuous sale of boats to the Dealer, or any other act or transaction of business, after the termination or expiration of this Agreement shall not be construed as a continuation of this Agreement, the commencement of a new agreement, or a waiver of any termination of this Agreement.

d.   Upon the termination or expiration of this Agreement, all obligations owed by Dealer to Malibu shall become immediately due and payable, whether otherwise then due or not (without presentment, demand, protest or notice of any kind, all of which are waived by Dealer), and Malibu may offset or deduct from any or all sums owed to Dealer any or all sums owed by Dealer, returning to Dealer the excess, if any.

e.   Upon the effective date of any termination or expiration of this Agreement, Dealer shall immediately cease to hold itself out as a Malibu dealer or a dealer of the Products, and shall discontinue the use of all trademarks, trade names, signs, logotypes or any other Special Property of Malibu, and any license or agreement for the use thereof shall be deemed terminated.

f.   During the term of this Agreement, and for a period of twenty-four (24) months following the termination or expiration of this Agreement, Dealer shall not disparage Malibu, any of Malibu's officers or employees, or any Malibu Product, or otherwise take any action which could reasonably be expected to adversely affect the reputation of Malibu, any of Malibu's officers or employees, or any Malibu Product.

14.  Reservations.   Malibu shall have the right in its sole discretion to allocate Products among dealers and customers as it determines appropriate, change the configuration or construction of, or specifications for, any of the Products, to discontinue the manufacture or distribution of any of the Products, all without incurring any obligation or liability to Dealer.

15.  Status of Parties.   Dealer is an independent business contracting and conducting business on its own behalf, and not as the agent, partner, franchisee, or joint venturer of Malibu or its affiliates, for any purpose whatsoever.  Except for Dealer's agreement and obligation to comply with this Agreement, the management of Dealer's business and the formulation of plans, policies and procedures for the operation of Dealer's business are the sole prerogative and responsibility of Dealer.

16.  Time of the Essence; Force Majeure. Time is of the essence as to all aspects of this Agreement and its performance, provided however that no party will be deemed in breach of this Agreement for any reasonable

Dealer Acceptance - Initial:  _JK_____

delay or failure in performance of any non-monetary obligation due to any force majeure cause outside of its control, for so long as such condition of force majeure materially exists.

17. <u>Governing Law, English Language.</u>  This Agreement shall be governed by the substantive laws of the state of Tennessee, without regard to choice of laws principles.  In the event Dealer is outside of the United States, the parties agree that the United Nations Convention on Contracts for the International Sale of Goods shall have no applicability.  In the event any state law (or national law in the event Dealer is outside of the United States), requires or imposes additional or different terms than those set forth in this Agreement, those additional or different terms shall be deemed to supplement or supersede the terms of this Agreement, but only to the minimum extent required by law.  All other provisions of this Agreement shall remain in effect, and shall be fully enforceable.

It is the express wish and intent of the parties that this Agreement and all related documents, including notices and other communications, shall be drawn up in the English language only. *Il est la volonté expresse des parties que cette convention et tous les documents s'y rattachant, y compris les avis et les autres communications, soient rédigés et signés en anglais seulement.*

18. <u>Dispute Resolution Procedures.</u>

   a. <u>Dealers in the United States and Canada.</u>  The sole and exclusive jurisdiction and venue for any legal action between the parties arising under or relating to this Agreement or any of the Products shall be the Loudon County, Tennessee Circuit Court or the United States District Court having authority in that jurisdiction, and the parties each hereby irrevocably consent and submit to the exclusive jurisdiction of these courts and waive any objection to jurisdiction or venue in those courts. Malibu's defense or participation in any legal proceedings in response to any claim which may be brought by Dealer, or Malibu's initiation of a claim for injunctive relief against Dealer, in any other jurisdiction or venue shall not constitute a waiver of this provision. The parties hereby irrevocably waive any right to a trial by jury and agree that any litigated dispute shall be resolved in a nonjury trial.  Each party shall be responsible for its own attorney's fees and other costs and expenses associated with the litigation. In the event of any unauthorized or improper use of Malibu's Confidential Information or Special Property, or other circumstances giving rise to a claim by Malibu for injunctive relief arising under or relating to this Agreement, the parties agree that Malibu shall be entitled to a Temporary Restraining Order and Preliminary Injunction without the requirement of posting a bond as a condition therefor, and the filing of any action for injunctive relief shall be in addition to any legal action for damages or other relief pursuant to or relating to this Agreement.

   b. <u>Dealers in Other Countries.</u> Except for controversies or claims primarily relating to the validity or infringement of any of the Special Property of Malibu (as to which Malibu may bring an action in any court having jurisdiction over the matter), any controversy or claim arising under or relating to this Agreement or relating to the Products, shall be settled by binding arbitration to be conducted in Loudon County Tennessee, United States of America, using the arbitration services of a recognized commercial arbitration service (such as the American Arbitration Association) nominated or otherwise acceptable to Malibu. Any such arbitration shall be conducted by a sole neutral arbitrator,

Dealer Acceptance - Initial:  ___*JK*_____

pursuant to the applicable commercial arbitration rules of the designated arbitration service. Each party will pay an equal share of all fees and costs of the arbitrator. Any judgment on the award rendered by the arbitrator may be entered and enforced in any court having competent jurisdiction wherever located.

19. <u>Entire Agreement and Severability.</u>

    a.   This Agreement, including all exhibits and all policies, procedures, or programs and any Dealer Manual relating to this Agreement, contains the entire understanding and contract between the parties and expressly supersedes all prior and different agreements, representations and understandings. In signing this Agreement, Dealer agrees and represents that Malibu has performed all obligations under any prior contracts or agreements between the parties, that Dealer has no defenses, claims or set-offs relating to this Agreement or any prior contracts or agreements between the parties, and Dealer's execution of this Agreement shall constitute a waiver and release of any and all claims that Malibu has breached or violated Malibu's obligations under any prior contracts or agreements between the parties.

    b.   The headings in this Agreement are solely for the convenience of the parties, and shall not be considered as substantive terms of this Agreement.

    c.   Except for sales and incentive programs and policies that Malibu may publish from time to time relating to this Agreement, this Agreement may not be changed, amended or supplemented except by a subsequent written agreement signed by both parties (including a principal officer of Malibu).

    d.   If any provision of this Agreement is held illegal or unenforceable in a judicial or arbitration proceeding, such provision shall be severed and shall be operative, and the remainder of this Agreement shall remain operative and binding on the Parties to the fullest extent allowed by law.

    e.   This Agreement is binding upon the parties hereto, together with their respective successors and assigns. In the event any provision of this Agreement is found to be unenforceable in whole or in part, the remaining provisions of this Agreement shall be enforced in accordance with the intent of this Agreement.

    f.   This Agreement shall not be effective until signed by both parties (and shall not be effective until signed by both parties, including two authorized signatures on behalf of Malibu, notwithstanding the conduct of any business between the parties), and may be signed in counter-parts, and electronic or facsimile signatures shall be deemed binding and enforceable. In signing this Agreement on behalf of Dealer, the undersigned representative represents and warrants that she/he has the full and unrestricted authority to sign this Agreement as a binding contract of Dealer, and as an expressly and properly approved action on behalf of Dealer (including any corporate resolutions or other approval actions).

20. <u>Notices.</u> Any notice required or permitted by this Agreement shall be in writing and will be sufficient if delivered in person, by email if receipt is acknowledged by the other party, or by sending such notice by recognized overnight courier service (such as FedEx or UPS) properly addressed to the other party's address set forth in this Agreement or as otherwise revised by written notice to the other party. All such notices will be deemed given one (1) day after the date of sending.

21. <u>Waiver.</u> The failure of a party to insist upon performance strictly in accordance with the terms of this

Dealer Acceptance - Initial: __JK____

Agreement will not be deemed a waiver of the right to insist upon such performance at any time during the continuation of any default or with respect to the same or any other default on any future occasion.

22. <u>Review Before Signing.</u> Dealer and its authorized representative agree and represent that it/they has/have carefully reviewed this Agreement before signing it, and that the terms and conditions of this Agreement are reasonable, satisfactory and acceptable to Dealer.

[signatures on next page]

Dealer Acceptance - Initial: __JK____

30905743.4

Document Ref: WV7BK-SFVUY-JDSYV-W5IJT

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the dates indicated below.

**Accepted on behalf of Malibu:**

*Eric Bondy*
_____      **Date:** _08 / 18 / 2022_____
Eric Bondy, Vice President of Sales

*Wayne Wilson*

_____      **Date:** _09 / 07 / 2022_____
Wayne Wilson, CFO

**Accepted on behalf of Dealer:**

_____      **Date:** _08 / 18 / 2022_____
Dealer's Authorized Representative

Printed Name: <u>Jim Kutches</u>

Title: _Acquisition & Compliance Director_____

Dealer Acceptance - Initial: _JK_____

# EXHIBIT 1

Legal Name of Dealer: Tommy's Lewisville ("<u>Dealer</u>" or "<u>you</u>")

Type of Entity and State or Province DBA: Tommy's Lewisville, a TX Boat Dealership

Dealer Location: 375 Oakridge Blvd, Lewisville, TX 75057, USA("<u>Dealer Location</u>")

Dealer Administrative Office if different: <u>Same as Above</u>

Term: This Agreement starts on the Effective Date and will expire without further notice on June 30, 2025 unless earlier terminated under this Agreement ("Term"). At the time of the expiration or earlier termination of this Agreement, your appointment as a Malibu dealer will automatically terminate.

The following is a list of counties that are assigned to Dealer:

**Oklahoma:: Bryan, Choctaw, Cotton, Jefferson, Love, Marshall, ::Texas:: Anderson, Archer, Baylor, Bosque, Camp, Cherokee, Clay, Collin, Comanche, Cooke, Dallas, Delta, Denton, Eastland, Ellis, Erath, Fannin, Franklin, Freestone, Grayson, Hamilton, Henderson, Hill, Hood, Hopkins, Hunt, Jack, Johnson, Kaufman, Lamar, Limestone, Montague, Navarro, Palo Pinto, Parker, Rains, Red River, Rockwall, Shackelford, Smith, Somervell, Stephens, Tarrant, Throckmorton, Titus, Upshur, Van Zandt, Wichita, Wilbarger, Wise, Wood, Young**

Dealer Acceptance - Initial: _TK_____

Document Ref: WV7BK-SFVUY-JDSYV-W5IJT

### 2023 MALIBU PRODUCT LINES

<u>Performance Series</u>:
Response TXi
Response TXi CB
Response TXi MO
Response TXi MOCB

<u>Wakesetter Series</u>:
Wakesetter 20 VTX
Wakesetter 22 LSV
Wakesetter 23 LSV
Wakesetter 25 LSV
Wakesetter 26 LSV
Wakesetter 21 LX
Wakesetter 23 MXZ
Wakesetter 24 MXZ

<u>M Series</u>:
M220
M240

Dealer Acceptance - Initial: __JK____

<u>**MALIBU BOAT MAINTENANCE AND DEALER PREPARATION PROCEDURES**</u>

Without limiting its other obligations under the Dealer Agreement:

<u>Maintenance and Storage</u>:

Dealer will exercise all commercially reasonable efforts to properly maintain and store all Malibu boat products in its inventory in accordance with general industry standards and best practices in connection with the storage and maintenance of motor boat inventories of the type and class of the Malibu boat products, including but not limited to:

(1) Protecting Malibu boat products from temperature fluctuations such as freezing climates.

(2) Providing other appropriate cover for Malibu boat products stored outside in order to ensure that interiors remain dry and exteriors are shaded from the sun.

(3) Removing shrink-wrap from Malibu boat products upon delivery to prevent condensation and mildew on interiors and discoloration of gelcoat on exteriors.

<u>Dealer Preparation and Record Keeping</u>:

In connection with the sale or other distribution of any Malibu boat product to a retail customer, Dealer will:

(1) Perform any and all necessary rigging installation and inspection services prior to delivery to the retail customer.

(2) Furnish the retail customer with information provided by Malibu as to the safe and proper use and maintenance of Malibu Products. This will include but is not limited to Malibu's operational manual, engine manual and vinyl care manual.

(3) Furnish the retail customer with all notices, correction letters, safety messages, and any other written material provided by Malibu in connection with Malibu boat products. Upon delivery to the retail customer, Dealer will complete the Warranty Registration card provided and forward to Malibu or complete the online warranty registration within ten (10) days. If using the warranty card, the card must be signed by the retail customer in the presence of the Dealer or Dealer's representative, and a copy sent to Malibu.

(4) Maintain complete sales and service records regarding all Malibu boat product customers. Dealer agrees to report to Malibu on a regular basis the names and addresses of the Malibu boat products customers, to the extent not prohibited by applicable law.

Dealer Acceptance - Initial: _JK_____

30905743.4

Document Ref: WV7BK-SFVUY-JDSYV-W5IJT

**EXHIBIT 2**
**PERFORMANCE STANDARDS**

The following performance standards are in addition to those in Sections 7 (e), (f) and (g) of the Agreement (together, the "Performance Standards"). They will be measured and reviewed every fiscal year (beginning July 1 of each year), unless another measuring period is noted below.

1. Dealer will maintain a proper level of floorplan to support Malibu & Axis commitment and purchases estimated at $20261769
2. Dealer will be required to hit a Malibu target Market Share of 22% by 12/31/2022 & 22%  by 6/30/2023 as agreed to on your MY23 Malibu Commitment Sheet. This will be measured based off SSI data.
3. Your CSAT index for any rolling six month period shall meet a minimum score of 91% and a minimum survey return rate of 40% for New Owner Survey and a minimum score of 85% and a minimum survey return rate of 25% for Year 1 Owner Survey.   Per DPP your scores will be measured each July, October, January and April with these results setting the RSI level for the current quarter.
4. You must complete warranty registration for 100% of the Malibu boat products you sell. Each boat sold must be registered within 10 days after customer takes delivery of the boat.
5. Quarterly update identifying the dealership sponsored promotional personnel and a calendar of promotional events. Number to be agreed upon with Malibu Sales Rep and to be based on market size and market factors.
6. Dealers are required to update inventory in Dealer CRM on a weekly basis. Weekly inventory must be updated in the Dealer CRM prior to midnight eastern time each Friday.
7. Attendance at all Sales, Service, Regional and North American Dealer Meetings is required by appropriate dealership personnel.  Attendance of and participation in Malibu & Axis sponsored Sales Training will be supported by Coop.
8. Malibu Boats shall have the sole right to determine qualification and compliance with the terms and conditions of Dealer Performance Program.  Malibu reserves the right to modify, suspend, terminate or replace the DPP program or any sales program at any time.
9. Dealer will be required to stock a representation of the following new models: 22 LSV & 26 LSV
10. Dealer is required to have a clearly identified link on their dealership website that links visitors to the Malibu Build A Boat.
11. You agree that you shall represent Malibu Products at the following boat shows: Dallas & Ft Worth
12. Dealer is required to be a current member of WSIA (Water Sports Industry Association) and to actively promote "WAKE RESPONSIBLY".
13. Commitments as an Exclusive Malibu & Axis Dealer will be:  MY23 - 155 Malibu & 85 Axis:  For MY24 & MY25 the commitments for both Malibu & Axis will be at the Platinum Level as agreed to by Dealer & Malibu Sales Manager.
14. Exclusivity - Malibu & Axis Brands are to be the exclusive inboard watersports brands at all dealer locations.

Dealer Acceptance - Initial: _JK_____

**Accepted on behalf of Dealer:**

_____      **Date:** 08 / 18 / 2022
Dealer's Authorized Representative                         _____

Printed Name: <u>Jim Kutches</u>

Title: <u>Acquisition & Compliance Director</u>

Dealer Acceptance - Initial: _JK_____

**EXHIBIT 3**

**Exclusive Towed Water Sports Boat Brand.** You agree that, without the prior written authorization of Malibu (which may be conditioned, delayed or withheld in Malibu's sole and absolute discretion), you will not sell, advertise for sale, or otherwise arrange, negotiate, assist or facilitate the sale of any new boats which are manufactured or distributed by or bearing the trademarks or logo in any substantial matter of any inboard sport-boat brand (each a "Direct Competitor"), which means a brand of trailerable fiberglass boats with inboard or inboard/outboard gasoline powered engine configurations, between 18 and 26 feet LOA, and configured to be used as the towing vessel for towed water sports activities, including, but not limited to, Nautique, Mastercraft, Supra, Moomba, MB, Centurion, Supreme, Epic, Tige, ATX, and Heyday.  You further agree that, unless and until Malibu terminates this Agreement or notifies you that Malibu will not renew this Agreement at expiration, without the prior written authorization of Malibu (which may be conditioned, delayed or withheld in Malibu's sole and absolute discretion), you will not engage in negotiations or enter into any contract or agreement of any nature whatsoever with a Direct Competitor.  You acknowledge and understand that violation of this section 5 is grounds for Malibu's immediate termination of this Agreement, subject to applicable law.

Exclusivity - Malibu & Axis Brands are to be the exclusive inboard watersports brands at 375 Oakridge Blvd, Lewisville, TX 75057, USA

**Accepted on behalf of Dealer:**

_____        Date: 08 / 18 / 2022 _____
Dealer's Authorized Representative

Printed Name: Jim Kutches

Title: Acquisition & Compliance Director

Dealer Acceptance - Initial: _JK_____

AXIS

2023 MODEL YEAR MULTI-YEAR DEALER AGREEMENT

This Dealer Agreement ("Agreement") is between Malibu Boats, LLC, a Delaware limited liability company having its principal place of business at 5075 Kimberly Way, Loudon TN 37774, USA ("Malibu") and Tommy's Lewisville 375 Oakridge Blvd, Lewisville, TX 75057, USA ("Dealer")

In consideration of the terms set forth in this Agreement, Malibu and Dealer hereby contract and agree as follows:

| | |
|---|---|
| Dealer Address: | 375 Oakridge Blvd, Lewisville, TX 75057, USA |
| Effective Date: | July 1, 2022 |
| Expiration Date | June 30, 2025 |

1. <u>Appointment of Dealer.</u>

   a. Malibu hereby appoints Dealer as an authorized retail dealer during the term of this Agreement for the retail sale and service of Axis Products to end use retail consumers at Dealer's approved store location(s) within the Dealer Area ("Dealer Area"), as set forth in Exhibit 1.  Dealer will not sell or service the Products from other locations in or out of the Dealer Area without Malibu's express, prior approval. Dealer shall not sell the Products through sub-dealers or brokers.  This Agreement extends only to the Products as expressly set forth in Exhibit 1, and Malibu may add other products or engage in other business activities (including adding new products or brands during the term of this Agreement) which are outside the scope of this Agreement unless/until otherwise expressly added to or incorporated into the scope of this Agreement.

   b. Malibu will not appoint another dealer for the Products in the Dealer Area during the term of this Agreement, except that Malibu may appoint another dealer in the Dealer Area if Dealer materially breaches any of the terms of this Agreement (in which case the Dealer Area shall remain non-exclusive for the remaining term of this Agreement).  Malibu may also appoint another dealer in the Dealer Area to represent any products or services which are outside of the scope of Dealer's appointment.  Malibu does not restrict the sale of Products into areas as to which no dealer has been assigned, and the referral of potential customers to Dealer in any such unassigned area shall not be construed to modify the Dealer Area to include any unassigned area. The Dealer Area may be modified in any subsequent agreement.

   c. Dealer's appointment shall be subject to the terms of this Agreement, including any schedules attached to this Agreement, and shall also be subject to any Malibu policies, procedures or programs

Dealer Acceptance - Initial: _JK_____

and/or any Dealer Manual, any of which may be published from time to time (and which may be amended and shall be effective as amended during the term of this Agreement), all of which are incorporated by reference as a part of this Agreement.  Malibu shall make all policies, procedures, or programs and any Dealer Manual available to Dealer via Malibu's dealer website portal or through other communications, and it is Dealer's responsibility to access, review and comply with these policies, procedures, programs and/or any Dealer Manual because they are fully enforceable as a part of this Agreement.

2.  <u>Term</u>.  This Agreement must be signed by both parties to be effective, and starts on the Effective Date and will expire and terminate as set forth in Exhibit 1, unless earlier terminated under this Agreement.  Malibu will provide Dealer with a new agreement, or notice of non-renewal or termination, reasonably in advance of the expiration of this Agreement.   In the event any new agreement is signed, this Agreement shall be deemed superseded, null and void, as of the effective date of any new agreement.  Any new agreement may contain terms, conditions and requirements which are different than those contained in this Agreement. Nothing in this Agreement (including provisions or projections dealing with future performance goals or requirements for periods beyond the term of this Agreement) shall be construed to create a promise, representation or agreement of a continuing relationship beyond the term of this Agreement, and this Agreement shall be deemed terminated, null and void, if no new agreement is signed except as to any provisions which expressly continue beyond the term of this Agreement. Any payment or performance following the expiration or termination of this Agreement will not be construed as a renewal or extension of the Term or this Agreement, but as independent and separate transactions terminable at will by Malibu.

3.  <u>Dealer Responsibilities.</u>  In addition to the other terms of this Agreement, Dealer shall:

    a.  Maintain a fully operational retail sales and service facility at the Dealer Location.

    b.  Identify itself as a dealer of the Products, and use its best efforts as an authorized Malibu dealer to promote and sell the Products in the Dealer Area.

    c.  Meet or exceed the performance standards as set forth in Exhibit 2, including any initial product order, order commitments, market share requirements, customer satisfaction benchmarks, training, and inventory or other financing commitments, as specified in Exhibit 2. At least thirty days (30) before the commencement of each model year during the term of this Agreement, Dealer shall enter into a new, updated Exhibit 2 (Performance Standards), which is acceptable to Malibu, setting forth the Performance Standards applicable to Dealer during the remaining term of this Agreement.  This Agreement shall end and be immediately terminated upon Dealer's failure to comply with the annual requirement.

    d.  Maintain an adequate service department, including trained service department staff for whom Malibu shall provide service training from time to time (Malibu shall provide the training at no charge to Dealer, but Dealer shall pay all out-of-pocket expenses incurred by its personnel in attending this training), and also including personnel with OEM certification to provide engine and other component service, which is adequately equipped and stocked to provide prompt and convenient service (including any aftermarket installations or modifications which may be independently offered or performed by Dealer for Dealer's customers, and as to which Malibu makes no recommendation, representation, approval or warranty) to purchasers and owners of the Products (whether or not originally sold by Dealer).  Service work may be subcontracted only with Malibu's prior authorization.

Dealer Acceptance - Initial: _JK_____

e.  Make a copy of Malibu's limited warranty available for review by prospective customers of the Products, and provide all buyers with a copy of Malibu's limited warranty and all other Malibu and component documents and manuals in connection with any sale of the Products (as well as copies of all component warranties).  Dealer shall not make any representations relating to Malibu's limited warranty.

f.  Provide prompt and thorough pre-delivery commissioning, delivery and warranty registration (including registration with the manufacturer of all component warranties, such as engines) of the Products, in accordance with Malibu's (or any applicable component manufacturer's) policies and procedures.

g.  Provide warranty service on the Products (whether or not originally sold by Dealer) in accordance with Malibu's applicable warranty policies and procedures (which may be changed from time to time), as to which Malibu agrees to pay Dealer at Dealer's standard (or agreed upon) rate, subject to reasonable audits of Dealer's warranty service performances from time to time.

h.  Dealer shall not offer new products for sale of any other brands and products which compete with the Products, as set forth in Exhibit 3.

i.  Purchase and maintain adequate liability and casualty insurance on Dealer's operations and business activities, with limits of not less than two million dollars ($2,000,000), with proof of such insurance to be made available upon request.

j.  Notify Malibu immediately of any accidents involving Malibu's products of which Dealer becomes aware.

k.  Notify Malibu immediately in the event any Products are presented more than two (2) times for unresolved warranty claims, including warranty claims on engines and components not warranted by Malibu.

l.  Comply with, and not take any action in contravention or inconsistent with, all applicable laws and regulations in the operation of Dealer's business and the marketing and sale of the Products, including in the case of International Dealers compliance with all laws, regulations, controls and tariffs applicable to the import and export of the Products, including the United States Foreign Corrupt Practices Act.

m.  Indemnify and hold Malibu, together with its parent, affiliates, employees, offices and agents, harmless from any and all claims and damages arising as a result of any alleged fault, negligence, breach, violation of law or wrongdoing on the part of Dealer.  In the event any such claim arises, Dealer shall promptly notify Malibu in writing of the claim.  Malibu shall have the sole and exclusive right to control and conduct all litigation or other proceedings, and to enter into any settlement negotiations and settlements, as determined in its sole discretion, including the selection and retention of counsel of its choice.  Under no event shall Dealer give any admission, or enter into any settlement or compromise of any claim, suit, or action, without the prior written consent of Malibu, which shall be given or withheld in Malibu's sole discretion.

4.  <u>Financial Status and Credit.</u>

a.  Dealer shall maintain a credit standing and financial condition satisfactory to Malibu, and shall upon request provide Malibu with complete and accurate financial statements for Dealer and its principal(s).  Dealer consents to full and open disclosure of financial information concerning Dealer

Dealer Acceptance - Initial: __*JK*____

between Malibu and any financial institution or floor plan lender which finances Dealer's purchase and inventory of Products, and Dealer hereby authorizes any such financial institution or floor plan lender to provide Malibu with all financial information relevant to Dealer including financial statements or reports, payment or performance history, credit references, financial analyses, inventory reports or audits, and other information concerning Dealer's performance of its obligations.  Upon request, Dealer shall provide written confirmation authorizing these disclosures.  Dealer shall, at all times, comply with all financing and lending requirements and obligations, including the making of all payments, curtailments, and so forth.

b.  Dealer shall pay for all Products in accordance with Malibu's terms of payment, including payment terms applicable to specific orders.  All Products shall be paid for in full at the time of shipment, unless otherwise expressly agreed by Malibu.

c.  Malibu may, but shall not be required to, establish, modify, or discontinue credit terms or limits for Dealer.  Dealer hereby grants Malibu a purchase money security interest in all Products until they are paid for, and Dealer authorizes Malibu to file a financing statement or any other document(s) that may be necessary to perfect or provide other record notice of that security interest.

d.  In the event any Products are not paid for when due, Malibu reserves all rights relating to that non-payment, and shall have the right to charge interest on all such overdue amounts at the maximum rate allowed by law, and to offset or withhold any amounts due by it to Dealer against any of Dealer's obligations to Malibu.

e.  Malibu may accelerate and declare all outstanding amounts owed by Dealer as immediately due and owing upon any event of Dealer non-payment that continues for more than fifteen (15) days after the payment due date, or upon the expiration or termination of this Agreement.

5.  Orders, Prices, Terms, Shipment.

a.  Dealer shall submit all orders in the manner, and following the procedures, prescribed by Malibu.  No order shall be considered accepted until acknowledged and approved by Malibu, and Malibu reserves the right to reject any order (in whole or in part) in its sole discretion.  Malibu may require deposits or progress payments (which will be forfeited and non-refundable as liquidated damages upon Dealer's cancellation or failure to accept or pay for that order) on orders, or may impose other terms and requirements as a condition of any order.  Likewise, Malibu may require Dealer to pay a cancellation or restocking fee, as determined by Malibu, on any order which is cancelled or as to which Dealer fails or refuses to take delivery, or as to any Products which Malibu is required to purchase under the terms of any inventory floor plan or other financing arrangements.

b.  Prices will be determined based on Malibu's applicable wholesale price list or program in effect on the date of Dealer's order, except for any Malibu buying or promotion programs that may be in effect from time to time.  Malibu may change its wholesale price list, or any buying or promotional programs, in its sole discretion, as to any orders which have not then been submitted and accepted, without prior notice to Dealer.  Dealer shall not be eligible to participate in any buying or promotional programs, or to receive rebates, payments or incentives, during any period in which Dealer is in default of any provision of this Agreement.  All prices shall be net of shipping, delivery and handling charges, insurance, sales, use or VAT taxes, or other taxes, customs, duties, governmental or other charges, all of which shall be paid by Dealer.

Dealer Acceptance - Initial: __JK____

c.  To the extent that Dealer's printed purchase orders or other purchasing documents contain terms and conditions which are inconsistent with this Agreement (or any other purchase documents or acknowledgements used by Malibu), Dealer agrees that Malibu's terms and conditions, as in effect from time to time, shall prevail and that Dealer's terms and conditions shall have no application to the transaction (and shall not supplement or supersede Malibu's terms and conditions), and shall be null and void.

d.  Any production or shipping dates shall be preliminary only, and shall reflect Malibu's best estimate of the date any order shall be manufactured or shipped.  Malibu reserves the right to allocate the manufacture or shipping dates of all Products in its sole discretion.  Malibu shall make commercially reasonable efforts to notify Dealer of any anticipated material delays in the manufacture or shipping of any order, and Dealer shall have five (5) business days from the date of any such notification to cancel any such order.  Malibu shall have no liability or responsibility to Dealer on account of any delays in the manufacture or shipping of any order, whether resulting from Malibu's allocation of the manufacture or shipment of its products or any other reason or cause.

e.  All sales shall be FOB Malibu's manufacturing facility (as applicable to each order) (the "Point of Shipment"), and Dealer shall solely and exclusively have all risk of loss when the Products leave Malibu's Point of Shipment, regardless of whether Malibu has utilized, suggested, or approved any common carrier, third party or any method of shipment, and regardless of whether shipping or freight costs are included in the invoice for the Products.  Dealer shall be solely and exclusively responsible for ensuring that Dealer, any common carrier or third-party who takes possession of and/or ships the Products is properly and sufficiently licensed, qualified, competent and adequately insured, and Malibu shall have no responsibility or liability in connection therewith.  Dealer shall acquire or purchase any shipping insurance it may desire.  Dealer shall indemnity, defend and hold Malibu harmless from any and all demands, claims, suits, liabilities, damages and losses of any kind or nature whatsoever (whether incurred by Dealer or any third-party), which arise out of or relate to the conduct or actions of Dealer, any common carrier, or any third-party who takes possession of and/or ships the Products.

f.  Upon receipt of any Products, Dealer will promptly inspect the Products and inform Malibu of any non-conformities or defects.  Any non-conformities or defects as to which notice is not given within five (5) days of Dealer's receipt of the Products shall be deemed waived.  All non-conformities or defects shall be repaired or addressed through Malibu's warranty procedures, except as otherwise expressly agreed by Malibu, and Malibu gives no other warranties to Dealer with respect to any such non-conformities or defects.

g.  No return of the Products is permitted, absent Malibu's express agreement and written authorization, which shall be given or withheld in Malibu's sole discretion

6.  <u>Marketing and Promotional Activities.</u>

a.  Dealer shall sell or distribute the Products only to end retail customers from Dealer's approved store location(s), or during other pre-approved boat shows or promotional events.  Although Dealer may sell to customers (who, on their own, seek to purchase Products from Dealer) residing in other countries, Dealer shall not sell or ship Products for initial delivery to or for the customer outside of the country in which the Dealer Area is located.  Dealer may sell Products to other Axis dealers (in

Dealer Acceptance - Initial: _JK_____

Dealer's same country, and not internationally) on a wholesale-to-wholesale basis, providing that Malibu is promptly informed of all such transactions.

b.  Dealer shall identify itself as a Axis dealer at its approved store location(s), and shall maintain a dealer-specific website prominently promoting and advertising Axis's products.  Dealer's website shall include an embedded link to the Axis Wake Research website, in accordance with Malibu's policies.

c.  Dealer's website shall specifically promote the sales and service of the Products in the Dealer Area, and Dealer shall not advertise, promote or market the sales or service of the Products outside of the Dealer Area, except that Dealer may advertise or market new Products through internet listings on Dealer's own website or other general marine or multiple listing websites (providing that such listings identify Dealer's location(s), and that such general listings are restricted to Products which are in the Dealer's inventory) which are focused on the sale of Products to customers within Dealer's Area to the fullest extent reasonably possible.  Malibu does not restrict the advertising of used products.

d.  Nothing in this Agreement shall be construed as prohibiting Dealer from selling the Products to customers residing outside the Dealer Area, who visit the dealership and seek to purchase Products from Dealer. However, with respect to the sale of any Products outside of the Dealer Area (as determined by Axis: (i) Dealer shall forfeit any and all incentives originally assigned to or paid to Dealer on that unit, including normal dealer program dollars associated with annual commitment programs, factory to dealer retail or wholesale incentives or retail spiff incentives; (ii) Dealer will be billed for the total amount of incentives forfeited in connection with the next available boat ordered (or billed independently of any order, as determined in Axis' sole discretion); and (iii) the forfeited incentives may be paid in whole or in part by Axis  to the dealer in whose territory the boat in question is registered and who is responsible for providing warranty service to the end retail user, to assist in providing appropriate customer support for the end retail user. Any such out of Dealer Area sales shall also be subject to any additional Axis policies and procedures that may established by Axis from time to time.

e.  Dealer shall not advertise the price for any new Products (whether or not acquired directly from Malibu or from a third-party) for the current and immediately prior model years, except as otherwise expressly authorized by Malibu (such as with respect to a specific promotional program).  This restriction shall not, however, restrict or prohibit Dealer from communicating a proposed price for a Product to individual, prospective customers.

f.  Upon request, Dealer shall provide Malibu with copies of all Dealer advertising, promotional and marketing communications, postings and publications.

g.  Dealer acknowledges that this Agreement does not restrict, hinder or impair Dealer's decision as to the retail price at which any Product may be sold, and that the final sales price of any Product remains within the Dealer's sole discretion and control.

h.  The parties agree that these restrictions and policies are reasonable and for their mutual benefit, that any violation of these restrictions and policies are substantially likely to mislead the public concerning the Products, their availability and other material information, and that any violation of these restrictions and policies will be a violation of Malibu's rights and interests in its trademarks.  These

Dealer Acceptance - Initial: _JK_____

restrictions shall apply during the term of this Agreement, and for a period of twenty-four (24) months thereafter.

7. <u>Confidential Information.</u> Dealer and its employees, contractors and agents agree to maintain in strict confidence, and not disclose and to use only in the performance of this Agreement, any confidential or proprietary information ("Confidential Information") concerning the business affairs or operations of Malibu or its affiliates, or the Products. Confidential Information includes anything that Malibu considers to be confidential and proprietary including, without limitation, all trade secrets, customer lists, price lists or pricing programs or information, marketing or business plans, sales programs, or other information concerning the manufacture or distribution or promotion or marketing of the Products.  Dealer shall be responsible for all breaches by its employees, contractors or agents.  Dealer will return or destroy all Confidential Information (including electronically store information or any documents relating thereto in any form or media) to Malibu upon the termination or expiration of this Agreement.  These obligations relating to the Confidential Information shall remain in effect indefinitely, including after the termination or expiration of this Agreement.

8. <u>Trademarks, Copyrighted and Other Materials.</u>  Malibu and/or its affiliated companies are the exclusive owners of certain trademarks, service marks, logos and copyrighted materials (including hull, product and component designs, together with any industrial designs, patent or copyright details, patents, technical information or other confidential information relating to the Products or otherwise, which is now or hereafter owned or used by Malibu), which Malibu uses or may use in connection with the Products or otherwise in connection with its business ("Special Property").  Dealer will not have, nor shall it acquire, any rights in the Special Property (including any trademarks, service marks, logos and copyrighted materials added by Malibu in the future).  Dealer will not use or register any of the Special Property for any purpose (including as a part of Dealer's corporate/entity or business name), except as expressly authorized in writing by Malibu.  Dealer is authorized to use the Special Property for the limited purpose of identifying the Products offered for sale by Dealer, and to advertise the sale of those Products, providing that Dealer shall not use the Special Property in any form or style not provided or approved by Malibu.  This authorization will not be interpreted as a license for the Special Property, and Dealer will acquire no proprietary or other rights with respect to the Special Property, and this (or any other) authorization for limited use will terminate simultaneously and automatically with the termination or expiration of this Agreement.  Dealer will not use, register or claim any right or interest in the Special Property, nor shall Dealer create any other trademarks, copyrighted or legally protected materials relating to the Products or the Axis Wake Research Brand.  All such property shall be the sole and separate property of Malibu or its affiliates, as to which Dealer shall have no right or interest whatsoever.  Dealer shall promptly notify Malibu of any suspected or actual infringement, unauthorized use of, or challenge to the Special Property or Malibu's (or its affiliate's) rights therein, and Dealer agrees that neither it nor anyone acting in concert with it shall contest Malibu's (or its affiliate's) sole ownership and rights in and to the Special Property.  In the event of any improper or unauthorized use of, or challenge to, the Special Property, Dealer will cooperate with and assist Malibu in all actions to defend against all claims which are adverse to Malibu's interests therein, as requested or directed by Malibu. These obligations relating to the Special Property shall remain in effect indefinitely, including after the termination or expiration of this Agreement.

9. <u>Assignment and Transfer of Agreement.</u>  Dealer understands and acknowledges that the rights and duties set forth in the Agreement are personal to Dealer (or its current principal(s) if dealer is a corporation,

Dealer Acceptance - Initial: __JK____

company or other business entity) and that Malibu has entered into the Agreement in reliance on the business skill and experience, financial capacity, and personal character of Dealer (and its current principal(s), if applicable). Neither Dealer, nor any principal(s), without Malibu's prior written approval, shall, by operation of law (including upon the death or disability of Dealer or its principal(s)) or otherwise, sell, assign, transfer, convey, give away, pledge, mortgage or otherwise encumber to any person, persons, partnership, association, LLC, or corporation, any interest in the Dealership or this Agreement. Malibu agrees that it will give good faith consideration to any succession plan or any proposed assignment of this Agreement to a new Dealer (or principal), except that the approval or disapproval of any such succession plan or assignment shall be in Malibu's sole discretion. Any attempted or purported succession or assignment not having the prior written approval of Malibu shall be null and void, and shall constitute a default hereunder.

10. <u>Default Events.</u> In addition to any failure of Dealer to perform the requirements, terms and conditions set forth elsewhere within this Agreement, the following shall also be deemed violations and events of default under this Agreement, all of which (whether specifically listed in this paragraph or otherwise set forth in this Agreement) shall be deemed "good cause" for the non-renewal or termination of this Agreement, or allowing Malibu to take any other actions allowed under this Agreement:

    a.   Any failure of Dealer to pay when due any amounts owed to Malibu or its affiliates.

    b.   Any failure by Dealer to fulfill the Performance Requirements set forth in Exhibit 2, or to enter into an updated Exhibit 2 (Performance Standards) which is acceptable to Malibu, Prior to the commencement of each model year during the term of this Agreement.

    c.   Any failure to Dealer to have sufficient and adequate floor plan financing and other financial arrangements or resources to perform Dealer's obligations under this Agreement.

    d.   Any actions or undertakings by Dealer to conduct its business operations outside of the Dealer Area, or any discontinuance by Dealer of its business operations (including the closure of any approved location) inside the Dealer Area.

    e.   Any improper marketing or promotional activities by Dealer, or any unauthorized disclosure of Axis's dealer or wholesale buying/pricing information.

    f.   Any action or omission by Dealer in violation of Malibu's policies, procedures, or programs or any Dealer Manual, or any unauthorized disclosure of Malibu's marketing programs or business strategies.

    g.   Any sale (or entering into any agreement to sell) any competing Brands or product lines in violation of this Agreement.

    h.   Any improper use by Dealer of Malibu's Confidential Information or Special Property.

    i.   Any act of fraud, deception or illegal conduct by Dealer or its principal(s), or any failure to maintain and operate Dealer's business in accordance with applicable legal requirements, including any licenses or permits.

    j.   Dealer's (or Dealer's principal(s)') insolvency, bankruptcy, assignment of its assets for the benefit of creditors, or the initiation of any similar proceedings by, or against, Dealer or its principal(s).

    k.   Any attempted or completed assignment, sale or transfer of Dealer or its business or business assets, or a material change (as determined by Malibu in its sole discretion) in Dealer's ownership or principal(s), except in accordance with the procedures set forth in this Agreement.

Dealer Acceptance - Initial: _JK_____

l.   Any failure of Dealer to fulfill its other obligations under this Agreement.

11.  <u>Remedies and Procedures for Default.</u> Upon the occurrence of any event of default, Malibu may by written notice to Dealer undertake or implement any or all of the following remedies, together with all other remedies as may be available to Malibu:

    a.   Provide Dealer with notice of, and an opportunity to cure, any such violation(s) and/or event(s) of default (within thirty (30) days following the notice) if Malibu determines in its sole discretion that any such violation(s) and/or event(s) of default can reasonably be cured, or if otherwise required by law.

    b.   Suspend its performance hereunder, including any warranty authorizations or any sale of Products, parts and accessories to Dealer, until such time as Dealer provides Malibu with reasonable assurance of Dealer's ability to perform its obligations hereunder.

    c.   Declare that the Dealer Area shall no longer be exclusive as to Dealer, including the appointment of one or more co-dealers to sell the Products in the Dealer Area during the remaining term of this Agreement and thereafter.

    d.   Declare Dealer ineligible to participate in any incentive programs, special buying programs, rebates, bonuses or other financial incentives.

    e.   Cause any deposits (including deposits on Product orders), program incentives, rebates, bonuses and other financial incentives to be forfeited, cancelled, or not renewed.

    f.   Cancel any Dealer orders then pending.

    g.   Terminate this Agreement as a result of any violation(s) or event(s) of default.

The exercise or implementation of any remedy by Malibu shall not be exclusive, nor shall Malibu's use or reliance on a remedy constitute a waiver of Malibu's right to impose additional remedies for the same breach, either at the same time or subsequently. Dealer's performance of its obligations hereunder shall be deemed a condition precedent to Malibu's obligations under this Agreement.

12.  <u>Other Termination Events.</u>  This Agreement may also be terminated upon the occurrence of any of the following:

    a.   If Malibu violates, fails to perform, or is otherwise in default of its obligations under the terms of this Agreement, and the violation, failure or performance or other default continues for thirty (30) days following Dealer's written notice thereof to Malibu.

    b.   If Dealer gives sixty (60) days written notice to Malibu of Dealer's intent to resign as a Dealer, except that Malibu may elect to make Dealer's resignation effective immediately (or in less than sixty (60) days) upon its receipt of any such notice.

    c.   If the parties enter into a mutually acceptable termination agreement.

    d.   If the parties fail to enter into a new, superseding dealer agreement upon the expiration of this Agreement.

13.  <u>Effect of Termination or Expiration of Agreement; Special Provisions</u>

    a.   Any expiration or termination of this Agreement will not relieve any party from any obligation or liability to the other party that has accrued pursuant to this Agreement prior to the time of termination

Dealer Acceptance - Initial: ___JK_____

or expiration.

b.  Malibu is not obligated to purchase any of Dealer's inventory of the Products, signage or equipment under any circumstances (including the termination or expiration of this Agreement), except that Malibu may at its option and in its sole discretion repurchase from Dealer (free of all liens and claims) all or any portion of the Products in Dealer's inventory at the lesser of (i) the net wholesale purchase price paid to Malibu for such Products less any discounts, promotional payments, rebates or other allowances previously paid or credited by Malibu, or (ii) the depreciated value of such Malibu Products as reasonably determined by Malibu, with any repurchase being further subject to credit or offset by Malibu for all amounts then owed and unpaid by Dealer.  Any repurchases by Malibu will be FOB the Dealer Location; and Dealer will promptly make such Malibu Products available for inspection and pick-up by Malibu or its agent or carrier as instructed by Malibu.

c.  In the event of the termination or expiration of this Agreement, Malibu is relieved from any obligation to make any further Product (including parts and accessories) shipments under the Agreement, and may cancel all of Dealer's unshipped orders for Products (including parts and accessories), irrespective of previous acceptance by those orders, except as otherwise expressly agreed in writing between the parties.  The acceptance of orders from the Dealer, the continuous sale of boats to the Dealer, or any other act or transaction of business, after the termination or expiration of this Agreement shall not be construed as a continuation of this Agreement, the commencement of a new agreement, or a waiver of any termination of this Agreement.

d.  Upon the termination or expiration of this Agreement, all obligations owed by Dealer to Malibu shall become immediately due and payable, whether otherwise then due or not (without presentment, demand, protest or notice of any kind, all of which are waived by Dealer), and Malibu may offset or deduct from any or all sums owed to Dealer any or all sums owed by Dealer, returning to Dealer the excess, if any.

e.  Upon the effective date of any termination or expiration of this Agreement, Dealer shall immediately cease to hold itself out as a Axis dealer or a dealer of the Products, and shall discontinue the use of all trademarks, trade names, signs, logotypes or any other Special Property of Malibu, and any license or agreement for the use thereof shall be deemed terminated.

f.  During the term of this Agreement, and for a period of twenty-four (24) months following the termination or expiration of this Agreement, Dealer shall not disparage Malibu, any of Malibu's officers or employees, or any Axis Product, or otherwise take any action which could reasonably be expected to adversely affect the reputation of Malibu, any of Malibu's officers or employees, or any Axis Product.

14.  <u>Reservations.</u>  Malibu shall have the right in its sole discretion to allocate Products among dealers and customers as it determines appropriate, change the configuration or construction of, or specifications for, any of the Products, to discontinue the manufacture or distribution of any of the Products, all without incurring any obligation or liability to Dealer.

15.  <u>Status of Parties.</u>  Dealer is an independent business contracting and conducting business on its own behalf, and not as the agent, partner, franchisee, or joint venturer of Malibu or its affiliates, for any purpose whatsoever.  Except for Dealer's agreement and obligation to comply with this Agreement, the management

Dealer Acceptance - Initial:  _JK_____

of Dealer's business and the formulation of plans, policies and procedures for the operation of Dealer's business are the sole prerogative and responsibility of Dealer.

16. <u>Time of the Essence; Force Majeure.</u> Time is of the essence as to all aspects of this Agreement and its performance, provided however that no party will be deemed in breach of this Agreement for any reasonable delay or failure in performance of any non-monetary obligation due to any force majeure cause outside of its control, for so long as such condition of force majeure materially exists.

17. <u>Governing Law, English Language.</u>  This Agreement shall be governed by the substantive laws of the state of Tennessee, without regard to choice of laws principles.  In the event Dealer is outside of the United States, the parties agree that the United Nations Convention on Contracts for the International Sale of Goods shall have no applicability.  In the event any state law (or national law in the event Dealer is outside of the United States), requires or imposes additional or different terms than those set forth in this Agreement, those additional or different terms shall be deemed to supplement or supersede the terms of this Agreement, but only to the minimum extent required by law.  All other provisions of this Agreement shall remain in effect, and shall be fully enforceable.

It is the express wish and intent of the parties that this Agreement and all related documents, including notices and other communications, shall be drawn up in the English language only. *Il est la volonté expresse des parties que cette convention et tous les documents s'y rattachant, y compris les avis et les autres communications, soient rédigés et signés en anglais seulement.*

18. <u>Dispute Resolution Procedures.</u>

   a. <u>Dealers in the United States and Canada.</u>  The sole and exclusive jurisdiction and venue for any legal action between the parties arising under or relating to this Agreement or any of the Products shall be the Loudon County, Tennessee Circuit Court or the United States District Court having authority in that jurisdiction, and the parties each hereby irrevocably consent and submit to the exclusive jurisdiction of these courts and waive any objection to jurisdiction or venue in those courts. Malibu's defense or participation in any legal proceedings in response to any claim which may be brought by Dealer, or Malibu's initiation of a claim for injunctive relief against Dealer, in any other jurisdiction or venue shall not constitute a waiver of this provision. The parties hereby irrevocably waive any right to a trial by jury and agree that any litigated dispute shall be resolved in a nonjury trial.  Each party shall be responsible for its own attorney's fees and other costs and expenses associated with the litigation. In the event of any unauthorized or improper use of Malibu's Confidential Information or Special Property, or other circumstances giving rise to a claim by Malibu for injunctive relief arising under or relating to this Agreement, the parties agree that Malibu shall be entitled to a Temporary Restraining Order and Preliminary Injunction without the requirement of posting a bond as a condition therefor, and the filing of any action for injunctive relief shall be in addition to any legal action for damages or other relief pursuant to or relating to this Agreement.

   b. <u>Dealers in Other Countries.</u> Except for controversies or claims primarily relating to the validity or infringement of any of the Special Property of Malibu (as to which Malibu may bring an action in any court having jurisdiction over the matter), any controversy or claim arising under or relating to this

Agreement or relating to the Products, shall be settled by binding arbitration to be conducted in Loudon County Tennessee, United States of America, using the arbitration services of a recognized commercial arbitration service (such as the American Arbitration Association) nominated or otherwise acceptable to Malibu. Any such arbitration shall be conducted by a sole neutral arbitrator, pursuant to the applicable commercial arbitration rules of the designated arbitration service. Each party will pay an equal share of all fees and costs of the arbitrator. Any judgment on the award rendered by the arbitrator may be entered and enforced in any court having competent jurisdiction wherever located.

19. <u>Entire Agreement and Severability.</u>

    a. This Agreement, including all exhibits and all policies, procedures, or programs and any Dealer Manual relating to this Agreement, contains the entire understanding and contract between the parties and expressly supersedes all prior and different agreements, representations and understandings. In signing this Agreement, Dealer agrees and represents that Malibu has performed all obligations under any prior contracts or agreements between the parties, that Dealer has no defenses, claims or set-offs relating to this Agreement or any prior contracts or agreements between the parties, and Dealer's execution of this Agreement shall constitute a waiver and release of any and all claims that Malibu has breached or violated Malibu's obligations under any prior contracts or agreements between the parties.

    b. The headings in this Agreement are solely for the convenience of the parties, and shall not be considered as substantive terms of this Agreement.

    c. Except for sales and incentive programs and policies that Malibu may publish from time to time relating to this Agreement, this Agreement may not be changed, amended or supplemented except by a subsequent written agreement signed by both parties (including a principal officer of Malibu).

    d. If any provision of this Agreement is held illegal or unenforceable in a judicial or arbitration proceeding, such provision shall be severed and shall be operative, and the remainder of this Agreement shall remain operative and binding on the Parties to the fullest extent allowed by law.

    e. This Agreement is binding upon the parties hereto, together with their respective successors and assigns. In the event any provision of this Agreement is found to be unenforceable in whole or in part, the remaining provisions of this Agreement shall be enforced in accordance with the intent of this Agreement.

    f. This Agreement shall not be effective until signed by both parties (and shall not be effective until signed by both parties, including two authorized signatures on behalf of Malibu, notwithstanding the conduct of any business between the parties), and may be signed in counter-parts, and electronic or facsimile signatures shall be deemed binding and enforceable. In signing this Agreement on behalf of Dealer, the undersigned representative represents and warrants that she/he has the full and unrestricted authority to sign this Agreement as a binding contract of Dealer, and as an expressly and properly approved action on behalf of Dealer (including any corporate resolutions or other approval actions).

20. <u>Notices.</u> Any notice required or permitted by this Agreement shall be in writing and will be sufficient if delivered in person, by email if receipt is acknowledged by the other party, or by sending such notice by recognized overnight courier service (such as FedEx or UPS) properly addressed to the other party's

Dealer Acceptance - Initial: _JK_____

address set forth in this Agreement or as otherwise revised by written notice to the other party. All such notices will be deemed given one (1) day after the date of sending.

21. <u>Waiver.</u> The failure of a party to insist upon performance strictly in accordance with the terms of this Agreement will not be deemed a waiver of the right to insist upon such performance at any time during the continuation of any default or with respect to the same or any other default on any future occasion.

22. <u>Review Before Signing.</u> Dealer and its authorized representative agree and represent that it/they has/have carefully reviewed this Agreement before signing it, and that the terms and conditions of this Agreement are reasonable, satisfactory and acceptable to Dealer.

[signatures on next page]

Dealer Acceptance - Initial: _JK_____

Document Ref: WV7BK-SFVUY-JDSYV-W5IJT

**IN WITNESS WHEREOF**, the parties have executed this Agreement on the dates indicated below.

**Accepted on behalf of Malibu:**

*Eric Bondy*
_____
Eric Bondy, Vice President of Sales

Date: 08 / 18 / 2022
_____

*Wayne Wilson*
_____
Wayne Wilson, CFO

Date: 09 / 07 / 2022
_____

**Accepted on behalf of Dealer:**

_____
Dealer's Authorized Representative

Date: 08 / 18 / 2022
_____

Printed Name: Jim Kutches

Title: Acquisition & Compliance Director
_____

Dealer Acceptance - Initial: _JK_____

# EXHIBIT 1

Legal Name of Dealer: Tommy's Lewisville ("<u>Dealer</u>" or "<u>you</u>")

Type of Entity and State or Province DBA: Tommy's Lewisville, a TX Boat Dealership

Dealer Location: 375 Oakridge Blvd, Lewisville, TX 75057, USA ("<u>Dealer Location</u>")

Dealer Administrative Office if different: <u>Same as Above</u>

Term: This Agreement starts on the Effective Date and will expire without further notice on June 30, 2025 unless earlier terminated under this Agreement ("Term"). At the time of the expiration or earlier termination of this Agreement, your appointment as a Malibu dealer will automatically terminate.

The following is a list of counties that are assigned to Dealer:

**Oklahoma:: Bryan, Choctaw, Cotton, Jefferson, Love, Marshall, ::Texas:: Anderson, Archer, Baylor, Bosque, Camp, Cherokee, Clay, Collin, Comanche, Cooke, Dallas, Delta, Denton, Eastland, Ellis, Erath, Fannin, Franklin, Freestone, Grayson, Hamilton, Henderson, Hill, Hood, Hopkins, Hunt, Jack, Johnson, Kaufman, Lamar, Limestone, Montague, Navarro, Palo Pinto, Parker, Rains, Red River, Rockwall, Shackelford, Smith, Somervell, Stephens, Tarrant, Throckmorton, Titus, Upshur, Van Zandt, Wichita, Wilbarger, Wise, Wood, Young**

Dealer Acceptance - Initial: _JK_____

## <u>2023 Axis PRODUCT LINES</u>

Axis A20

Axis A225

Axis A24

Axis T220

Axis T235

Axis T250

Dealer Acceptance - Initial: _JK_____

Document Ref: WV7BK-SFVUY-JDSYV-W5IJT

## AXIS BOAT MAINTENANCE AND DEALER PREPARATION PROCEDURES

Without limiting its other obligations under the Dealer Agreement:

Maintenance and Storage:

Dealer will exercise all commercially reasonable efforts to properly maintain and store all Axis boat products in its inventory in accordance with general industry standards and best practices in connection with the storage and maintenance of motor boat inventories of the type and class of the Axis boat products, including but not limited to:

(1)      Protecting Axis boat products from temperature fluctuations such as freezing climates.

(2)      Providing other appropriate cover for Axis boat products stored outside in order to ensure that interiors remain dry and exteriors are shaded from the sun.

(3)      Removing shrink-wrap from Axis boat products upon delivery to prevent condensation and mildew on interiors and discoloration of gelcoat on exteriors.

Dealer Preparation and Record Keeping:

In connection with the sale or other distribution of any Axis boat product to a retail customer, Dealer will:

(1)      Perform any and all necessary rigging installation and inspection services prior to delivery to the retail customer.

(2)      Furnish the retail customer with information provided by Malibu as to the safe and proper use and maintenance of Axis Products.  This will include but is not limited to Axis's operational manual, engine manual and vinyl care manual.

(3)      Furnish the retail customer with all notices, correction letters, safety messages, and any other written material provided by Malibu in connection with Axis boat products.  Upon delivery to the retail customer, Dealer will complete the Warranty Registration card provided and forward to Malibu or complete the online warranty registration within ten (10) days.  If using the warranty card, the card must be signed by the retail customer in the presence of the Dealer or Dealer's representative, and a copy sent to Malibu.

(4)      Maintain complete sales and service records regarding all Axis boat product customers.  Dealer agrees to report to Malibu on a regular basis the names and addresses of the Axis boat products customers, to the extent not prohibited by applicable law.

Dealer Acceptance - Initial: _JK_____

**EXHIBIT 2**
**PERFORMANCE STANDARDS**

The following performance standards are in addition to those in Sections 7 (e), (f) and (g) of the Agreement (together, the "Performance Standards"). They will be measured and reviewed every fiscal year (beginning July 1 of each year), unless another measuring period is noted below.

1. Dealer will maintain a proper level of floorplan to support Malibu & Axis commitment and purchases estimated at $20261769

2. Dealer will be required to hit an Axis target Market Share of 13% by 12/31/2022 & 13%  by 6/30/2023 as agreed to on your MY23 Axis Commitment Sheet. This will be measured based off SSI data.

3. Your CSAT index for any rolling six month period shall meet a minimum score of 91% and a minimum survey return rate of 40% for New Owner Survey and a minimum score of 85% and a minimum survey return rate of 25% for Year 1 Owner Survey.   Per DPP your scores will be measured each July, October, January and April with these results setting the RSI level for the current quarter.

4. You must complete warranty registration for 100% of the Malibu boat products you sell. Each boat sold must be registered within 10 days after customer takes delivery of the boat.

5. Quarterly update identifying the dealership sponsored promotional personnel and a calendar of promotional events. Number to be agreed upon with Malibu Sales Rep and to be based on market size and market factors.

6. Dealers are required to update inventory in Dealer CRM on a weekly basis. Weekly inventory must be updated in the Dealer CRM prior to midnight eastern time each Friday.

7. Attendance at all Sales, Service, Regional and North American Dealer Meetings is required by appropriate dealership personnel.  Attendance of and participation in Malibu & Axis sponsored Sales Training will be supported by Coop.

8. Malibu Boats shall have the sole right to determine qualification and compliance with the terms and conditions of Dealer Performance Program.  Malibu reserves the right to modify, suspend, terminate or replace the DPP program or any sales program at any time.

9. Dealer will be required to stock a representation of the following new models: A225 & T235

10. Dealer is required to have a clearly identified link on their dealership website that links visitors to the Axis Build A Boat.

11. You agree that you shall represent Malibu Products at the following boat shows: Dallas & Ft Worth

12. Dealer is required to be a current member of WSIA (Water Sports Industry Association) and to actively promote "WAKE RESPONSIBLY".

13. Commitments as an Exclusive Malibu & Axis Dealer will be:  MY23 - 155 Malibu & 85 Axis:  For MY24 & MY25 the commitments for both Malibu & Axis will be at the Platinum Level as agreed to by Dealer & Malibu Sales Manager.

14. Exclusivity - Malibu & Axis Brands are to be the exclusive inboard watersports brands at all dealer locations.

Dealer Acceptance - Initial: _*JK*____

Document Ref: WV7BK-SFVUY-JDSYV-W5IJT

**Accepted on behalf of Dealer:**

_____     **Date:** 08 / 18 / 2022
Dealer's Authorized Representative                       _____

Printed Name: Jim Kutches

Title: Acquisition & Compliance Director
       _____

Dealer Acceptance - Initial: _JK_____

**EXHIBIT 3**

**Exclusive Towed Water Sports Boat Brand**. **You agree that, without the prior written authorization of Malibu (which may be conditioned, delayed or withheld in Malibu's sole and absolute discretion), you will not sell, advertise for sale, or otherwise arrange, negotiate, assist or facilitate the sale of any new boats which are manufactured or distributed by or bearing the trademarks or logo in any substantial matter of any inboard sport-boat brand (each a "Direct Competitor"), which means a brand of trailerable fiberglass boats with inboard or inboard/outboard gasoline powered engine configurations, between 18 and 26 feet LOA, and configured to be used as the towing vessel for towed water sports activities, including, but not limited to, Nautique, Mastercraft, Supra, Moomba, MB, Centurion, Supreme, Epic, Tige, ATX, and Heyday.  You further agree that, unless and until Malibu terminates this Agreement or notifies you that Malibu will not renew this Agreement at expiration, without the prior written authorization of Malibu (which may be conditioned, delayed or withheld in Malibu's sole and absolute discretion), you will not engage in negotiations or enter into any contract or agreement of any nature whatsoever with a Direct Competitor.**  You acknowledge and understand that violation of this section 5 is grounds for Malibu's immediate termination of this Agreement, subject to applicable law.

Exclusivity - Malibu & Axis Brands are to be the exclusive inboard watersports brands at 375 Oakridge Blvd, Lewisville, TX 75057, USA

**Accepted on behalf of Dealer:**

_____      Date: ___08 / 18 / 2022_____

Dealer's Authorized Representative

Printed Name: Jim Kutches

Title: Acquisition & Compliance Director

Dealer Acceptance - Initial: _JK_____

# Signature Certificate

Reference number: WV7BK-SFVUY-JDSYV-W5IJT

| Signer | Timestamp | Signature |
|---|---|---|

**Jim Kutches**
Email: jkutches@gettommys.com

| | | |
|---|---|---|
| Sent: | 16 Aug 2022 19:47:09 UTC | |
| Viewed: | 18 Aug 2022 15:16:57 UTC | |
| Signed: | 18 Aug 2022 15:19:26 UTC | |

**Recipient Verification:**
✔ Email verified          18 Aug 2022 15:16:57 UTC

IP address: 99.129.253.88
Location: Grand Rapids, United States

**Eric Bondy**
Email: ericb@malibuboats.com

| | | |
|---|---|---|
| Sent: | 16 Aug 2022 19:47:09 UTC | |
| Viewed: | 18 Aug 2022 20:49:24 UTC | |
| Signed: | 18 Aug 2022 20:50:24 UTC | |

**Recipient Verification:**
✔ Email verified          18 Aug 2022 20:49:24 UTC

IP address: 108.178.126.2
Location: Pflugerville, United States

**Wayne Wilson**
Email: waynew@malibuboats.com

| | | |
|---|---|---|
| Sent: | 16 Aug 2022 19:47:09 UTC | |
| Viewed: | 07 Sep 2022 13:38:11 UTC | |
| Signed: | 07 Sep 2022 13:40:18 UTC | |

**Recipient Verification:**
✔ Email verified          07 Sep 2022 13:38:11 UTC

IP address: 96.33.98.50
Location: Loudon, United States

Document completed by all parties on:
07 Sep 2022 13:40:18 UTC

Page 1 of 1



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature
solution trusted by 30,000+ companies worldwide.



# Exhibit 3



# 2023 MALIBU
# DEALER PERFORMANCE PROGRAM

Malibu is excited to introduce to you our new 2023 Dealer Performance Program ("DPP"). This program gives you the choice of performance levels, provides quick feedback on your performance, and most importantly it allows you to put more cash in your pocket sooner.

The DPP is tailored for your specific dealership and market and is constructed to allow you a choice of programs that best meet your needs. For each dealership you will have three tier levels available to you; Platinum, Gold and Silver and your Malibu Sales Manager will walk you through the program to discuss the volume targets for each level. The program rewards dealers who place orders on time leading to a balanced year-round production schedule. After meeting with your Malibu Sales Manager, you will select a tier level that reflects your anticipated sales projection, expected market growth and market share target. Upon selection of tier level, you and your Malibu Sales Manager will complete the 2023 Malibu Commitment Sheet.

Malibu will use your commitment to determine production capability for the 2023 Model Year so it is important to be thoughtful and to make the most accurate projections possible. If a dealer does not meet or exceed their 1st half commitment Malibu cannot guarantee that we will be able to build Dealer 2nd half boats. For example, if Dealer commitment is established as 24 boats then dealer will need to take (11) 1st half boats in order to guarantee (13) 2nd half boats.

There are various components of the Dealer Performance Program that will be offered to dealers throughout the year based on tier level and achievement of the objectives agreed to on the 2023 MY Malibu Commitment Sheet.

1. Performance will be measured from on time confirmation of orders. (BCP-Boat Confirmation Payout)
2. Quarterly target achievement. (QCP – Quarterly Commitment Payout)
3. Marketing Payout. (Coop)
4. Warranty Registration & CSAT achievement. (RSI -Registration & Survey Incentive)
5. Market Share Bonus (MSB) (Platinum Commitment Only)

We are excited to offer you a program that will allow you to benefit from your performance quickly and efficiently.

 
The program will consist of the following payouts and rules:

1. **Quarterly Ordering Process**
   a. Ordering will be done on a quarterly basis
      i. Q1 – JUL/AUG/SEP
      ii. Q2 – OCT NOV/DEC
      iii. Q3 – JAN/FEB/MAR
      iv. Q4 – APR/MAY/JUN

   b. All orders for a given quarter must be in "submitted" status by the following deadlines:
      i. Q1 – JUN 3rd
         1. Signed Commitment Sheet needs to be submitted prior to execution of 2023 MY Dealer Agreement.
      ii. Q2 – AUG 15th
      iii. Q3 – NOV 15th
      iv. Q4 – FEB 15th
   c. Any missed/late quarterly order submission will disqualify a dealer from receipt of the BCP, QCP and Coop on **ALL** units for that quarter.
   d. Model Mix needs to be locked in/reviewed 45 days **prior** to the spray month (example: if the boat sprays in September an order with the correct model/Hull Choice needs to be identified by July 15)
   e. Once an order is slotted it can no longer be cancelled.
   f. Model Mix is specific to Hull Choice
   g. If slot date is set and order is not confirmed by 35-day deadline and there has been no approval by Regional Sales Manager or Order Coordinator, then order status will be updated to "Quote" status which has the potential to negatively impact Dealer BCP, QCP & Coop.

2. **Order Confirmation Process**
   a. All orders must be confirmed by Midnight Eastern Time **35 days prior** to slot/spray date. July, January & June order confirmation process as noted below.
      i. All July orders must be confirmed by June 15, 2022.
      ii. All January orders must be confirmed by December 15, 2022.
      iii. All June orders must be confirmed by midnight eastern 35 days prior to slot/spray date or by May 15, 2023…whichever comes first.
   b. If an order is not confirmed **35 days prior** to slot/spray date or dates noted in i, ii, and iii above and delay is not approved by Dealer's Regional Sales Manager and the order coordinator. orders@malibuboats.com, order status will be updated to "Quote" status which has the potential to negatively impact Dealer BCP, QCP & Coop.

3. **Boat Confirmation Payout ("BCP")**
   a. For each boat confirmed by the dealer at least 35 days prior to its assigned slot/spray date the dealer will receive a BCP according to its tier level:





    **b.** Confirmation must occur by midnight Eastern Time 35 days in advance of the slot/spray date.

        **i.** Malibu Order Coordinator may approve order modifications inside the confirmation window, but the original order confirmation MUST have occurred prior to 35 day window for eligibility.

    **c.** Payment for each BCP will be made within 21 days of the end of the calendar month of spray, but only after payment or flooring confirmation is received by Malibu.

    **d.** Boats ordered above and beyond the monthly committed amount ("excess orders") will earn a BCP if the dealer has not missed any commitments in prior months of the model year ("shortfall orders"). If a dealer has had shortfall orders, no excess orders will be eligible for the BCP until the number of excess orders exceeds the number of shortfall orders, and then only the excess orders above and beyond the committed orders shall be eligible for BCP.

**4. Quarterly Commitment Payout ("QCP")**

    **a.** In the event that a dealer earns his BCP on every boat the dealer commits to have built in a quarter (no shortfall orders in the quarter), the dealer will receive a QCP payment for each boat according to its tier level:



    **b.** Payment for each QCP will be made within 45 days of the end of the quarter of spray, but only after confirmation of the following:

        **i.** Payment or flooring confirmed for all orders shipped thru the end of the quarter.

        **ii.** Cumulative total of orders in submitted or confirmed status that satisfies commitment thru the following quarter.

    **c.** Boats ordered above and beyond the quarterly committed amount ("quarterly excess orders") will be eligible for BCP but will not be eligible for QCP until you have satisfied your annual commitment. All quarterly excess orders will go towards satisfying the next quarter's commitment until the annual commitment is satisfied.

**5. Quarterly Coop ("Coop")**

    **a.** In the event that a dealer earns their QCP for the quarter. The dealer will receive a Coop credit for each boat that he received a QCP on, that can be used to reimburse of eligible marketing spend pursuant to the Company's Coop Program:



    **b.** Payment for each Coop credit will be consistent with the Company's Coop Program and made biannually within 45 days of the end of Q2 & Q4.

    **c.** Boats ordered above and beyond the quarterly committed amount ("quarterly excess orders") will be eligible for BCP but will not be eligible for Coop credit until you have satisfied your annual commitment. Once a dealer has achieved their annual commitment, orders above that annual commitment will receive a Coop credit.



6. **Registration & Survey Incentive ("RSI")**
   a. The MY23 RSI incentives encompass warranty registrations and two separate surveys. The maximum potential incentive is ███████ on Malibu. Importantly, the program is set up so that you can earn three discreet portions vs. all-or-nothing. At each quarter end, that quarter's warranty registration data and Rolling-6-Month survey data will be pulled to set a quarterly payout amount which will then be paid out within 45 days after the quarter end. The RSI will be paid in a single quarterly sum for the quarter just closed based on the following rules/requirements.

      i. Accurate/complete warranty registrations: Because a successful survey program starts with accurate owner email addresses, the first ██████ on Malibu is earned with fault-free warranty registrations (assessed at each quarter-end for the quarter just finished) -- defined as all fields completed accurately including a real owner email address that is not a dealer, no-name, or otherwise unusable/defunct address. A faulty registration when the quarter closes renders that individual boat ineligible for any RSI. Dealer will need to get all faulty registrations corrected prior to June 30, 2023, or they will be deducted from the eligible Q4 totals.
      ii. New Owner Survey (the Buying/Delivery Experience): Served 30 days from the Sold/Delivery Date entered on the warranty registration, the next ████████ on Malibu is earned if you meet all three of the following criteria (assessed each quarter using Rolling-6-Month data):
         1. Survey response rate ≥40%
         2. No Bounced emails (you will have opportunity to try to correct these as you learn of them monthly)
         3. Dealer Customer Satisfaction Score ≥91
      iii. Year 1 Owner Survey (the Owning/Service Experience): Served 11 months after the first survey, the final ███████ on Malibu is earned if you meet all three of the following criteria (assessed each quarter using Rolling-6-Month data):
         1. Survey response rate ≥25%
         2. Dealer Customer Satisfaction Score ≥85
         3. No Dissatisfied responses on query "Dealer helped my confidence in this boat/brand choice."

   b. Delay of warranty registration past the 10-day deadline after Sold/Delivered Date will disqualify dealer from receipt of RSI on any boat. Systemic abuse and delay of warranty registration will disqualify dealer from participation in the RSI program.
   c. Boats not registered within 24 months of invoice will not be eligible for RSI.
   d. There will be a ██████ chargeback of program dollars for any fraudulent Warranty Registration discovered at any time.
   e. Dealers will get emailed reports of their key survey metrics on a monthly basis, while October, January, April & July data pulls of P6M results set the payout levels to be paid out for the previous quarter.

7. **Market Share Bonus ("MSB")**
   a. Malibu will accrue ████████████████████████████████████████████


    **b.** Dealer will work with RSM to establish the Market Share (warranty registration Canadian Dealers) goals ending December 31, 2022 & June 30, 2023 for the assigned dealer territory and identify it on the 2023 MY Dealer Commitment Sheet.

        **i.** If December 31, 2022 Share goal is achieved and Dealer has met Q1 and Q2 commitment, Dealer will receive payout of ██████████ ████████████████ Payment will be made to dealer in April 2023 using March 2022 SSI data to review December 31, 2022 ending Market share

        **ii.** If June 30, 2023 Share goal is achieved and Dealer has full year commitment, Dealer will receive payout of ██████████████████ ████████████. Payment will be made to dealer in October 2023. using September 2023 SSI data to review June 30, 2023 ending Market share.

## 8. Inventory

    **a.** Dealers are required to update inventory in Dealer CRM on a weekly basis.

    **b.** Weekly inventory must be updated in the Malibu Dealer CRM prior to Midnight Eastern Time each Friday.

        **i.** Any delay in weekly inventory updates will result in Malibu holding the BCP & RRP payouts to dealer commensurate with the delay. i.e Dealer misses one week, Malibu holds BCP/RRP payment one week etc.

        **ii.** If a dealer does not update inventory weekly for a month or four consecutive weeks, they forfeit the preceding months BCP and RRP payments.

    **c.** Every new unit will need to be designated as:

        **i.** Available for Sale & Boat Use updated

        **ii.** Sold - pending delivery: Month/Year of sale selected & Boat Use updated.

## 9. Automatic Tier Reduction

    **a.** In the event a dealer misses any quarterly committed boat order volumes by more than ████████████████████████████ the dealer's payment levels will automatically be reduced to the next tier level down for all subsequent payments or credits. In this event, dealer quarterly commitment levels will not be adjusted downward.

## 10. Winter Flooring Program

    **a.** Flooring interest expenses associated with 2023 model year boats will be paid for by Malibu Boats through April 30th if purchased before that date. Beginning May 1st, dealers will assume the interest charges on all unpaid balances.

    **b.** Dealers utilizing financing from Wells Fargo will have the interest paid by Malibu direct to Wells Fargo. Dealers utilizing financing other than Wells Fargo should contact the accounting department for reimbursement details.

## 11. Non-Winter Flooring Program

    **a.** If a dealer chooses not to participate in the free winter flooring plan then the dealer is eligible for the following discount structure for model year 2023 boats based on the invoice date. This is an all or nothing program, meaning the dealer will have to choose to participate or not participate in the free winter flooring program at the beginning of the 2023 model year. **It is the dealer's responsibility to get the dealership's orders in early and**




**confirm spray dates that will bring invoicing in line with the following discounts.**

    i.  Q1 2022 MY (JUL/AUG/SEP)
    ii.  Q2 2022 MY (OCT/NOV/DEC)
    iii.  Q3 2023 MY (JAN/FEB/MAR) 

## 12. Exclusions from the DPP
    **a.** Only model year 2023 and later boats are subject to the QCP, during the model year there may be boats that come available with a discount that Malibu offers to the dealer network. Any boat sold with a discount over ▮▮▮ will not qualify for any BCP, QCP or Coop payment.
    **b.** Replacement units (warranty or otherwise) will be excluded from inclusion in achievement of a dealers committed volumes.

## 13. Eligibility for and Disqualification from DPP programs
    **a.** Any dealer that enters or announces future entry into any dealership or distribution agreement or a similar relationship, whether or not documented by a written agreement with a Direct Competitor as defined in the Dealer Agreement will be excluded from all DPP payments. "New boats" means any boat that has not been titled in the name of a purchaser from a dealer or distributor.
    **b.** Any dealer that purchases new trailers for sale to the buyer with 2023 MY product from any other manufacturer other than Malibu Boats LLC will be excluded from all DPP payments.
    **c.** A minimum commitment of 4 Malibu boats is required to qualify for BCP, QCP or Coop payments.

## 14. Additional Conditions and Changes
    **a.** Participation in _**ALL**_ Malibu DPP programs is conditioned on the dealer's compliance with its Dealer Agreement and timely payment within credit terms on their boat, part and warranty accounts.
    **b.** Malibu Boats shall have the sole right to determine qualification and compliance with the terms and conditions of this DPP programs. Malibu reserves the right to modify, suspend, terminate or replace the DPP program or any sales program at any time.

## 15. Tier Level Summary
    **a.** The below tier level table summarizes the available program dollars by tier level. Please consult your Malibu Sales Manager for your tier level volume targets.



| | | | | | | | |
|---|---|---|---|---|---|---|---|
| BCP | | ▮ | | ▮ | | ▮ | |
| QCP | | ▮ | | ▮ | | ▮ | |
| Coop | | ▮ | | ▮ | | ▮ | |
| RSI | | ▮ | | ▮ | | ▮ | |
| MSB | | ▮ | | ▮ | | ▮ | |
| **TOTAL** | | ▮ | | ▮ | | ▮ | |

 

**MALIBU DEALER PROMOTIONAL CO-OP PROGRAM**

The Malibu Dealer Promotional Coop Program has been designed to assist dealers in reaching their potential in branding, promoting and advertising the Malibu line of boats in their dealership. Malibu offers the following co-op advertising program for the 2023 Model Year.

**Dealers must submit reasonable supporting documentation for expenses for the following items for co-op advertising reimbursement:**

- Malibu sponsored sales training initiatives
- Advertising (Print, Radio, Television, Billboards)
- Demo Days & Special Events
- Promotional Boat Show Expenses
- Digital marketing with preapproval
- Authorized Malibu signage
- Direct Mail Campaigns
- Newsletters

**Guidelines:**

- Malibu will pay up to ████████████████, with coop credits earned by the dealer per the 2023 DPP program
- All Coop reimbursement claims must be submitted for MY2023 before the cutoff deadline of July 31st, 2023
- All coop claims must be submitted within 60 days after the qualified activity, unless during June 2023

**Coop Requirements**

Dealers must complete a coop claim form and attach the required supporting documentation. If a claim is submitted without the required support, the claim will be denied and returned. Claims may be submitted throughout the year thru the Coop tab on the Dealer Portal.

- For print advertising and direct mail, submit an actual example of any printed piece, along with the paid receipt or invoice from the media supplier
- For radio and TV ads, submit the media schedule, advertising contract and voice over or graphic copy per commercial
- For Boat show claims, dealers must indicate on the coop claim form the total number of boats displayed by brand and model, the total number of Malibu boats displayed and a copy of the paid receipt or paid bill, along with proof of payment and boat show pictures of the dealer's Malibu boats on display
- National advertising, stationery, business cards, website content or hosting expenses, yellow pages or Malibu logo-ized promotional items are not eligible for co-op
- Dealer related labor is not eligible for co-op
- **All Coop claims must be submitted per the deadline stated above.**

Please contact Kasey Millikan at kaseym@malibuboats.com for support in coop submittal and approval.

# Exhibit 4



# MY24 MALIBU
# DEALER PERFORMANCE PROGRAM

Malibu is excited to introduce our new MY24 Malibu Dealer Performance Program.

The Dealer Performance Program is tailored to your dealership and market and allows a choice of programs that best meet your needs. For each dealership two tier levels are available: Platinum and Gold. Your Malibu Regional Sales Manager will discuss the required volume targets and market share for each level. You will select a tier level that reflects your anticipated sales projection, expected market growth and market share target. You will select your tier level and complete the MY24 Malibu Commitment Sheet with your Malibu Regional Sales Manager.

Malibu will use commitment sheets from our dealers to inform our production capacities for the MY24 Model Year, so it is important to be thoughtful and to make accurate projections.

There are two components of the Dealer Performance Program based on tier level and achievement of the objectives agreed to on the MY24 Malibu Commitment Sheet. Eligibility for participation in this program requires execution of a MY24 Malibu Commitment Sheet.

1. **Dealer Performance Program Incentives**

    The below table summarizes the available program dollars available by tier level for each Qualifying Boat.

    | Tier Level | ███ | | ███ | |
    |---|---|---|---|---|
    | Order Performance Incentive | ███ | | ███ | |
    | Market Share Incentive | ███ | | ███ | |
    | TOTAL | ███ | | ███ | |

2. **Payment of Incentives**

    Payment of any available Dealer Performance Program Incentives to you from Malibu for each Qualifying Boat are subject to the rules and requirements of this Dealer Performance Plan and may be made as follows:

    a. **Payment of Order Performance Incentive**

        i. Payment of the Order Performance Incentive will be split as follows:
            1) ████████████████████ paid 21 days after the end of a month in which a Qualifying Boat is shipped



2) ███████████████████████ paid once annually by August 14, 2024, ███████████████████

**b. Payment of Market Share Incentive**

    **i.** If the June 30, 2024 Market Share Goal is achieved, you may be eligible to receive payout of ████ ████████████████████████████████.

    **ii.** If you are eligible for the Market Share Incentive, payment will be made by October 31, 2024, using September 2024 SSI data to review June 30, 2024 ending market share.

**3. <u>Requirements</u>**

The following requirements must be met for you to be eligible for the Dealer Performance Program Incentives.

    **a. Qualifying Boat**

        **i.** A Qualifying Boat is a MY2024 boat with a fully paid invoice that is shipped during MY2024 and that otherwise meets the requirements of the Dealer Performance Program.

        **ii.** Only MY24 and later boats are eligible for incentives. There may be boats that become available during MY2024 with a discount that Malibu offers to its dealer network. Any boat sold with a wholesale discount over ████ will not be a Qualifying Boat.

        **iii.** Replacement units (warranty or otherwise) are excluded and will not be considered a Qualifying Boat.

    **b. Quarterly Order Entry**

        **i.** All orders for a given quarter must be in "submitted" status in the dealer portal by the following deadlines:
            1) Q1 – JUL orders by JUN 15th & AUG/SEP by JUN 23rd
            2) Q2 – AUG 15th
            3) Q3 – NOV 15th
            4) Q4 – FEB 15th

    **c. Order Confirmation Process**

        **i.** All orders must be confirmed by Midnight Eastern Time **35 days prior** to slot/spray date, except for the following:
            1) All July orders must be confirmed by June 15, 2023
            2) All January orders must be confirmed by December 15, 2023
            3) All June orders must be confirmed by midnight eastern 35 days prior to slot/spray date or by May 15, 2024 whichever comes first



    **d. Inventory Update Process**

        **i.** Inventory must be updated in Dealer CRM on a weekly basis

        **ii.** Weekly inventory must be updated in the Malibu Dealer CRM prior to Midnight Eastern Time each Friday.

        **iii.** Every new unit will need to be designated as:
            1) Available for Sale or
            2) Sold Pending Delivery

    **e. Market Share Goal**

        **i.** Your Regional Sales Manager will work with you to establish a target Market Share Goal (warranty registration for Canadian Dealers) for MY2024 ending June 30, 2024 for your assigned dealer territory and identify it on the MY24 Dealer Commitment Sheet. The Market Share Goal **must** be met to be eligible for payment of **any** of the available Market Share Incentive. Although your Regional Sales Manager will work with you to establish the Market Share Goal, the target Market Share Goal is in Malibu's sole discretion.

**4. <u>Disqualifying Events</u>**

You may be disqualified from ***any and all*** available incentives, whether already accrued or that may have otherwise been available for the remainder of MY2024, for failure to comply with the Eligibility Requirements listed above. If a Disqualifying Event occurs, you will also become ineligible to receive any incentives, whether already accrued or that may have otherwise been available for the remainder of MY2024, and will lose eligibility for future payments of the monthly or annual portions of the Dealer Performance Program Incentives.

The following non-exhaustive list of Disqualifying Events will disqualify you from eligibility for payment of incentives under the Dealer Performance Plan.

    **a. Order Entry**

        **i.** Any missed or late order entry that deviates from the MY24 Malibu Commitment Sheet

        **ii.** Model Mix including Hull Choice must be locked in/reviewed 45 days prior to the spray month (example: if the boat sprays in September an order with the correct model/Hull Choice needs to be identified by July 15)

        **iii.** Requesting cancellation of an order that is slotted

        **iv.** If slot date is set and order is not confirmed per the Order Confirmation Process

        **v.** Any delay in weekly inventory updates

 
    **b. Market Share**

        **i.** Failure to meet your Market Share Goal for MY2024 will disqualify you from receiving any of the available Market Share Incentive.

    **c. Other Events**

        **i.** If you enter into or announce future entry into any dealership or distribution agreement or a similar relationship during participation in the Dealer Performance Program, whether or not documented by a written agreement, with a Direct Competitor as defined in the Dealer Agreement, you will become ineligible for all Dealer Performance Program payments. "New boats" means any boat that has not been titled in the name of a purchaser from a dealer or distributor.

        **ii.** Any dealer that purchases new trailers for sale to the buyer with MY24 product from any other manufacturer other than Malibu Boats LLC will be excluded from all Dealer Performance Program payments.

        **iii.** Failure to comply with the terms of your Dealer Agreement

**5. <u>Winter Flooring Program</u>**

    **a.** Flooring interest expenses associated with MY24 model year boats will be paid for by Malibu Boats through April 30th if purchased before that date. Beginning May 1st, you will assume the interest charges on all unpaid balances.

    **b.** Dealers utilizing financing from Wells Fargo will have the interest paid by Malibu direct to Wells Fargo. Dealers utilizing financing other than Wells Fargo should contact Malibu for reimbursement details.

**6. <u>Non-Winter Flooring Program</u>**

    **a.** If you choose not to participate in the free winter flooring plan, then you may be eligible for the following discount structure for MY24 boats based on the invoice date. You must choose whether to participate in the free winter flooring program at the beginning of the MY24. **It is your responsibility to get orders in early and confirm spray dates that will bring invoicing in line with the following discounts.**

        **i.** Q1 MY24 (JUL/AUG/SEP) 
        **ii.** Q2 MY24 (OCT/NOV/DEC)
        **iii.** Q3 MY24 (JAN/FEB/MAR)

**7. <u>Additional Conditions</u>**

    **a.** Participation in <u>***ALL***</u> Malibu Dealer Performance Programs is conditioned on your full compliance with the terms your Dealer Agreement, timely payment within credit terms on their boat, part and warranty accounts, and


compliance with the terms of any other agreements between you and Malibu.

**b.** Malibu Boats shall have the sole right to determine qualification and compliance with the terms and conditions of this Dealer Performance Programs. Malibu reserves the right to modify, suspend, terminate or replace the Dealer Performance Program or any sales program at any time at its sole discretion without notice.

**c.** This MY2024 Dealer Performance Program supersedes all incentives and payouts awarded under any prior Dealer Performance Programs or other incentive programs from Malibu, such as marketing/Co-Op payments and warranty registration/CSAT incentives.

**d.** The availability of the incentives of this MY2024 Dealer Performance Program will end with final shipment of dealers MY24 committed product., unless modified or terminated earlier by Malibu.

# Exhibit 5

| | | |
|---|---|---|
| In Re: | ) | **Case No. 24-90000-elm-11** |
| | ) | (Jointly Administered) |
| TOMMY'S FORT WORTH, LLC, | ) | |
| et al., | ) | Fort Worth, Texas |
| | ) | June 7, 2024 |
| Debtors. | ) | 2:30 p.m. Docket |
| | ) | |
| | ) | RULING:  EMERGENCY MOTION FOR |
| | ) | ENTRY OF INTERIM AND FINAL |
| | ) | ORDERS ON CASH COLLATERAL [12] |
| | ) | |
| | ) | RULING:  EMERGENCY MOTION TO |
| | ) | ENFORCE AUTOMATIC STAY [107] |
| _____ | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE EDWARD L. MORRIS,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtors:          Elizabeth Nicolle Boydston
                          Alexandria Rahn
                          GUTNICKI, LLP
                          10440 North Central Expressway,
                            Suite 800
                          Dallas, TX  75231
                          (469) 895-4413

For the Debtors:          Max Schlann
                          GUTNICKI, LLP
                          45 Rockefeller Plaza, Suite 2000
                          New York, NY  10111
                          (646) 825-2330

For Malibu Boats:         Ian Shapiro
                          Daniel Shamah
                          COOLEY, LLP
                          55 Hudson Yards
                          New York, NY  10001-2157
                          (212) 479-6000

For Malibu Boats:         Katharine Battaia Clark
                          THOMPSON COBURN, LLP
                          2100 Ross Avenue, Suite 3200
                          Dallas, TX  75201
                          (972) 629-7100

APPEARANCES, cont'd.:

For Malibu Boats:     Joshua I. Divack
            THOMPSON COBURN, LLP
            488 Madison Avenue
            New York, NY  10022
            (212) 478-7340

For the U.S. Trustee:   Erin Schmidt
            OFFICE OF THE UNITED STATES
              TRUSTEE
            1100 Commerce Street, Room 976
            Dallas, TX  75202
            (214) 767-8967

For M&T Bank:       Michael Berthiaume
            Toby L. Gerber
            NORTON ROSE FULBRIGHT US, LLP
            2200 Ross Avenue, Suite 3600
            Dallas, TX  75201-7932
            (214) 855-7171

For STORE Master Funding  Khaled Tarazi
XVIII, LLC:        BUCHALTER, P.C.
            15279 N. Scottsdale Road,
             Suite 400
            Scottsdale, AZ  85254
            (480) 383-1840

Recorded by:       Shelley Warren
            UNITED STATES BANKRUPTCY COURT
            501 W. 10th Street
            Fort Worth, TX  76102
            (817) 333-6005

Transcribed by:      Kathy Rehling
            311 Paradise Cove
            Shady Shores, TX  76208
            (972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1     <u>FORT WORTH, TEXAS - JUNE 7, 2024 - 2:56 P.M.</u>

2     THE COURT:  All right.  Good afternoon, everybody.

3 We're on the June 7, 2024 2:30 p.m. docket.  We have the

4 Tommy's Fort Worth, LLC and affiliated Debtors' cases,

5 jointly administered under Case 24-90000.

6     First of all, let me apologize to you all on the delay in

7 coming out.  As I suspected, time was going to run short.

8 But we will proceed.

9     Let me just make sure that I have a representative of

10 each of the key parties present.  Do I have somebody on

11 behalf of the Debtors?

12     MS. BOYDSTON:  Yes, Your Honor.  You have Liz

13 Boydston of Gutnicki on behalf of Debtors.

14     THE COURT:  Okay.  How about for M&T Bank?

15     MR. GERBER:  Good afternoon, Your Honor.  Toby

16 Gerber on behalf of M&T Bank.

17     THE COURT:  All right.  And for the Malibu Boat

18 entities?

19     MR. SHAPIRO:  Your Honor, it's Ian Shapiro and my

20 colleague Daniel Shamah is on the phone for Malibu Boats.

21     THE COURT:  Okay.  Very good.

22     All right.  Before the Court for determination are the

23 following two matters.  First, the Debtors' request for entry

24 of a fourth interim order authorizing the Debtors' continuing

25 use of cash collateral pursuant to the Debtors' underlying

cash collateral motion filed at Docket No. 12, titled Emergency Motion of Debtors for Entry of Interim and Final Orders (1) Authorizing the Use of Cash Collateral; (2) Granting Adequate Protecting [sic]; (3) Modifying the Automatic Stay; (4) Setting a Second Interim Hearing; (5) Setting a Final Hearing; and (5) [sic] Granting Related Relief, which I will refer to as the "Cash Collateral Motion."

And, second, the Debtors' Emergency Motion to Enforce Automatic Stay and Punitive Damages for Willful Violations of the Automatic Stay Against Malibu Boats, Inc. and Malibu Boats, LLC, filed at Docket No. 107, which I will refer to as the "Stay Enforcement Motion."

In relation to the Cash Collateral Motion, M&T Bank, or just "M&T" for short, filed an initial objection at Docket No. 21. Thereafter, first interim, second interim, and third interim orders were entered in relation to the Cash Collateral Motion at Docket Nos. 52, 76, and 95 that collectively authorized the Debtors' limited use of cash collateral through June 7, 2024, in accordance with the terms and limitations thereof and the respective budgets approved thereby.

In accordance with the requirements of the third interim order, on June 5, 2024, the Debtors filed their Notice of Proposed Fourth Interim Order at Docket No. 119, pursuant to

which the Debtors have evidenced their request for entry of a
fourth interim order pursuant to which the Debtors would be
authorized to continue their use of cash collateral for up to
an additional 30 days, or more practically speaking, through
the end of June, pending the final hearing, which is proposed
for June 27, 2024.

I will refer to the Proposed Fourth Interim Order
included as part of Docket No. 119 as the "Proposed Fourth
Interim Order."

On June 6, 2024, M&T filed its supplemental objection to
the Cash Collateral Motion and Proposed Fourth Interim Order
at Docket No. 124.

In relation to the Stay Enforcement Motion, which the
Debtors filed on June 3, 2024 and on which the Debtors
request emergency consideration, Malibu Boats, Inc. and
Malibu Boats, LLC -- who for simplicity I will collectively
refer to as "Malibu," recognizing, however, that for contract
purposes, one or the other may be the only contract
counterparty -- filed an objection at Docket No. 126 on June
6, 2024.

In relation to both matters, the Cash Collateral Motion
and the Stay Enforcement Motion, as you know, the Court
conducted an evidentiary hearing on June 6, 2024.  It went
late into the evening.

Having now considered, in relation to the Cash Collateral

1  Motion the Cash Collateral Motion, the previously-entered

2  interim orders, the Proposed Fourth Interim Order, and M&T's

3  objections; and in relation to the Stay Enforcement Motion,

4  the Stay Enforcement Motion and Malibu's objection; and in

5  relation to both matters, the evidence introduced, the

6  representations and arguments of counsel, and the record in

7  these proceedings, the Court now issues its findings,

8  conclusions, and rulings in relation to both matters as

9  follows.

10  Starting with Jurisdiction.  The Court has jurisdiction

11  over the proceedings initiated by the Cash Collateral Motion

12  and Stay Enforcement Motion pursuant to 28 U.S.C. Sections

13  1334 and 157 and Miscellaneous Order No. 33 of the District

14  Court for the Northern District of Texas.

15  Venue of the jointly-administered bankruptcy case and

16  such proceedings in this district is proper pursuant to 28

17  U.S.C. Sections 1408 and 1409, and the proceedings constitute

18  core proceedings within the meaning of 28 U.S.C. Section

19  157(b)(2) -- specifically, 157(b)(2)(M) in the case of the

20  Cash Collateral Motion proceeding and 157(b)(2)(A), (G), and

21  (O) in the case of the Stay Enforcement Motion proceeding.

22  Turning to some General Background.  As explained during

23  the initial hearings in this case, facts which I believe to

24  be uncontested, the Debtors collectively conduct business as

25  a water sports enthusiast brand known as Tommy's Boats that

originated in Colorado in 2012.

As of May 20th through 21, 2024, being the dates of the filing of the Debtors' bankruptcy cases, as applicable, which I will refer to as the "Petition Date," the Debtors operated out of 14 business locations and five additional on-water rental program locations in the states of Texas, Colorado, Michigan, Arizona, California, Florida, Nevada, and Tennessee.

Leading up to the bankruptcy filings, Tommy's Boats was one of the largest ski and wake dealers globally and supplied a full suite of boat repair services, boat rental services, on-the-water fueling and docking services, retail sales of super-premium ski and wake boats, luxury cruisers, fishing boats, pontoons, fliteboards, and retail goods and apparel.

As of the Petition Date, the Debtors employed approximately 279 employees.

Leading up to the bankruptcy filings, the Debtors' primary if not only original equipment manufacturer or OEM relationship was with Malibu, and the Debtors' dealership arrangement with Malibu accounted for both a substantial portion of Malibu's annual sales and a substantial portion of the Debtors' revenue generation.

In very simple and general terms, the Debtors were given the right to market themselves as Malibu dealers, selling Malibu products. As part of the relationship, Malibu agreed

1 to provide geographic exclusivity to the dealerships and to

2 provide certain incentives to the dealerships.

3      The dealerships were expected to conduct their operations

4 in a manner consistent with Malibu standards and requirements

5 and consistent with the Malibu brand, and the parties were to

6 come to terms on a new set of dealership agreements on an

7 annual basis as each successive year's Malibu product models

8 rolled out, including the parties' expectations with respect

9 to product purchase volumes.

10      To enable the Debtors to have sufficient Malibu products

11 onsite at the dealerships, the Debtors necessarily needed to

12 have floorplan financing in place.  And, typically, the

13 floorplan financing lender required some form of contractual

14 repurchase commitment from Malibu as protection should the

15 Debtors default in repayment of the financing.

16      With this in mind, in 2023, M&T agreed to provide such

17 floorplan financing to the Debtors, and on or about May 18,

18 2023, (1) the Debtors entered into a floorplan financing loan

19 agreement with M&T, which I will refer to as the "Loan

20 Agreement," coupled with the execution of a variable rate

21 demand note dated May 18, 2023, pursuant to which M&T agreed

22 to provide up to $110 million in floorplan financing to the

23 Debtors; and (2) the Debtors executed a revolving line note

24 dated May 18, 2023 for a separate working capital line of

25 credit of up to $5 million that M&T agreed to provide to the

Debtors. *See* M&T Exhibit 1.

To secure repayment of the amounts advanced by M&T, M&T obtained the Debtors' execution of both (1) a general security agreement dated May 17, 2023, pursuant to which the Debtors granted to M&T a security interest in all personal property and fixtures, then-existing and thereafter-acquired, including, among other things, accounts, chattel paper, investment property, deposit accounts, documents, goods, equipment, general intangibles, instruments, inventory, and money, and the proceeds, products, rents, issues, profits, and accounts arising therefrom, to secure all obligations owed by the Debtors to M&T, whether then-existing or thereafter-incurred; and (2) a cross-default and cross-collateral agreement dated May 18, 2023, pursuant to which M&T was given certain cross-default and cross-collateral rights in the event of a default under any credit agreement between the Debtors or a Debtor and M&T. *See, again*, M&T Exhibit 1.

For simplicity, all of the M&T loan documents introduced into evidence at M&T Exhibit 1 will be referred to as the "Loan Documents."

Pursuant to the Cash Collateral Motion, the Debtors acknowledge that, pursuant to the Loan Documents, as of the Petition Date, the obligations owed to M&T by the Debtors were secured by a first priority lien on substantially all of

the Debtors' personal property and fixtures.

While the Loan Documents introduced into evidence do not include evidence of the perfection of M&T's security interests, to date the Debtors have not challenged or otherwise questioned such perfection.

As is customary in floorplan financing, the Loan Agreement provides that, upon the sale of any collateral consisting of marine inventory that is sold or otherwise disposed of, the Debtors must immediately account to M&T for the proceeds and deliver to M&T such proceeds.  *See* Loan Agreement, Section 9.1, which I will refer to as the "Sale Paydown Provision."

In or about July 2023, Malibu shipped roughly $6.1 million in marine products to the Debtors that the Debtors had ordered.  At that time, the model year 2024 dealership agreements had not been finalized between the Debtors and Malibu, and hence Malibu had also not yet agreed to provide a repurchase agreement to M&T in connection with the floorplan financing.

As a result, the $6.1 million of new products were not immediately paid from the floorplan financing, which created a problem in ongoing dealership agreement renewal discussions between Malibu and the Debtors.

To make things worse, as time passed, the $6.1 million wasn't paid, and the new dealership agreements were not

finalized, resulting in the Debtors not receiving some of the

typical dealership benefits, such as short-term interest

carrying cost reimbursement from Malibu and the payment or

reimbursement of rebates, incentives, and the like from

Malibu, the Debtors ended up defaulting on the Sale Paydown

Provision, or as the parties have come to commonly describe

it, the Debtors ended up having sales out of trust or the

Debtors were SOT.

Even worse, the Debtors failed to remit certain sales tax

amounts and registration fees to the applicable governmental

entities, totaling as much as roughly $5 million by the time

of the Petition Date.

Ultimately, M&T agreed to finance the $6.1 million

purchase from Malibu, to ideally get the dealership

agreements and the repurchase agreement finalized so as to

facilitate a rightsizing of the Debtors' inventory, which had

grown to an unsupportable level. But, later, when M&T

determined through audit another SOT situation and learned

that Malibu had informed the Debtors in March 2024 that they

were not going to move forward with the 2024 model-year

dealership agreement renewals, M&T declared defaults and

determined to move forward more aggressively in the

protection of its interests.

In particular, in or about April 2024, M&T filed suit

against some or all of the Debtors in Michigan and in

1    conjunction therewith sought the appointment of a receiver,
2    to which the Debtors consented.

3        However, later, when the receiver began to take certain
4    actions that Debtors' management felt to be less than value-
5    maximizing and not geared towards the possibility of
6    preserving the Debtors as a going concern, the Debtors filed
7    these bankruptcy proceedings.

8        Focusing first more on the cash collateral matter,
9    pursuant to 11 U.S.C. Section 363(c)(2), a debtor-in-
10   possession may not use cash collateral unless each entity
11   that has an interest in such cash collateral consents, or the
12   Court, after notice and a hearing, authorizes such use in
13   accordance with the provisions of Section 363.

14       Here, M&T has not consented to the Debtors' continuing
15   use of cash collateral.  And I should, before I even get to
16   that point, note that it's undisputed that substantially all
17   of the cash on hand as of the Petition Date was cash
18   collateral of M&T.  And given the lien in substantially all
19   of the personal property of the Debtors, any conversion of
20   that property, the proceeds through sale or other
21   disposition, would also constitute cash collateral.

22       So, again, here, M&T has not consented to the Debtors'
23   continuing use of cash collateral under the Proposed Fourth
24   Interim Order.  Therefore, court authorization is necessary,
25   subject to other provisions of Section 363.

1      Give me one second.

2          (Pause.)

3          THE COURT:  I apologize for that interruption.

4      With respect to such other provisions, Section 363(e) of

5  the Bankruptcy Code provides that, notwithstanding any other

6  provision of Section 363, at any time, on request of an

7  entity that has an interest in property used or proposed to

8  be used by the debtor-in-possession, the Court, with or

9  without a hearing, shall prohibit or condition such use as is

10 necessary to provide adequate protection of such interest.

11     Here, M&T asserts that its interest in the cash

12 collateral proposed to be used by the Debtors under the terms

13 of the Proposed Fourth Interim Order will not be adequately

14 protected.  Pursuant to Section 363(p) of the Bankruptcy

15 Code, M&T has the burden of proving the validity, priority,

16 and extent of its asserted interest in cash collateral, and

17 the Debtors have the burden of proving that such interest is

18 adequately protected.

19     I'll just note that, based upon the factual background I

20 previously went through, that M&T has satisfied its burden of

21 proving the validity, extent, and priority of its security

22 interests, which, frankly, have been acknowledged by the

23 Debtors.

24     With respect to the proposed use, in specific terms, the

25 Debtors propose to continue to use cash collateral through

the end of June 2024, in accordance with the proposed budget
that was introduced into evidence as Debtors' Exhibit 1.

The Court notes that in reference to the Stay Enforcement
Motion, the other motion which was tried later in the day, we
had another Debtors' Exhibit 1, hence just noting for the
record we had two different Debtors' Exhibit 1s.  So, here,
obviously, the Debtors' Exhibit 1 for the cash collateral
proceeding was the proposed budget, which I will hereafter
simply refer to as the "Budget."

Pursuant to the Budget, while a Petition Date starting
cash balance is not reflected, the Budget reflects a starting
cash balance as of June 7, 2024 of $5,226,154.

Between the Petition Date and the end of June 2024, the
Debtors project total cash receipts of $10,326,512, including
$750,000 projected to be realized from the sale of a
dealership as to which there is not yet a definitive sale
agreement or a motion for approval.

Arguably, some portion of the $10.3 million plus in
receipts -- namely, to the extent tied to customer payments
for the labor of employees in servicing boats and other
customer-owned marine vessels, as opposed to the purchase of
personal property of the Debtors -- may be unencumbered by
M&T's security interests, at least to the extent they didn't
become encumbered postpetition on account of adequate
protection provided under one or more of the interim cash

1  collateral orders.

2  However, the Debtors did not make any distinction on that

3  point at the hearing.  Therefore, adding the starting cash

4  balance of $5,226,154 to the projected receipts of

5  $10,326,512 arguably takes us to a total of approximately

6  $15.5 million in cash collateral over the budget period.

7  Out of this amount, the Debtors propose to pay a total of

8  $5,881,858 to M&T, including the incremental cash receipts

9  projected to be obtained in excess of the costs of marine

10  inventory, which is set out in a separate line item on the

11  second page of the Budget, leaving a projected cash

12  collateral balance of roughly $9.6 million.

13  At the end of the interim budget period of June 28, 2024,

14  the Debtors project an ending cash balance of approximately

15  $3.8 million, meaning that in excess of $5 million in cash

16  collateral is proposed to be spent on things other than

17  paying down the M&T debt through the end of June.

18  Taking into account the paydown on the M&T debt, the

19  Debtors project the outstanding balance owed to M&T at the

20  end of June 2024 to be $90,129,359.  And that makes the big

21  assumption that, as part of a to-be-finalized dealership sale

22  by the end of June 2024, the purchaser will pay as part of

23  the purchase price $4,676,237 to M&T, or the equivalent

24  thereof in the form of a debt assumption arrangement that M&T

25  agrees to, assuming they would agree to it.

1    Outside of a starting cash balance as of June 7, 2024,

2  the Court received little in the way of meaningful valuation

3  testimony as to property of the estate.  At best, Mr. Freel,

4  the Debtors' head of operations, testified that the Debtors

5  currently have marine inventory in stock of roughly $85

6  million at cost, and he indicated that such inventory was

7  being sold at roughly 107 percent of cost, suggesting that

8  such inventory could possibly have a fair market value in the

9  range of $90.85 million.

10    The Debtors seem to suggest that because of the

11  prepetition receivership, for purposes of considering a

12  starting asset valuation of the marine inventory as of the

13  Petition Date, that a liquidation value is more appropriate.

14    In considering this, the Court is guided by Section

15  506(a) of the Bankruptcy Code, which provides that, in

16  Subpart (a)(1), so this is Section 506(a)(1), towards the end

17  of the provision, for purposes of valuing interests, such

18  value shall be determined in light of the purpose of the

19  valuation and of the proposed disposition or use of such

20  property.

21    So, with that in mind, what that language appears to

22  clearly provide for is it's a contemporaneous look at what is

23  the property proposed, what exactly is the proposed

24  disposition of the property on a prospective basis under the

25  facts and circumstances involved, as opposed to any sort of

1   historical analysis.

2       Give me one second again.

3       (Pause.)

4       THE COURT:  Just bear with me one second, folks.  I

5   forgot to bring something with me.  Just bear with me one

6   minute, folks.

7       (Pause.)

8       THE COURT:  All right.  Again, I apologize.  So,

9   going back to the provision of Section 506(a)(1), the gist of

10  where I believe the Debtors were trying to get to was to

11  suggest that because there was a receivership in place prior

12  to the Petition Date, that, given a receivership's role of

13  effectively trying to liquidate property theoretically as

14  promptly as possible, and arguably at prices that are more on

15  a liquidation basis as opposed to a fair market value basis,

16  that by continuing to fund a going concern operation of the

17  Debtors, that that sort of inherently created adequate

18  protection of M&T's interests by propping up the prices to a

19  fair market value, as opposed to what could conceivably be a

20  liquidation value.

21      So the point of my analysis is, considering Section

22  506(a)(1), I think that that is not a proper evaluation

23  because it's a contemporaneous evaluation to be made based

24  upon the proposed disposition of the property currently, and

25  as currently proposed as of the Petition Date, the Debtor was

1    and is attempting to operate as a going concern, trying to

2    maximize value of the sale of its marine inventory at fair

3    market values, and hence that's the starting point, even if

4    that may seem, in some respects, unfair.

5         I will note that my view is supported by, among others,

6    Judge Glenn from the Southern District of New York, who, in

7    the case of *Official Committee of Unsecured Creditors v. UMB*

8    *Bank, N.A. (In re Residential Capital, LLC)*, it's at 501 B.R.

9    549, it's a Bankruptcy Southern District of New York 2013

10   opinion, talked about this kind of same situation, albeit a

11   little different scenario.

12        But starting on Page 591, he notes there that the

13   plaintiffs had argued for adequate protection purposes that

14   the collateral should be valued at the petition date based

15   upon the foreclosure value of the collateral in the hands of

16   the secured creditor, but that the defendants, which was the

17   secured creditor, argued that the collateral should be valued

18   based upon the fair market value of the collateral in the

19   hands of the debtors.  And he agreed with the defendants that

20   the fair market value rather than the foreclosure value

21   applied, and then went through and talked about some of the

22   grounds for his view, including talking a little bit about

23   the *Timbers* case, which we heard about yesterday during the

24   hearing, at the Supreme Court level, as well as the Supreme

25   Court's *Rash* opinion.

1    So, in any event, the starting point here, that's why I
2    attempted to do the best I could with the limited pseudo-
3    valuation testimony that I had with respect to the cost value
4    of the marine inventory, to at least see where we were from a
5    starting standpoint.
6    So, going back to the Budget, obviously, some portion --
7    and I guess let me back up.  So, as of June 7, 2024,
8    arguably, if I extrapolate a fair market value based upon an
9    experiential sales situation of approximately 107 percent of
10   cost, we theoretically have a fair market value of marine
11   inventory as of June 7, 2024 in the neighborhood of $90.85
12   million.
13   So, thinking about that, obviously, some portion of that
14   inventory will be sold through the end of June 2024 under the
15   projections in order to generate the cash receipts.  In
16   particular, in excess of $5 million in boat sales receipts
17   are projected between June 8, 2024 and June 28, 2024.  Thus,
18   taking the ending cash balance of approximately $3.8 million,
19   and adding to it remaining marine inventory with an
20   ostensible fair market value of roughly $85 million, results
21   in a total of approximately $88.8 million in asset coverage
22   against the projected M&T outstanding balance of $90.1
23   million, meaning that M&T is undersecured and the Debtors
24   must show that the net expenditure of cash collateral by the
25   Debtors will not result in a diminution in the value of M&T's

1  interest as of the Petition Date, after taking into account

2  any offered adequate protection.

3      Additionally, because the Debtors are proposing a carve-

4  out under the Proposed Fourth Interim Order, the amount of

5  the carve-out must also be taken into account because it has

6  the effect of also reducing the collateral coverage.

7      With that in mind, in talking about what forms of

8  adequate protection have been offered, we do have some

9  guidance from Section 361 of the Bankruptcy Code, obviously,

10 as to what forms adequate protection may take.  We know, of

11 course, that it can take the form of periodic cash payments.

12 And, significantly, in thinking through that provision,

13 obviously, it's contemplated that the cash payments are

14 coming from other than the creditor's own cash collateral,

15 because that's just shifting pocket to pocket.  So if there's

16 some new source of periodic cash payment that's effectively

17 reducing the exposure on the outstanding debt.

18      Alternatively, or additionally, providing an additional

19 or replacement lien in property that is not already

20 encumbered by the secured party.

21      Or, third, it's the amazing language that Congress has

22 given us of some other form of indubitable equivalent.

23      With that in mind, the Debtors propose to have provided

24 M&T adequate protection in the form of, first, replacement

25 liens.  However, the Debtor is not generating any new

unencumbered property that any replacement lien would attach

to, so that if there is any at all, it's so de minimis that

it's really not even worth consideration.

Two, there's the proposal to provide a super-priority

administrative claim.  Based upon the testimony of Mr.

Dragelin, who was largely uncontroverted, and his analysis of

where the case exists and the projected burn on cash and the

incurrence of administrative expenses in the case, and also

taking into account priority claims that theoretically will

exist on account of unpaid sales tax, and particularly if

it's trust fund in nature that has its own independent

concerns, Mr. Dragelin's testimony is that he believes that

the case is already administratively insolvent, after

consideration of M&T's liens.

So, having the granting of a super-priority

administrative claim also provides little in the way of

protection.

Finally, there was also the suggestion that obtaining

reporting requirements and other kind of nonmonetary bells

and whistles provide adequate protection.  And I'm not here

to tell you that there isn't some element of adequate

protection with respect to that.  However, the adequate

protection contemplated for purposes of protecting a

financial interest has to also be, at a sort of bare minimum,

financial in nature.

1    As a result of the foregoing, I find that the Debtors

2 have failed to carry their burden of proving that M&T's

3 interests will be adequately protected under the currently

4 formulated Proposed Fourth Interim Order and accompanying

5 Budget.

6    That's not to say that there is not a potential path

7 forward here.  But under the currently proposed arrangement,

8 I don't find that the Debtors have carried their burden.

9    I will say the same thing that I said yesterday, which is

10 I frankly scratch my head and wonder why we can't find a path

11 forward here that can be consensual in nature, because I am

12 absolutely a hundred percent confident that if an arrangement

13 isn't worked out and this either turns into a foreclosure

14 process, effectively, or a conversion and/or the appointment

15 of a trustee or whatever else, I can virtually guarantee that

16 there is going to be substantial leakage of value.  But I

17 can't force parties to do what they don't want to do.  I'll

18 just encourage you all to continue to talk.

19    Turning to the Stay Enforcement Motion, 11 U.S.C. Section

20 362(a)(3) provides that the filing of a petition for

21 bankruptcy relief operates as a stay applicable to all

22 entities of, among other things, any act to obtain possession

23 of property of the estate, or of property from the estate, or

24 to exercise control over property of the estate.

25    The automatic stay is self-executing and has the legal

effect of an injunction, and its violation may lead to a finding of contempt and the award of compensatory and even possibly punitive damages in certain circumstances.

Property of the estate includes all legal and equitable interests of the Debtor as of the commencement of the case. *See* 11 U.S.C. Section 541(a).

As such, such interests include, among other things, contract rights. *See*, *for example*, *In re Mirant Corp.* I think that's 303 B.R. 319 (Bankr. N.D. Tex. 2003).

With that in mind, here, the Debtors assert that their contractual rights under the 2023 Malibu dealership agreements constitute property of the estate protected by the automatic stay, and they assert that Malibu, in permitting other entities to conduct business as their dealers within the exclusive territorial areas described in the 2023 dealership agreements, and in promoting those new dealers, is violating the automatic stay by interfering with the Debtors' contractual rights.

The Debtors specifically request, on an emergency basis, that Malibu be immediately enjoined from (1) performing under any existing dealership agreement with a competitive dealer within the Debtors' exclusive territories; (2) entering into any new dealership agreements with a competitive dealer in the Debtors' exclusive territories; and (3) selling or shipping any boats to competitor dealers within the Debtors'

1   exclusive territories that would violate the Debtors'

2   dealership agreements.  *See* Stay Enforcement Motion,

3   Paragraph 63.  *See, also*, Debtors' proposed order, Paragraphs

4   3 through 5, seeking to have Malibu enjoined from performing

5   under any competitor dealership agreement, entering into any

6   new dealership agreement, and shipping or delivering any

7   boats that in each case would be "in violation of the

8   dealership agreements with the Debtors."

9      Malibu objects to the requested relief on the basic

10   premise that there are no such non-expired, non-terminated

11   dealership agreements with the Debtors that remain in force,

12   at least to the extent that they would provide to the Debtors

13   exclusive territorial rights that remain in force.

14      With respect to the motion, the first thing that the

15   Court has to consider under the complex Chapter 11 procedures

16   that have been approved by the Court under its general order,

17   I have to consider whether or not emergency consideration of

18   the motion is appropriate.  Given the nature of the

19   allegations, without getting to the merits of the dispute,

20   because, really, emergency consideration is the very first

21   thing to consider, and while I probably should have

22   articulated this yesterday, I do find that, given the nature

23   of the allegations, that they were sufficient to at least

24   consider in part whether relief was appropriate under the

25   motion and to consider it on an emergency basis.  In

particular, if there were circumstances that were sort of
immediately and irreparably injuring the Debtors' business
prospects, that rises to the level of emergency
consideration, as opposed to, for example, any kind of damage
issues.  I don't really view it in terms of considering
compensatory damages or punitive damages or the like.  That
sort of is lesser of a concern as opposed to whether or not
the stay needs to be enforced more specifically through the
issuance of a separate order.

So, turning to the merits, we have 14 different
relationships that existed at some point in time prior to the
petition -- well, prior to the Petition Date, for certain.
It was a little fuzzy to me as to exactly where the Texas
dealership agreements fit into the mix because we focused so
much on the non-Texas locations.  But it appears that there
were 12 dealership arrangements that had existed outside of
Texas and two within Texas, and the non-Texas dealership
relationships were the focus of the hearing, frankly.

In relation to that, it is undisputed that -- and, again,
really just kind of focusing on those 12 -- it's undisputed
-- well, let me back up.  I think I had previously mentioned
that since the time of the Tommy's Boats brand origination in
Colorado, that the Debtors had been working with Malibu to
serve it under a dealership arrangement, and that as the
Debtor expanded to new locations the Malibu relationship

1 expanded with it.

2     It is also undisputed that the way that Malibu conducted

3 its business with its dealers was to effectively enter into a

4 new set of dealership agreements at the commencement of each

5 new model year, and that by doing that could effectively not

6 only figure out if there were new issues to address on

7 account of the new models, but be talking about unit volumes

8 to be acquired, any kind of rebate incentive-type plans to

9 have in place, potentially deal with any sort of floorplan

10 financing that a dealer may have in place in terms of whether

11 there's going to be a repurchase agreement with that

12 floorplan financer to help facilitate the dealership

13 relationship and what have you.  But the point is it was a

14 yearly process and that there was always a new model year

15 agreement that was entered into.

16     Unsurprisingly, I suppose, in some respects, as you would

17 roll into each new model year, everybody wasn't necessarily

18 focused on the new agreement until we've already sort of

19 treaded past the natural life of the original dealership

20 agreement.  And so, as Mr. Borisch testified, it was often --

21 it was common, effectively, for the new dealership agreement

22 each year to ultimately be finalized and then executed into

23 the following model year, as opposed to it being executed

24 prior to the beginning of the new model year.

25     That creates some interesting issues in terms of what

1  happens when the parties can't come to an agreement, what's

2  going on between Point A and Point B as that happens.

3      I think that there are provisions within the dealership

4  agreements that effectively address some of this, and that's

5  what we're going to end up talking through, frankly.  Because

6  I think in some respects there's some significant disconnect

7  with respect to how people are interpreting the agreements.

8      The key agreement that was focused on was introduced into

9  evidence as Debtors' Exhibit 1.  And, again, this is on the

10  Stay Enforcement side.  We had at Exhibit 1 a 2023 model year

11  dealership agreement that was entered into with respect to a

12  dealer address in Colorado.  And as Mr. Borisch testified,

13  all of the non-Texas 2023 model year dealer agreements that

14  were entered into with the non-Texas locations were

15  substantially identical to the form of Exhibit 1.

16      With respect to Exhibit 1, if we look at the provisions

17  of Paragraph 1 on the first page, there are two provisions

18  that are effectively the subject matter of the requested

19  relief on an emergency basis.  In Subpart (a), the provision

20  starts out with the language, "Malibu hereby appoints

21  Dealer..." and we'll close-quote and just I'll highlight of

22  course the dealer we're talking about here is one of the

23  Debtor dealers.  But picking back up, "...as an authorized

24  retail dealer during the term of this agreement for the

25  retail sale and service of Malibu products to end-use retail

1    consumers at Dealer's approved store locations within the
2    dealer area, as set forth in Exhibit 1."

3        If we look at Exhibit 1 to this agreement, when it comes
4    to the dealer area there is a list of counties within
5    Colorado that are assigned to the dealer.  So, hence, it
6    describes in Exhibit 1 what the dealer area is.  And there is
7    also the approved dealer location that is identified on
8    Exhibit 1, which actually specifies the address.  So both of
9    those things are identified on Exhibit 1.

10       Then the second part of Paragraph 1 is in Subpart (b),
11   which kind of correspondingly says, "Malibu will not appoint
12   another dealer for the products in the dealer area during the
13   term of this agreement."  And I'll close-quote there but note
14   it goes on to say, of course, if there's a material breach
15   then obviously that's an exception, because if you have a
16   material breach, you have obviously a material breach.

17       It also goes on to say that Malibu can appoint another
18   dealer in the dealer area to represent products or services
19   which are outside the scope of dealer's appointment.  So if
20   there are certain products, for example, that the dealer
21   hasn't been authorized -- the Debtor dealer hasn't been
22   authorized to sell but some other dealer has been, then --
23   basically, the idea is not to have competition between
24   dealers within the same approved dealer area.

25       Of course, all of this refers to during the term of the

1  agreement.  So we have, on Page 1, we have sort of an initial

2  reference of an effective date here of July 1, 2022 and an

3  expiration date of June 30, 2023, which suggests -- that's a

4  first indication of what is the term of this agreement.

5       But more specifically we have, in Paragraph 2 on the next

6  page, an actual term provision, which states, "This agreement

7  must be signed by both parties to be effective, and starts on

8  the effective date..."  Okay.  That was the same thing as on

9  the first page.  "... and will expire and terminate as set

10  forth on Exhibit 1, unless earlier terminated under this

11  agreement."

12       Kind of strange that it refers to Exhibit 1 instead of

13  the first page, where the expiration date is noted.  However,

14  here, Exhibit 1 just simply references the -- here, Exhibit 1

15  states that it will expire without further notice on June 30,

16  2023, unless earlier terminated under the agreement.  And

17  then that is defined as "Term."

18       So, taken at face value, that says that it's going to

19  terminate, unless terminated earlier under the term of the

20  agreement, on June 30, 2023.

21       What the Debtors have focused on as a potential point of

22  contention is that that same provision goes on to say,

23  "Malibu will provide Dealer with a new agreement or notice of

24  non-renewal or termination reasonably in advance of the

25  expiration of the agreement."

1    However, it then picks up with additional language that

2    says, "Nothing in this agreement (including provisions or

3    projections dealing with future performance goals or

4    requirements for periods beyond the term of this agreement)

5    shall be construed to create a promise, representation, or

6    agreement of a continuing relationship beyond the term of

7    this agreement, and this agreement shall be deemed

8    terminated, null and void, if no new agreement is signed,

9    except as to any provisions which expressly continue beyond

10   the term of this agreement."

11   Okay. So the Debtors seem particularly perplexed by this

12   provision, although it's pretty standard.

13   And let me just note, I'm going to take a little side

14   note here. This agreement, and I assume that if all the

15   other ones were substantially in conformity with that, have a

16   choice a law provision that Tennessee law will apply. And I

17   did take a quick look at basic Tennessee contract principles,

18   which of course are, frankly, consistent with Texas contract

19   principles.

20   And so, for considering these provisions, and other

21   provisions which we'll get to, I considered, among other

22   cases, the *Maggart v. Almany Realtors, Inc.* case. It's at

23   259 S.W.3d 700. It's a Tennessee Supreme Court opinion in

24   2008, where the Tennessee Supreme Court -- and I should note,

25   obviously, in terms of in evaluating contractual disputes, a

bankruptcy court is to be guided by applicable nonbankruptcy law in considering those issues. So, hence, that's why I'm looking at Tennessee law.

But the Supreme Court of Tennessee notes that the cardinal rule for interpretation of contracts is obviously to ascertain the intention of the parties and to give effect to that intention, consistent with legal principles.

It goes on to note that if the language of the contract is clear and unambiguous, the literal meaning controls the outcome of the dispute. In such a case, the contract is interpreted according to its plain terms as written and the language used is taken in its plain, ordinary, and popular sense.

The interpretation should be one that gives reasonable meaning to all of the provisions of the agreement, without rendering portions of it neutralized or without effect.

And they simply note here that ambiguity does not arise in a contract merely because the parties may differ as to interpretations of certain of its provisions. A contract is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one.

And then concludes, as it's talking about basic principles, that the court will not use a strained construction of the language to find an ambiguity where none exists.

1    So, with all of that in mind, what Paragraph 2 is clearly

2 indicating, or what I find the parties' intentions were, is

3 that the agreement would start on the effective date, as

4 noted on Page 1, and would expire and terminate as set forth

5 on Exhibit 1 unless earlier terminated.  And we know Exhibit

6 1 indicates that, at the latest, June 30 is the expiration

7 date.

8    Obviously, Malibu had an obligation to provide notice,

9 which, for obvious reasons, as evidenced by this case, was

10 necessary and appropriate, because if we're going to have

11 negotiations lingering on into the post-expiration period, if

12 that notice of non-renewal or termination has not been

13 provided, that is opening the door wide open to fraudulent

14 inducement claims, to promissory estoppel claims, to all

15 kinds of things on account of the failure to provide notice.

16    But that does not negate the fact that, by the plain

17 terms of the agreement, it expired and terminated as of the

18 expiration date.

19    Now, the Debtors' highlighting of this language that

20 comes later as suggesting that it somehow confuses

21 everything, I just don't find to be a valid argument.  What

22 the balance of the language is saying is simply that nothing

23 in the agreement is to be construed as a promise,

24 representation, or agreement of a continuing relationship

25 beyond the term of the agreement, and that once it's

1  terminated the agreement is done and it's null and void,

2  except to the extent that a separate provision within the

3  agreement makes it expressly clear that that provision will

4  have continuing vitality post-termination/post-expiration.

5  Okay?

6      That provision also goes on, by the way, to say, "Any

7  payment or performance following the expiration or

8  termination of this agreement will not be construed as a

9  renewal or extension of the term of this agreement, but as

10  independent and separate transactions terminable at will by

11  Malibu."

12      So it is clear that, while someone may feel that it's

13  unfair to sort of continue to conduct business post-

14  expiration, sort of feels like maybe you're being led on,

15  this provision says, Don't be led on; if we continue to do

16  business, it's to be treated as a separate and independent

17  transaction on the terms that we're working under with

18  respect to those transactions.

19      Now, with respect to this language about an exception,

20  that there may be certain provisions that provide for

21  continuing vitality notwithstanding expiration or

22  termination, I just want to highlight a couple of those to

23  illustrate it.

24      We have, for example, in Paragraph 7 of the agreement, it

25  relates to confidential information that is shared during the

1  dealership relationship.  Obviously, once that information is

2  shared, kind of the cat's out of the bag, if you will.  So,

3  naturally, Malibu included as the last sentence of that

4  provision the following language.  And this is in the

5  confidential information provision.  "These obligations

6  relating to the confidential information shall remain in

7  effect indefinitely, including after the termination or

8  expiration of this agreement."

9      Similarly, in Paragraph 8 relating to trademarks and

10  copyrighted materials and what have you of Malibu, the final

11  sentence of the provision states, "These obligations relating

12  to the special property" -- which is the same kind of

13  copyrighted and trademarked stuff -- "shall remain in effect

14  indefinitely, including after the termination or expiration

15  of this agreement."

16      That's what Paragraph 2 is referring to, is that, there,

17  where the agreement expressly states post-termination, post-

18  expiration, these obligations will continue, and the parties

19  by signing the agreement evidence their understanding that

20  they will continue, then they will continue, notwithstanding

21  the fact that, upon expiration or termination of the

22  agreement, the agreement otherwise is done and is deemed null

23  and void.

24      Now, the interesting provision, and kind of one of the

25  reasons I'm going through this, because you already kind of

1  know where I've gone in terms of where I'm deciding this, but

2  there seems to be a huge amount of confusion with respect to

3  Paragraph 6.  Because Paragraph 6 is somewhat of an odd

4  provision.  So let's start at the end.  Because Paragraph 6

5  has Subdivisions (a) through (h).  Okay.  And in the first

6  part of (h), the parties agree that the restrictions and

7  policies within that Section 6 are reasonable and for their

8  mutual benefit.

9      And then the final sentence says, "These restrictions

10  shall apply during the term of this agreement and for a

11  period of 24 months thereafter."  So if this agreement, for

12  example, Debtors' Exhibit 1, expired on June 30, 2023, then

13  for two years thereafter -- *i.e.*, through June 30, 2025 --

14  they would be in play.  And the parties agreed to that.

15      So let's talk about some of these things.  We have,

16  interestingly, in Subpart (b) -- because I asked Mr. Shapiro

17  specifically if he agreed that all of these provisions were

18  still applicable through the 24 months.  In Paragraph (b),

19  the language states the following:  "Dealer shall identify

20  itself as a Malibu dealer at its approved store locations,

21  and shall maintain a dealer-specific website prominently

22  promoting and advertising Malibu's products."

23      So that is curious, because then we have in Paragraph

24  13(e) of the same agreement language that says, "Upon the

25  effective date of any termination or expiration of this

1    agreement, Dealer shall immediately cease to hold itself out

2    as a Malibu dealer or a dealer of the products and shall

3    discontinue the use of all trademarks, trade names," et

4    cetera, et cetera.

5        Those two provisions conflict.  And I agree that with

6    respect to those two provisions we have ambiguity.  And in

7    that regard, kind of going back to considering the terms of

8    agreements, we also have the Tennessee Supreme Court's

9    decision in *Teter v. Republic Parking System, Inc.*, 181

10   S.W.3d 330.  It's a 2005 Tennessee Supreme Court opinion that

11   on Page 342 just notes the unremarkable proposition that all

12   provisions in a contract should be construed in harmony with

13   each other, if possible, to promote consistency and to avoid

14   repugnancy between the various provisions of a single

15   contract.

16       And then we have, in *Allmand v. Pavletic*, 292 S.W.3d 618,

17   another Tennessee Supreme Court opinion from 2009, on Page

18   628 there is a short reference to the fact that specific

19   provisions control over more general ones.  And also we have

20   the Tennessee Supreme Court's similar notation, albeit in a

21   different context, that in construing statutory language, for

22   example, when there is an ostensible conflict -- and, again,

23   this is *Martin v. Powers*, 505 S.W.3d 512, a 2016 opinion, on

24   Page 524 -- that in the event of conflict in statutory

25   language, specific statutory provisions control over general

1   provisions.

2        So, with that in mind, and considering these provisions

3   of this agreement, it would appear to me that Section 13(e)

4   represents a general provision, making it clear that, as a

5   general proposition, once the agreement has terminated or

6   expired, the dealer shall cease holding itself out as a

7   Malibu dealer or a dealer of the products.

8        However, what Paragraph 6 seems to suggest is -- and this

9   sort of dovetails with this concept that people are

10  negotiating things post-expiration, where there might be a

11  period of time when things are continuing to work itself

12  along, what are we doing with the fact that we've got a

13  dealer who's got all these products still onsite but yet we

14  have a dealership agreement that has expired?  Paragraph 6

15  makes it clear it doesn't matter that it's expired.  For at

16  least a 24-month period, here's how we're going to deal with

17  things.  Number one, with respect to your products, you're

18  going to identify yourself as a Malibu dealer with respect to

19  those products.  Number two, you're not going to advertise,

20  which means going out to the public, not a specific

21  negotiation with a customer, but going out to the public and,

22  like, putting in newspapers or putting on the, you know,

23  Channel 8 at night, you're not going to advertise the price

24  for any new products -- which query whether we even have any

25  of that with the Debtors because we don't have any model year

1   2024, I would assume.  Or maybe we do, because there were

2   some acquisitions as negotiations were still going on.  But

3   there won't be any advertising for any new products -- oh,

4   I'm sorry, it does go on to make it clear -- for current and

5   immediately-prior model years, except as expressly authorized

6   by Malibu.

7       And so, I mean, and that's for obvious reasons, right?

8   It's to make sure -- because as the new products roll out,

9   you don't want to have the dealers undercutting the pricing

10  that Malibu is trying to establish with respect to these

11  newer products.  Once it gets aged, then it's, okay, we need

12  to move it off the floor.  But as to the newer stuff, Malibu

13  needs to have some price controls.

14      That said, we're talking about outward talking to the

15  public.  If somebody comes onsite, the provision goes on to

16  make it crystal clear:  This restriction shall not, however,

17  restrict or prohibit Dealer from communicating a proposed

18  price for a product to individual prospective customers.

19      In other words, once they're onsite, fine, you can sell

20  it for whatever you want.  We just don't want public -- we

21  don't want conflicting messaging, basically, to the public

22  through advertising.

23      And that is further made clear in Part (g) of Section 6,

24  which states that the dealer acknowledges that this agreement

25  does not restrict, hinder, or impair dealer's decision as to

1  the retail price at which any product may be sold, and that

2  final sales price of any product remains within the dealer's

3  sole discretion and control.

4  So, again, the point is you could sell it for whatever

5  you want.  You just can't advertise it out there if it falls

6  within this new product for the current and immediately-prior

7  year inconsistent with Malibu's pricing.  Okay.

8  So, with all of that said, I do want to talk a little bit

9  about course of conduct, because there was the argument that,

10  by continuing to engage in this process of negotiating, that

11  that was, even though the agreement says what it says, that

12  there was course of conduct that overrode the agreement and

13  effectively amended the agreement to provide for the

14  continuing vitality of the 2023 dealership agreements.

15  And once again, I may need to go grab my notes.  One

16  moment.

17  (Pause.)

18  THE COURT:  All right.  The long and short of it is

19  that, based upon the evidence that was introduced, I do not

20  find that there was a course of conduct which rose to the

21  level of effectively an amendment to the 2023 dealership

22  agreements to modify the term language.

23  And in that regard, I'll just note that it appears clear

24  to me, just summarizing first and then getting to specifics,

25  that the dealership negotiations soured or were at least

hampered between the Debtors and Malibu by virtue of the fact
that we very quickly had some unpaid inventory that caused
Malibu to become upset, which needed to be resolved before
they were really seriously going to get down to business.
Some of that, of course, can be attributed -- the Debtors
attribute to the strong-arming of Malibu to take on more
product.  But either way, clearly, we had unpaid product.

Then we had the situation arise where Malibu became aware
of the fact that the Debtor was SOT, the Debtors were SOT,
and Malibu became concerned because they can't have a
situation where we've got -- because, again, understand,
floorplan financing is very specific.  Product comes on the
floor and it does need to be paid off, effectively, as those
product move, to make sure that the financing arrangement
isn't getting stilted.

So, once the SOT situation gets resolved, we still have
this continuing unpaid $6 million issue.  Finally, that ends
up getting resolved, but then we're so far late into the year
that nobody is particularly interested in I think unringing
the bell that we're so far into the year.  Plus, I think that
there was probably other issues going on, frankly.

But to make things worse, heading into early 2024, Malibu
catches wind of the fact that M&T had declared default
against the Debtors.  And then it was at that point, frankly,
for all practical matters, all over, and the discussion

turned into, well, we're happy to talk to you about 2025 but we're not going to talk about 2024 anymore.

So, in that regard, we had a September 11, 2023 internal email, it appears like an internal email at Malibu at Exhibit 10 from Mr. Springer to it looks like some of his team members, that this SOT situation is a terrible situation and that -- basically communicating no dealership agreements can be done until that issue is resolved.

October 13, 2023, we have a follow-up Springer email indicating also that the $6 million issue has to be resolved as well, and then the 2024 dealership agreements can be focused on. That's at Exhibit 20.

Shortly thereafter, on October 18, 2023, we have indication that the SOT situation was resolved. That's at Exhibit 19.

Then the question is, okay, well, so where are we? November 9, 2023, we have correspondence from Malibu just confirming the fact, among other things, that the 2023 agreements have expired.

On January 17, 2024 -- and I'm sorry if I didn't say; that's Malibu Exhibit A. We have Exhibit 9, which is January 17, 2024 emails between Mr. Borisch and Mr. Springer indicating that this SOT situation and the unpaid $6 million purchase has thrown everything off of what would be a normal renewal or reentry negotiation with respect to the

1     agreements. And this, in part, kind of had to deal with

2     trying to deal with M&T as well and whether or not they're

3     going to do a repurchase agreement. Understandably, they're

4     not going to agree to repurchase inventory when we have an

5     SOT situation, because then you don't know who's on first,

6     what's on second, and you're potentially acquiring encumbered

7     -- repurchasing encumbered collateral and it becomes a

8     cluster.

9         We have February 2024, Exhibit 22, correspondence from

10    Malibu emphasizing again that there's no agreements and that

11    we're shifting gears to 2025 at this point.

12         We have, on February 27, 2024, as evidenced by Exhibit

13    43, the M&T default letter to the Debtors.

14         We have a March 11, 2024 Malibu letter, that's Exhibit

15    45, indicating that the Tommy's Fort Worth dealership

16    agreement is terminated.

17         We have the March 22, 2024 Malibu letter at Exhibit 46

18    confirming the expiration, or termination, as applicable, of

19    all prior agreements.

20         And then I just also noted to see also Exhibit 47, which

21    is the verified complaint filed by the Debtors against

22    Malibu, which indicates or is at least indicative of the fact

23    that they understood that, from Malibu's perspective, at

24    least, everything had been terminated or expired.

25         Now, on the flip side, we do have some indication of what

1    exactly are they doing here.  Because we have, throughout

2    this whole period, multiple boat sales to the Debtors, which

3    is evidenced by Exhibit 23, which extended up through the

4    time of deliveries into March 2024.  And we had throughout

5    the time frame multiple boat shows where, with Malibu's

6    consent, the Debtor is showing up as a dealer for Malibu and

7    helping to promote Malibu products.  And that's evidenced by

8    Exhibit 24.

9        It may well be -- and I will tell you, I don't have to

10   make this determination today -- but it may well be that that

11   conduct, in continuing to transact business and what have

12   you, may well have created a dealership arrangement between

13   Malibu and the Debtors, albeit not under the 2023 agreement.

14   Because I think that the 2023 agreement is crystal clear

15   that, once it's expired, it's expired.  And it makes clear in

16   Paragraph 2 that any payment or performance following

17   expiration or termination will not be construed as a renewal

18   or extension of this agreement but as independent and

19   separate transactions.

20       Well, so like I said, that may well be that there is a

21   separate dealership arrangement that was effectively orally

22   agreed upon as part of this course of conduct between the

23   parties.  The challenge that I have here is that, because

24   this is an emergency hearing and it is very pinpointed and

25   specific, the request in front of me is to enjoin Malibu from

performing under any separate dealership agreement that it
may have entered into with a competitive dealer that involves
the same dealer area under the terms the 2023 agreements,
enjoining Malibu from entering into any new dealership
agreement.  Like, so any one that they've already done,
enjoin them from performing thereunder.  Enjoin them from
entering into any new agreement that would tread into a
dealer area under a 2023 agreement, and enjoin them from
shipping or delivering any boats to any competitor within the
dealer area, in violation of the 2023 agreement.

The problem with the Debtors' argument is that, in each
of those cases, Paragraph 1 of the 2023 agreements is no
longer in force and effect because that provision has
expired.  And unlike Paragraph 6, which expressly makes those
provisions applicable for a 24-month period, and unlike
Paragraph 7 and 8 of the agreement that provide for the
continuing enforceability of those provisions indefinitely,
Paragraph 1 includes no such provision, and once the
agreement has expired, it's done.  It's null and void.

So, based upon the specific way in which the request for
relief has been made, I'm going to deny the Stay Enforcement
Motion.

And that will conclude the Court's ruling on the matters
before the Court today, and I appreciate everybody's
attendance in connection with these matters, and again

1    apologize that we got started a little late.

2       The Court will enter orders on these two matters that

3    will just simply incorporate by reference the oral ruling, so

4    the parties don't need to do anything.

5       That will conclude our 2:30 docket.  The Court will be in

6    recess.

7       (Conclusion of proceedings at 4:16 p.m.)

8                            --oOo--

9

10

11

12

13

14

15

16

17

18

19

20                        CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
     above-entitled matter.

22     **/s/ Kathy Rehling**                        **06/08/2024**

23

24   _____        _____
     Kathy Rehling, CETD-444                          Date
25   Certified Electronic Court Transcriber

INDEX

PROCEEDINGS                                    3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS                                        3

END OF PROCEEDINGS                            45

INDEX                                         46

# Exhibit 6



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 9, 2024**

_____

**United States Bankruptcy Judge**

_____

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| TOMMY'S FORT WORTH, LLC, *et al.*,[1] | § | Case No. 24-90000 |
| | § | |
| Debtors. | § | (Jointly Administered) |

### ORDER DENYING DEBTORS' EMERGENCY
### MOTION TO ENFORCE AUTOMATIC STAY

On June 3, 2024, the Debtors filed the *Debtors' Emergency Motion to Enforce Automatic Stay and Punitive Damages for Willful Violations of the Automatic Stay Against Malibu Boats, Inc. and Malibu Boats, LLC* [Docket No. 107] (the "**Stay Enforcement Motion**") to request certain relief against Malibu Boats, Inc. and Malibu Boats, LLC (collectively, "**Malibu**"). On June 6, 2024, Malibu filed *Malibu Boats, Inc.'s and Malibu Boats, LLC's Objection to Debtors' Emergency Motion to Enforce Automatic Stay and Punitive Damages for Willful Violations of the Automatic Stay* [Docket No. 126].

On June 6, 2024, the Court conducted an emergency hearing on the Stay Enforcement Motion. At the conclusion of the hearing, the Court took the matter under advisement, setting a hearing for June 7, 2024, to render a ruling. Accordingly, on June 7, 2024, after having considered

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Tommy's Fort Worth, LLC (3473); Tommy's Holding Company, LLC (2662); Tommy's Gran Rapids, LLC (9224); Tommy's Castaic, LLC (7501); Tommy's Lewisville, LLC (4750); High Country Watersports, LLC (6160); Walloon Lake Village Marina, LLC (0277); MKB Florida Holdings, LLC (5698); Tommy's Detroit, LLC (5242); Tommy's California Fresno, LLC (8597); Tommy's Phoenix, LLC (3036); Tommy's Las Vegas, LLC (7721); Tommy's Chattanooga, LLC (0839); Tommy's California Ventura, LLC (5149); Tommy's Rancho Cordova, LLC (1070); Tommy's Stockton, LLC (1338); and Tommy's Knoxville, LLC (8052).

the Stay Enforcement Motion, the Malibu objection, the evidence introduced, the representations and arguments of counsel, and the record in these proceedings, the Court orally issued its findings of fact, conclusions of law, and ruling (collectively, the "**Ruling**").  Based upon the Ruling, which is incorporated herein by reference, it is hereby:

**ORDERED** that the Stay Enforcement Motion is DENIED.

# # #   END OF ORDER   # # #